**SANJIV N. SINGH, APLC**
Sanjiv N. Singh (State Bar No. 193525)
ssingh@sanjivnsingh.com
1700 South El Camino Real, Suite 503
San Mateo, CA 94402
Telephone: (650) 389-2255

**BURNS CHAREST LLP**
Darren P. Nicholson (*pro hac vice*)
dnicholson@burnscharest.com
Hannah M. Crowe (*pro hac vice*)
hcrowe@burnscharest.com
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA MARIA MARCELA TAVANTZIS, as an individual, and as Legal Guardian of JESUS PLASENCIA, an incapacitated person,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | Case No.: 5:23-cv-05607-NW-SVK<br><br><br>**PLAINTIFFS' TRIAL BRIEF** |

# TABLE OF CONTENTS

I. Introduction..................................................................................................1

II. The Montreal Convention was Created to Improve Passenger Rights.............3

III. The Supreme Court's Interpretation of the Montreal Convention Controls. ..................................................................................................................4

    A. Under Article 17, the Definition of "Accident" Is Flexibly Applied to Protect Passengers Like Mr. Plasencia.............................................................4

    B. Under Article 21, to Avoid the Presumption of Liability American Must Prove It Was Not Negligent or that a Third-Party's Sole Negligence Caused Mr. Plasencia's Injuries. ...............................................................6

    C. Under Article 20, to Be Wholly or Partially Exonerated American Must Prove Mr. Plasencia was Contributorily Negligent. ........................................7

    D. Defenses Under Articles 20 and 21 Are, by Definition, Mutually Exclusive. ...................................................................................................8

IV. The Evidence Will Show Several Article 17 Accidents Occurred on Flight 68. ...........................................................................................................9

    A. American Airlines Unexpectedly and Unusually Failed to Follow Airline Protocol When Confronted with Mr. Plasencia's Stroke Symptoms at the Gate in Miami.................................................................9

    B. American Airlines Unexpectedly and Unusually Failed to Inform the Flight Deck of Mr. Plasencia's Worsening Condition Inflight, Precluding Diversion Within the Stroke Treatment Window.......................12

    C. These Accidents Were Causal Links in the Chain of Events Resulting in Mr. Plasencia's Injuries...........................................................................15

V. Conclusion. ....................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Air France v. Saks*, 470 U.S. 392 (1985) ....................................................................... 4, 5, 6

*Carlson v. Wald*, 151 Cal. App. 3d 598 (1984) ..................................................................... 8

*Doe v. Ethiad Airways, P.J.S.C.*, 870 F.3d 406 (6th Cir. 2017) ............................................ 7

*Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530 (1991) ........................................................ 3, 8

*Fulop v. Malev Hungarian Airlines*, 175 F. Supp. 2d 651 (S.D.N.Y. 2001) ......................... 3

*Husain v. Olympic Airways*, 116 F. Supp. 2d 1121 (N.D. Cal. 2000) ............................. 1, 8

*Husain v. Olympic Airways*, 316 F.3d 829 (9th Cir. 2002) .................................................. 5

*Kruger v. United Airlines, Inc.*, 481 F. Supp. 2d 1005 (N.D. Cal. 2007) .............................. 8

*Kwon v. Singapore Airlines*, 356 F. Supp. 2d 1041 (N.D. Cal. 2003) .................................. 8

*Mansour v. British Airways PLC*, 2020 WL 1847750 (W.D. Wash. Apr. 13, 2020) ........... 7

*McCaskey v. Continental Airlines, Inc.*, 159 F. Supp. 2d 562 (S.D. Tex. 2001) ................... 5

*Narayanan v. British Airways*, 747 F.3d 1125 (9th Cir. 2014) ............................................ 3

*Olympic Airways v. Husain*, 540 U.S. 644 (2004) ....................................................... 4, 5, 6, 7

*Phifer v. Icelandair*, 652 F.3d 1222 (9th Cir. 2011) ............................................................ 4

*Sensat v. Southwest Airlines Co.*, 363 F. Supp. 3d 815 (E.D. Mich. 2019) .......................... 7

*Smith v. American Airlines, Inc.*, 2009 WL 3072449 (N.D. Cal. Sept. 22, 2009) ................ 3

*Wallace v. Korean Air*, 214 F.3d 293 (2d Cir. 2000) ........................................................... 6

**Other Authorities**

The Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal May 28, 1999, S. TREATY DOC. NO. 106-45 ........................... 1, 3, 4, 7, 8

Plaintiffs Ana Maria Marcela Tavantzis, as an individual, and as Legal Guardian of Jesus Plasencia, an incapacitated person (collectively "Plaintiffs") file this Trial Brief and respectfully show the Court as follows:

## I.    Introduction.

The trial of this case involves the enforcement of critically important protections afforded to all international passengers under the Montreal Convention. As this Court recognized twenty-five years ago, "[w]hen a passenger enters a commercial flight, he surrenders a certain level of freedom—freedom of movement, of expression and of choice—**in return for a promise of safety and comfort**." *Husain v. Olympic Airways*, 116 F. Supp. 2d 1121, 1143 (N.D. Cal. 2000) (emphasis added). Accordingly, the Montreal Convention consists of a series of policy trades. On the one hand, international air carriers are provided with very specific and extraordinarily generous liability protections. Even in instances of profound human tragedy where many lives are lost, air carriers are protected from any passenger claim for punitive damages. On the other hand, passengers are expressly provided extra protections that expand the scope of ordinary liability. Air carriers are governed by a modified strict liability regime and are required to maintain adequate insurance to cover the expanded liability. Montreal Convention art. 50.

As this case aptly demonstrates, while American Airlines, Inc. ("American") enjoys the significant benefits of the Montreal Convention, it is incredulous when passengers seek the full benefit of its protections. Despite the Supreme Court's mandate that the definition of an Article 17 "accident" causing a passenger injury should be "flexibly applied," American attempts at every turn to warp this definition into an impossible hurdle for any Montreal Convention plaintiff to overcome.

The evidence in this trial will establish that American Airlines' personnel observed (and documented) Jesus Plasencia suffering very clear warning signs of a stroke before and shortly after takeoff from Miami. The evidence will show that the "warning signs" of a stroke are neither mysterious nor difficult to observe. This is why, for example, the

Centers for Disease Control,[1] the American Stroke Association,[2] and numerous international organizations[3] have engaged in a decades-long public awareness campaign[4] to encourage the public to "Act F.A.S.T." when presented with these warning signs.[5]



Consistent with this campaign, the evidence will show that American Airlines <u>expressly</u> incorporated stroke guidance into its Inflight Manual governing all flight personnel, trained its flight attendants about these warning signs, and created bright-line rules for flight attendants to follow whenever they were observed. These rules included,

---

[1] *Signs and Symptoms of Stroke*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/stroke/signs-symptoms/index.html.

[2] *World Stroke Day*, AM. STROKE ASS'N, https://www.stroke.org/en/about-the-american-stroke-association/world-stroke-day.

[3] *PHE encourages people to act FAST if they experience stroke symptoms*, PUB. HEALTH ENGLAND, https://assets.publishing.service.gov.uk/media/5a80dc71ed915d74e33fcd3a/Stroke_press_release_020215.pdf.

[4] *Every 40 Seconds a Stroke Occurs in the United States*, PR NEWSWIRE (Jan 23. 2013), https://www.prnewswire.com/news-releases/every-40-seconds-a-stroke-occurs-in-the-united-states-188020071.html.

[5] *F.A.S.T. is how we come together to end* stroke, AM. STROKE ASS'N (2022), https://www.stroke.org/-/media/Stroke-Files/FAST-Resources/FAST-Infographic.pdf.

at a minimum, informing other flight personnel and the flight deck about the observations. While American claims that it follows its Inflight Manual and takes these rules seriously, the evidence in this case will show, unequivocally, that these rules were not followed.

The failure of the flight crew on Flight 68 to follow American Airlines' policies and procedures was "unusual and unexpected" because "[t]he ordinary traveler reasonably would expect that . . . in handling life-threatening exigencies, airlines rendering services as common carriers would be particularly scrupulous and exacting in complying with their own industry norms, internal policies and procedures, and general standards of care." *Fulop v. Malev Hungarian Airlines*, 175 F. Supp. 2d 651, 665 (S.D.N.Y. 2001). In this case, the failure caused a catastrophic delay in Mr. Plasencia receiving standard, life altering, stroke treatment—the very result the "Act F.A.S.T." campaign and American's policies and procedures were designed to prevent.

Plaintiffs respectfully submit the evidence in this case will demonstrate that their claims fall squarely within the "accident' protections of the Montreal Convention and look forward to receiving the jury's verdict.

## II. The Montreal Convention was Created to Improve Passenger Rights.

The Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal May 28, 1999, is a treaty that governs the international carriage of people and cargo. S. TREATY DOC. NO. 106-45 (hereinafter "Montreal Convention").

When it went into effect in 2003, the Montreal Convention superseded the Warsaw Convention and its various amendments and intercarrier agreements. *Smith v. American Airlines, Inc.*, 2009 WL 3072449, at *2 (N.D. Cal. Sept. 22, 2009) (describing historical background of the Convention). The primary purpose of the preceding Warsaw Convention was to limit the liability of air carriers "'in order to foster the growth of the fledgling commercial aviation industry.'" *Narayanan v. British Airways*, 747 F.3d 1125, 1132 (9th Cir. 2014) (Pregerson, J. dissenting) (quoting *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 546 (1991)). Because the aviation industry was no longer fledgling in the late 1990s, the Montreal Convention was meant to improve upon the Warsaw

Convention's "meager and arbitrary limits" on carrier liability to provide for more meaningful passenger recovery. *See* Ex. A, Letter of Transmittal, S. TREATY DOC. NO. 106-45, V. The Montreal Convention "represent[ed] a vast improvement over the liability regime established under the Warsaw convention and its related instruments, relative to passenger rights in the event of an accident." *Id.* at III. But carriers like American still reap significant benefits from the Convention, including being governed by a single liability regime that includes a two-year statute of limitations and a complete bar against punitive, exemplary, and other non-compensatory damages. Montreal Convention arts. 29, 35.

### III. The Supreme Court's Interpretation of the Montreal Convention Controls.

#### A. Under Article 17, the Definition of "Accident" Is Flexibly Applied to Protect Passengers Like Mr. Plasencia.

Article 17 of the Montreal Convention provides:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Montreal Convention art. 17(1). The Supreme Court defines "accident" under Article 17 as "'an unexpected or unusual event or happening that is external to the passenger.'" *Olympic Airways v. Husain*, 540 U.S. 644, 651 (2004) (quoting *Air France v. Saks*, 470 U.S. 392, 405 (1985)).[6] "[T]he definition of accident 'should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries.'" *Id.* (quoting *Saks*, 470 U.S. at 405). The Supreme Court emphasizes that "for purposes of the 'accident' inquiry, . . . a plaintiff need only be able to prove that 'some link in the chain was an

---

[6] Even though the Montreal Convention replaced the Warsaw Convention, it "incorporates many of" its predecessor's substantive provisions. *Narayanan*, 747 F.3d at 1127 n.2. "Accordingly, in interpreting the Montreal Convention, courts have routinely relied upon Warsaw Convention precedent where the equivalent provision in the Montreal Convention is substantively the same." *Id.* (citing *Phifer v. Icelandair*, 652 F.3d 1222, 1224 n.1 (9th Cir. 2011)).

unusual or unexpected event external to the passenger.'" *Id.* at 652 (quoting *Saks*, 470 U.S. at 406).

For example, in *Husain,* a passenger who suffered from asthma and was sensitive to secondhand smoke asked to be reseated away from the smoking section. *Id.* at 647–48. In violation of airline policy, the flight attendant refused, and the passenger suffered a severe asthma attack and died. *Id.* In holding this conduct constituted an Article 17 accident, the Court rejected the air carrier's focus on the expected cigarette smoke as the "injury producing event," emphasizing instead that "there are often multiple interrelated factual events that combine to cause any given injury." *Id.* at 653, 657 (emphasis added). "[A]ny one of these factual events or happenings may be a link in the chain of causes and—so long as unusual or unexpected—could constitute an 'accident' under Article 17." *Id.* at 653 (citing *Saks*, 470 U.S. at 406). Applying these principles, the Court determined that the "exposure to the smoke and the refusal to assist the passenger are happenings that both contributed to the passenger's death." *Id.* at 654 (emphasis added).

The *Husain* Court accepted that the flight attendant's conduct was unexpected and unusual because the carrier did not challenge the district court's finding that the flight attendant's conduct "was unusual or unexpected in light of the relevant industry standard or [the carrier's] own company policy." *Id.* at 652 (citing *Husain*, 116 F. Supp. 2d at 1133); *see also id.* at 657 (quoting *Husain v. Olympic Airways*, 316 F.3d 829, 837 (9th Cir. 2002)) ("[N]o party disputes the Ninth Circuit's holding that the flight attendant's conduct was 'unexpected and unusual[.]'"). The *Husain* Court also recognized that inaction can constitute an unexpected or unusual event or happening when the inaction is contrary to industry standards or airline policy. *Id.* at 656 (citing *McCaskey v. Continental Airlines, Inc.*, 159 F. Supp. 2d 562, 574 (S.D. Tex. 2001)).

To prove accident at trial, Plaintiffs must show that an unexpected or unusual event or happening external to Mr. Plasencia was a link in the causal chain of events that led to his injuries. *See Husain*, 540 U.S. at 653; *Saks*, 470 U.S. at 405–06. Under the Supreme Court's binding *Husain* precedent, failure to follow airline industry standards or

5

PLAINTIFFS' TRIAL BRIEF
CASE NO.: 5:23-cv-05607-NW-SVK

American's own policies and procedures can constitute an unexpected or unusual event or happening. *See Husain*, 540 U.S. at 656. Prior briefing by American suggested Plaintiffs must demonstrate a "major" or "significant" deviation from industry standards or American's policies and procedures to prove "accident." This is wrong and defies the Supreme Court's repeated mandate that the definition of accident be <u>flexibly applied</u>. *See Husain*, 540 U.S. at 646; *Saks*, 470 U.S. at 405. This flexible definition "did not thereby authorize courts to add more hurdles for a plaintiff to overcome." *Wallace v. Korean Air*, 214 F.3d 293, 300 (2d Cir. 2000) (Pooler, J. concurring). Simply put, imposing additional requirements to the definition of accident "does not comport with the plain meaning of *Saks*" and *Husain*. *See id.* (emphasis added).

  **B.**  **Under Article 21, to Avoid the Presumption of Liability American Must Prove It Was <u>Not</u> Negligent or that a Third-Party's <u>Sole</u> Negligence Caused Mr. Plasencia's Injuries.**

Article 21 establishes the compensation framework in the case of death or injury of a passenger. "For damages arising under paragraph 1 of Article 17 not exceeding [128,821][7] Special Drawing Rights for each passenger, the carrier shall not be liable to exclude or limit its liability." Montreal Convention art. 21(1). Article 21(2) addresses damages in excess of 128,821 SDR:

> The carrier shall not be liable for damages arising under paragraph 1 of Article 17 to the extent that they exceed for each passenger [128,821] Special Drawing Rights in the carrier proves that:
>
>  (a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or

---

[7] The Special Drawing Right is an international reserve asset with a value based on a basket of five international currencies. *Special Drawing Rights (SDR)*, INTERNATIONAL MONETARY FUND, https://www.imf.org/en/About/Factsheets/Sheets/2023/special-drawing-rights-sdr. When adjusted for inflation, the current limit is 128,821 SDR. *2019 Revised Limits of Liability Under the Montreal Convention of 1999*, ICAO, https://www2023.icao.int/secretariat/legal/Pages/2019_Revised_Limits_of_Liability_Under_the_Montreal_Convention_1999.aspx.

>    (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

*Id.* art. 21(2). Once a plaintiff proves the occurrence of an Article 17 accident, the Montreal Convention "creates a <u>presumption of air carrier liability</u> and shifts the burden to the air carrier to prove lack of negligence." *Husain*, 540 U.S. at 649 n.5 (emphasis added); *see also Mansour v. British Airways PLC*, 2020 WL 1847750, at *3 (W.D. Wash. Apr. 13, 2020) ("The burden of proving non-negligence is on Defendants."). "The Montreal Convention imposes strict liability for injuries" and "[a]bove that strict-liability limit, a carrier remains liable for all damages sustained, with no limit," unless the carrier proves it was <u>not</u> negligent or the injuries were caused by the <u>sole</u> negligence of a third party. *Sensat v. Southwest Airlines Co.*, 363 F. Supp. 3d 815, 818 (E.D. Mich. 2019) (internal quotation marks omitted) (quoting *Doe v. Ethiad Airways, P.J.S.C.*, 870 F.3d 406, 422–23 (6th Cir. 2017)).

### C. Under Article 20, to Be Wholly or Partially Exonerated American Must Prove Mr. Plasencia was Contributorily Negligent.

Article 21(1) makes "the carrier 'strictly' liable" for damages not exceeding 128,821 SDR "subject only to an exoneration defense under Article 20." S. TREATY DOC. 106-45, at 12. Article 20 provides:

> If the carrier proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of <u>the person claiming compensation</u>, or the person from whom he or she derives his or her rights, the carrier shall be wholly or partly exonerated from its liability to the claimant to the extent that such negligence or wrongful act or omission caused or contributed to the damage. When by reason of death or <u>injury of a passenger compensation is claimed by a person other than the passenger</u>, the carrier shall likewise be wholly or partly exonerated from its liability to the extent that it proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of <u>that passenger</u>. This Article applies to all the liability provisions in this Convention, including paragraph 1 of Article 21.

Montreal Convention art. 20 (emphasis added). While the Montreal Convention uses the word "contributed," the exoneration provision operates as a <u>comparative</u> negligence scheme. *See Etihad Airways*, 870 F.3d at 423; *see also Kwon v. Singapore Airlines*, 356

F. Supp. 2d 1041, 1047 (N.D. Cal. 2003) (citing *Husain*, 116 F. Supp. 2d at 1141) (noting that Warsaw Convention analog of Article 20 "is in the nature of comparative negligence, rather than a traditional contributary negligence standard").

Here, American may wholly or partly exonerate its liability to Plaintiffs "to the extent that" Mr. Plasencia's "negligence or wrongful act or omission caused or contributed to the damage" he suffered as an injured passenger. Montreal Convention art. 20. Under the Montreal Convention, a passenger who is physically injured—like Mr. Plasencia—may recover for physical injury and emotional distress flowing from physical injury. *See, e.g.*, *Kruger v. United Airlines, Inc.*, 481 F. Supp. 2d 1005, 1009 (N.D. Cal. 2007). Passengers who are not physically injured yet suffer from emotional trauma—like Ms. Tavantzis—do not have claims under the Montreal Convention. *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 552 (1991). When permitted by state law, however, the Montreal Convention permits spouses and other family member to assert claims for loss of consortium caused by a passenger's death or physical injury. *Kruger*, 481. F. Supp. 2d at 1009 (establishing that loss of consortium is cognizable under Montreal Convention when permitted by state law). Accordingly, Ms. Tavantzis's spousal claim in this case emanates from California state law, not by the incidental fact that she was also a passenger on Flight 68. *Carlson v. Wald*, 151 Cal. App. 3d 598, 602 (1984) (establishing that California law permits compensatory damages for loss of consortium). Stated differently, Ms. Tavantzis is a person "other than the [injured] passenger" who makes a derivative claim for loss of consortium resulting from the physical injury to her husband, Mr. Plasencia. Montreal Convention art. 20. Because Ms. Tavantzis is not an "injured passenger" under the Montreal Convention, she is a "third party" for purposes of Article 21(2)(b).

**D.  Defenses Under Articles 20 and 21 Are, by Definition, Mutually Exclusive.**

Article 20 provides that American may exonerate itself from any form of liability, in whole or in part, by demonstrating the contributory negligence of "the passenger" who was physically injured—here, Mr. Plasencia. In contrast, Article 21(2)(b) provides that American may limit its liability for damages in excess of the SDR limits if it proves Mr.

8

PLAINTIFFS' TRIAL BRIEF
CASE NO.: 5:23-cv-05607-NW-SVK

Plasencia's injuries were solely caused by the negligence of a "third-party." By definition, the defenses in Articles 20 and 21(2)(b) are mutually exclusive. On the one hand, if Mr. Plasencia is in any way responsible for his injuries under Article 20, then by definition no third-party can be "solely" responsible under Article 21. On the other hand, if a third party is "solely" responsible for causing Mr. Plasencia's injuries under Article 21, Mr. Plasencia cannot also be responsible under Article 20 (putting his entitlement to SDR in jeopardy).

## IV. The Evidence Will Show Several Article 17 Accidents Occurred on Flight 68.

The evidence at trial will show that several unusual or unexpected events or happenings occurred on Flight 68 that were causally linked to Mr. Plasencia's injuries.

### A. American Airlines Unexpectedly and Unusually Failed to Follow Airline Protocol When Confronted with Mr. Plasencia's Stroke Symptoms at the Gate in Miami.

While Flight 68 was still at the gate in Miami, American personnel did not procure any medical attention for Mr. Plasencia and ultimately cleared him to fly despite Ms. Tavantzis informing them that Mr. Plasencia had exhibited possible stroke symptoms. This is unexpected and unusual in light of American's policies and procedures mandating a particular response from American personnel to passenger medical conditions like stroke.

Shortly after boarding Flight 68, Ms. Tavantzis observed Mr. Plasencia drop his phone, struggle to pick it up, and speak in gibberish. Ex. B, Tavantzis Dep. 34:8–15 (Sept. 27, 2024). Alarmed, Ms. Tavantzis pressed the "call" button to summon help and called out that her "husband is having a stroke." *Id.* at 36:4–8. Flight Attendant David Eccles approached Plaintiffs' seats. Ms. Tavantzis informed FA Eccles of her concerns. *Id.* at 37:13–16. Ms. Tavantzis wondered if they "shouldn't fly," and FA Eccles responded that he would "get somebody who can make that decision." *Id.* at 37:16–20.

FA Eccles testified that he felt "uncomfortable" after speaking with Plaintiffs, prompting him to contact the purser (lead flight attendant), Kelly Gambello. Ex. C, Eccles Dep. 12:10–17 (Sept. 24, 2024). According to FA Eccles, FA Eccles told Purser Gambello that Ms. Tavantzis told him that her husband had just "block [sic] out and couldn't

remember where he was." Ex. D, Eccles Report, AA_000104. Purser Gambello reported that although Mr. Plasencia "'looked' fine," she "wanted to see what the Captain thought since we were now at departure." Ex. E, Gambello Report, AA_000110. Purser Gambello requested that Captain Occhino speak with Plaintiffs. Ex. F, Occhino Dep. 33:22–25 (Sept. 18, 2024).

Captain Occhino left the flight deck in violation of the American Airlines Flight Operations Manual and arrived at Plaintiffs' seats. Ex. I, Flight Operations Manual, AA_000147 ("The captain should get involved *only* if there is clearly a safety of flight issue involved.") (emphasis in original). Captain Occhino testified that he had a brief conversation with Plaintiffs and that Mr. Plasencia seemed fine to him. Ex. F, Occhino Dep. at 49:16–19. But according to Captain Occhino, FA Eccles did not inform Captain Occhino that Ms. Tavantzis had reported that Mr. Plasencia exhibited possible stroke symptoms like blacking out. *Id.* at 39:14–23. Captain Occhino likewise did not ask FA Eccles any questions about why he was concerned about these passengers. *Id.* at 50:4 ("I had no conversation with [FA Eccles]."). Captain Occhino testified that if he "had known somebody had passed out" pre-flight, "we would have to go further." *Id.* at 52:25–53:2.

It is unexpected and unusual that, when faced with a passenger exhibiting potential stroke symptoms, American personnel failed to follow <u>all</u> of the applicable policies and procedures outlined in the American Airlines Inflight Manual and American Airlines Flight Operations Manual. The Inflight Manual contains the policies and procedures that American Airlines flight attendants are required to know and follow. The Inflight Manual includes a list of various illnesses and medical emergencies, their symptoms, and the appropriate treatment of a passenger exhibiting those symptoms. Under "Stroke," the Inflight Manual lists common symptoms, including: "Dizziness, weakness, flaccid muscles or inability to move muscles in extremities, falling suddenly/ one-sided weakness or loss of movement;" "Face – mouth drooping or twisted to one side, drooling, most often only on one side of the body;" "Slurred speech, difficulty talking or being understood, an inability to communicate, or confusion;" and "Unconsciousness." Ex. G, Inflight Manual,

AA_000484–85. In responding to these stroke symptoms, the first three steps after ruling out "other causes" are to:

- Deliver Medical Assistance PA for physician or medical personnel on board
- Notify captain of the need to contact the Physician on Call
- Contact the Physician on Call (POC)

*Id.* But the Flight 68 flight personnel failed to deliver a medical assistance PA for a physician or medical personnel on board and failed to contact the American Airlines Physician on Call (POC), the doctor available 24-7 to advise American flight crew on medical emergencies. Ex. H, Gambello Dep. 50:6–8 (Sept. 11, 2024); Ex. G, Inflight Manual, AA_000463 (describing the POC). According to Captain Occhino, FA Eccles also did not tell Captain Occhino that Ms. Tavantzis reported Mr. Plasencia losing his ability to speak, becoming confused, and being unable to pick up his phone for a period of time—all possible symptoms of stroke. Ex. F, Occhino Dep. 35:7–16; 39:17–23. And Captain Occhino did not ask any questions of either flight attendant. *Id.* at 35:14–16; 50:4. This complete lack of communication concerning a passenger's potential medical emergency is also unexpected and unusual in light of American's policies and procedures requiring effective crew communication.

To deflect from its policy violations, American intends to blame Mr. Plasencia and Ms. Tavantzis for not asking for medical attention at the gate in Miami. But "[t]he fact remains that the flight attendant was in a far better position to effectuate" medical attention for Mr. Plasencia. *See Husain*, 116 F. Supp. 2d at 1143. In Ms. Tavantzis's deposition, counsel for American asked her if she requested that Mr. Plasencia "be examined by a physician" while on the ground in Miami, to which she responded that she "didn't know [she] could" make such a request. Ex. B, Tavantzis Dep. 40:4–5. Much like the crew in *Husain*, the crew on Flight 68—not Mr. Plasencia or Ms. Tavantzis—was in the best position to request medical attention for Mr. Plasencia by following the Inflight Manual.

Plaintiffs expect American to further argue that Ms. Tavantzis is to blame because she should have done more to convince Mr. Plasencia to deplane after Captain Occhino

cleared him to fly. The air carrier took a similar tact in *Husain v. Olympic Airways*, in which it argued that the plaintiff and deceased passenger "should not have merely accepted [the flight attendant's] refusal to move" the decedent and instead should have requested to speak with [the flight attendant's] supervisor." 116 F. Supp. 2d at 1141. But the district court rejected this thinking: "Imposing such a duty would place an unreasonable burden on a passenger. . . ." *Id.* The *Husain* court also emphasized that it was "not realistic to expect [the plaintiff] to understand the flight crew hierarchy," and that a "reasonable passenger in [the plaintiff's] position would have reached precisely the conclusion that [the plaintiff] herself reached after listening to the flight attendant's final rebuff: her husband could either remain in his assigned seat or take it upon himself to exchange seats with another passenger." *Id.* at 1141–42. Like the decedent's wife in *Husain*, it is not realistic to expect Ms. Tavantzis to understand the crew hierarchy and respective ability to clear passengers to fly. When she told FA Eccles that she was concerned her husband had a stroke and wondered if they should remain on board, FA Eccles told her that he would "get somebody who can make that decision." Ex. B, Tavantzis Dep. 37:18–22. FA Eccles then sent Captain Occhino to talk to Plaintiffs. Ms. Tavantzis could not have known that under the Inflight Manual, FA Eccles should have delivered a medical assistance PA before informing the pilot of the need to contact the POC—neither of which occurred. Ex. G, Inflight Manual, AA_000484–85. She reasonably thought that if Captain Occhino knew Mr. Plasencia had exhibited possible stroke symptoms, Captain Occhino "wouldn't let him fly." *Id.* at 65:18–19. A reasonable passenger in Ms. Tavantzis's position would have reached the same conclusion she did: that Captain Occhino was the person who could make the decision to deplane Mr. Plasencia, and he instead cleared Mr. Plasencia to fly. *See Husain*, 116 F. Supp. 2d at 1141–42.

### B. American Airlines Unexpectedly and Unusually Failed to Inform the Flight Deck of Mr. Plasencia's Worsening Condition Inflight, Precluding Diversion Within the Stroke Treatment Window.

It is also unexpected and unusual that American personnel ignored the worsening stroke symptoms of Mr. Plasencia and failed to follow the training, policies, and

procedures mandating the proper response to these symptoms while inflight. These unexpected and unusual events caused Mr. Plasencia to deteriorate inflight without medical intervention until after the flight landed in Madrid and it was far too late. If American personnel had simply responded to Mr. Plasencia as they were required to under the Inflight Manual, diversion of the flight and timely medical attention would have been possible. Because the flight crew's failure to respond to Mr. Plasencia's worsening condition was unexpected and unusual and was a link in the causal chain of Mr. Plasencia's severe injuries, this too constitutes an Article 17 accident.

Again, the Inflight Manual that governs flight attendants lists common symptoms of stroke and requires flight attendants to respond as follows:

- Deliver Medical Assistance PA for physician or medical personnel on board
- Notify captain of the need to contact the Physician on Call
- Contact the Physician on Call (POC)

Ex. G, Inflight Manual, AA_000485. But FA Eccles did none of these things after he witnessed Mr. Plasencia his losing his balance on one side of his body approximately 1.5 hours into the flight. Ex. D, Eccles CERS Report, AA_000104 (**"But he kept losing is balanced [sic] <u>on the right side</u>."**) (emphasis added). Despite the fact that flight attendants like FA Eccles "are trained to detect symptoms of sick passengers" and respond accordingly, FA Eccles failed to do so. *See* Ex. I, Flight Operations Manual, AA_000147 ("Flight attendants are trained to detect symptoms of sick passengers.").

FA Eccles knew that something was wrong. He instructed the passengers seated around Mr. Plasencia "that if something happened they should press the flight attendant call light." Ex. D, Eccles Report, AA_000104. He checked on Mr. Plasencia "every five minutes" after his crew break. *Id.* FA Eccles also reported that even though Mr. Plasencia gave him a thumbs up during these five-minute interval check-ins, "he didn't look that good." *Id.* But none of FA Eccles' "actions" are the ones mandated by the Inflight Manual. Despite FA Eccles' concerns about Mr. Plasencia as early as 1.5 hours into the flight, he did not inform Purser Gambello or Captain Occhino of Mr. Plasencia's worsening

situation. Ex. H, Gambello Dep. 39:15–18. Purser Gambello confirmed that a passenger losing their balance on one side is something she would have expected to be made aware of as the purser. *Id.* at 39:7–9. And when Captain Occhino was told for the first time that FA Eccles witnessed Mr. Plasencia losing his balance on his right side and checked on Mr. Plasencia every five minutes during the flight, Captain Occhino stated unequivocally "**He should have told me.**" Ex. F, Occhino Dep. 141:2–12 (emphasis added). FA Eccles likewise did not deliver a medical assistance PA, as required by the Inflight Manual. Ex. G, Inflight Manual, AA_000485. Nor did FA Eccles notify the captain of the need to contact the Physician on Call as required. *Id.* In fact, the Physician on Call was <u>never</u> contacted on Flight 68, even after a medical emergency was finally declared while the flight was on its final descent into Madrid. Ex. H, Gambello Dep. 46:23–25. It is unexpected and unusual that despite being repeatedly confronted with a passenger's worsening stroke symptoms, a flight attendant trained to detect such symptoms and respond to them in a particular manner would simply disregard the American Airlines Inflight Manual.

American may claim that Mr. Plasencia should have somehow done more to advocate for himself <u>while he was suffering a major stroke</u>. But it was <u>American</u> that cleared Mr. Plasencia to fly, and "[w]hen a passenger enters a commercial flight, he surrenders a certain level of freedom—freedom of movement, of expression and of choice—in return for a promise of safety and comfort." *Husain*, 116 F. Supp. 2d at 1143; *see also* Ex. J, Curry Dep. at 101:15–19 (Jan 13, 2025) ("Q: [W]ho has ultimate say whether or not a passenger gets to fly, American or the passenger? A: American."); Ex. F, Occhino Dep. at 160:10–18 ("I am the final decision maker."). "The flight crew has the unique ability to provide comfort and safety during air travel, which passengers have the right to expect." *Husain*, 116 F. Supp. 2d at 1143. And, much like in the case of the decedent in *Husain*, "as a result of his position as an airline passenger, [Mr. Plasencia's] ability to make decisions about his fate and to act on those decisions was diminished. By entering the controlled environment of the airplane, [Mr. Plasencia] had authorized the

flight crew to act on his behalf to protect his safety." *See id.* In fact, Mr. Plasencia was in the "<u>worst position</u> to actually do something about" his rapidly declining health. *See id.* (emphasis added). By contrast, the Flight 68 cabin crew and flight deck were in the <u>best position</u> to act on behalf of Mr. Plasencia—but failed to do so. Indeed, the Flight 68 crew was trained in American policies and procedures on how to respond to passenger medical emergencies such as Mr. Plasencia's stroke. But instead of following these policies and procedures, American personnel ignored them.

### C. These Accidents Were Causal Links in the Chain of Events Resulting in Mr. Plasencia's Injuries.

The Article 17 accidents on Flight 68, both on the ground in Miami and approximately 1.5 hours into the flight, were links in the causal chain of events that led to Mr. Plasencia's severe injuries.

<u>First</u>, had FA Eccles followed American's policies and procedures when he was informed that Mr. Plasencia had "blocked [sic] out" and was disoriented on the ground in Miami, Mr. Plasencia would have received "standard of care evaluation" including "clinical assessment, measurement of vital signs, and brain imaging with CT and MRI." Ex. K, Schim Expert Report at 12. "Appropriate clinical evaluation" in Miami "would have disclosed the narrowed blood vessel and would have offered opportunity to treat much earlier." *Id.* But American's unexpected and unusual failure to respond to Ms. Tavantzis's reports of Mr. Plasencia's stroke symptoms at the gate prevented Mr. Plasencia from receiving timely medical attention in Miami, ultimately resulting in Mr. Plasencia's worsened injuries.

<u>Second</u>, had FA Eccles followed American's policies and procedures when he witnessed Mr. Plasencia exhibiting stroke symptoms 1.5 hours into the flight, Flight 68 would have diverted back to Miami or to another location on the East Coast. Ex. L, Levy Expert Report at 9. Diversion back to Miami would have taken approximately one hour and forty-five minutes. *Id.* If Mr. Plasencia had been taken to the hospital immediately after arriving back in Miami, he would have received timely ameliorative treatment. "Time is brain": "every minute of stroke untreated leads to loss of up to 2 million brain cells."

Ex. K, Schim Expert Report at 10. "The immediate aftermath of a stroke is critical, as timely intervention can significantly reduce the severity of long-term damage." *Id.*

It is unexpected and unusual that American personnel failed to follow the airline's own policies and procedures in the face of passenger stroke symptoms that they were trained to detect and for which they were required to seek qualified medical advice. These unexpected and unusual failures were links in the causal chain of events resulting in Mr. Plasencia's severe injuries. Had FA Eccles followed American policies and procedures by making a medical assistance PA, informing the flight deck of the need to call the POC, and in fact contacting the POC, Mr. Plasencia would have received medical attention on the ground in Miami, or Flight 68 would have made a prompt diversion to a city with appropriate emergency medical facilities. In either scenario, Mr. Plasencia would have received timely ameliorative stroke care.

## V. Conclusion.

American cannot enjoy the benefits of the Montreal Convention without accepting its associated liability when passengers are injured. American attempts to rely on flawed, non-binding caselaw from other district courts while avoiding the Supreme Court's binding declaration of the "flexible" Article 17 accident. American warps the provisions of the Convention beyond any logical meaning to avoid liability and points the finger at Plaintiffs while turning a blind eye to its own employees' repeated, clear violations of the airline's own training, policies, and procedures. Plaintiffs submit the evidence will demonstrate their claims fall squarely within the bounds of the Montreal Convention and look forward to trial of this case.

16
PLAINTIFFS' TRIAL BRIEF
CASE NO.: 5:23-cv-05607-NW-SVK

| | |
|---|---|
| Dated: September 1, 2025 | Respectfully submitted, |

*/s/ Hannah M. Crowe*
Darren P. Nicholson (p*ro hac vice*)
dnicholson@burnscharest.com
Hannah M. Crowe (p*ro hac vice*)
hcrowe@burnscharest.com
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550

Sanjiv N. Singh (State Bar No. 193525)
ssingh@sanjivnsingh.com
**SANJIV N. SINGH, APLC**
1700 South El Camino Real, Suite 503
San Mateo, CA 94402
Telephone: (650) 389-2255

*Attorneys for Plaintiffs*

## CERFICATE OF SERVICE

I hereby certify that on September 1, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record electronically by CM/ECF.

*/s/ Hannah M. Crowe*
Hannah M. Crowe

17

PLAINTIFFS' TRIAL BRIEF
CASE NO.: 5:23-cv-05607-NW-SVK