1 | Ivy L. Nowinski (State Bar No.: 268564)
Email: inowinski@condonlaw.com
2 | CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
3 | Los Angeles, California 90067-6036
Telephone: (310) 557-2030
4 | Facsimile:  (310) 557-1299

5 |   - and -

6 | David J. Harrington (*Pro Hac Vice*)
Email: dharrington@condonlaw.com
7 | CONDON & FORSYTH LLP
7 Times Square, 18th Floor
8 | New York, New York 10036
Telephone: (212) 490-9100
9 | Facsimile:  (212) 370-4453

10 | Attorneys for Defendant
AMERICAN AIRLINES, INC.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA MARIA MARCELA TAVANTZIS, as an individual, and as Legal Guardian of JESUS PLASENCIA, an incapacitated person,<br><br>       Plaintiff,<br><br>   vs<br><br>AMERICAN AIRLINES, INC.,<br><br>       Defendants. | Case No. 5:23-cv-05607-NW-SVK<br><br>**TRIAL BRIEF OF DEFENDANT AMERICAN AIRLINES, INC.** |

Defendant American Airlines, Inc. (hereinafter "American Airlines"), by and through its attorneys of record, Condon & Forsyth LLP, hereby submits its Trial Brief in this matter as follows:

/ /

/ /

1

2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii-iv

INTRODUCTION ..................................................................................................... 1

FACTS ....................................................................................................................... 2

ARGUMENT ............................................................................................................. 4

    I.      THE MONTREAL CONVENTION EXCLUSIVELY GOVERNS THE RIGHTS AND LIABILITIES OF THE PARTIES ................................................... 4

    II.     PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING THAT PLASENCIA SUSTAINED BODILY INJURIES CAUSED BY AN "ACCIDENT" UNDER ARTICLE 17 OF THE MONTREAL CONVENTION AS A MATTER OF LAW ........................................................................... 5

    III.    PLAINTIFFS CANNOT PROVE THAT ANY ALLEGED ACCIDENT" ONBOARD THE FLIGHT WAS THE PROXIMATE CAUSE OF PLAINTIFFS' INJURIES ........................................................................................ 14

    IV.    AMERICAN AIRLINES HAS A COMPLETE DEFENSE TO PLAINTIFFS' CLAIMS UNDER ARTICLE 20 OF THE MONTREAL CONVENTION ........ 20

    V.     EVEN IF PLAINTIFFS MEET THEIR BURDEN OF PROOF AND AMERICAN AIRLINES IS UNABLE TO EXONERATE ITSELF UNDER ARTICLE 20, PLAINTIFFS' DAMAGES WILL BE LIMITED UNDER ARTICLE 21 OF THE CONVENTION ......................................................................................... 21

    VI.    TAVANTZIS HAS ONLY A DERIVATIVE CLAIM FOR LOSS OF CONSORTIUM, AND IS NOT ENTITLED TO DAMAGES FOR PURELY EMOTIONAL DISTRESS UNDER THE MONTREAL CONVENTION ......... 22

CONCLUSION ....................................................................................................... 22

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Abramson v. Japan Airlines, Co.*,
    739 F. 2d 130 (3d Cir. 1984)............................................................................7, 8

5

6

*In re Air Crash at Little Rock Arkansas, on June 1, 1999*,
    291 F.3d 503 (8th Cir. 2002) ................................................................................15

7

*In re Air Crash Near Cali, Colombia on December 20, 1995*,
    985 F. Supp. 1106 (S.D.Fl. 1996), *vacated in part on other grounds in Cortes v. American
    Airlines, Inc*., 177 F.3d 1272 (111th Cir. 1999)..................................................15

8

9

*Air France v. Saks*,
    470 U.S. 392 (1985).............................................................................6, 7, 14, 15

10

11

*Arzu v. Am. Airlines, Inc.*,
    No. 4:24-CV-00433-P, 2025 WL 1347329 (N.D. Tex. May 8, 2025)..................9, 10, 11

12

*Aziz v. Air India Limited*,
    658 F.Supp.2d 1144 (C.D.Cal. 2009) ....................................................................9

13

14

*Banks v. Munir*,
    No. 120CV03729CNSMDB, 2023 WL 2914811 (D. Colo. Apr. 12, 2023) ...........20

15

16

*Campbell v. Air Jamaica Ltd.*,
    891 F. Supp. 2d 1338 (S.D. Fla. 2012) ..................................................................7

17

*Carey v. United Airlines*,
    255 F.3d 1044 (9th Cir. 2001) ...............................................................................5

18

19

*Dannenberg v. United States*,
    No. 04-CV-4897 NGG JMA, 2010 WL 4851341 (E.D.N.Y. Nov. 22, 2010).........19

20

*Dogbe v. Delta Air Lines, Inc.*,
    11-CV-6289 KAM LB, 2013 WL 4522572 (E.D.N.Y. Aug. 27, 2013) ..................14

21

22

*Eastern Airlines v. Floyd*,
    499 U.S. 530 (1991)...............................................................................6, 14, 22

23

24

*Ehrlich v. Am. Airlines*,
    360 F.3d 366 (2d Cir. 2004).....................................................................................5

25

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*,
    525 U.S. 155 (1999).............................................................................................5, 22

26

27

*Fischer v. Northwest Airlines, Inc.*,
    623 F. Supp. 1064 (N.D. Ill. 1985) .........................................................................7

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

*Fulop v. Malev Hungarian Airlines*,
  244 F. Supp. 2d 217 (S.D.N.Y 2003) .........................................................9, 11, 12

*Hipolito v. Northwest Airlines, Inc.*,
  15 Fed. Appx. 109 (4th Cir. 2001) ....................................................................7

*Hosaka v. United Airlines, Inc.*,
  305 F.3d 989 (9th Cir. 2002) ............................................................................4

*Jamil v. Kuwait Airways Corp.*,
  773 F. Supp. 482 (D.D.C. 1991) ......................................................................15

*Jennings v. Palomar Pomerado Health Systems*,
  114 Cal. App. 4th 1108 (2004) (*emphasis in original*)...................................16

*Kruger v. United Air Lines, Inc.*,
  481 F. Supp. 2d 1005 (N.D. Cal. 2007) .......................................................5, 22

*Krys v. Lufthansa German Airlines*,
  119 F.3d 1515 (11th Cir.1997) .......................................................................8, 9

*Margrave v. British Airways*,
  643 F. Supp. 510 (S.D.N.Y. 1986) ...................................................................15

*Olympic Airways v. Husain*,
  540 U.S. 644 (2004)...........................................................................................8

*Paradis v. Ghana Airways Ltd.*,
  348 F. Supp. 2d 106 (S.D.N.Y. 2004), *aff'd*, 194 Fed. Appx. 5 (2d Cir. 2006) .......5

*Rajcooar v. Air India Limited*,
  89 F. Supp. 2d 324 (E.D.N.Y. 2000) .....................................................7, 8, 12, 13

*Rodriguez v. Ansett Australia Ltd.*,
  383 F.3d 914 (9th Cir.2004) .........................................................................8, 14

*Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*,
  42 F. Supp. 3d 436 (E.D.N.Y. 2014), aff'd, 621 F. App'x 82 (2d Cir. 2015)..........13

*Samaan v. St. Joseph Hosp.*,
  670 F.3d 21 (1st Cir. 2012)..............................................................................19

*Serrano v. American Airlines, Inc.*,
  2008 WL 2117239 (C.D. Cal. 2008)...................................................................5

*Shah v. Pan American World Services, Inc.*,
  148 F.3d 84 (2d Cir. 1998)........................................................................14, 15

*Singh v. Caribbean Airlines Ltd.*,
  49 F. Supp. 3d 1108 (S.D. Fla. 2014), *aff'd sub nom. Singh ex rel. Singh v. Caribbean
  Airlines Ltd.*, 798 F.3d 1355 (11th Cir. 2015) .............................................7, 9

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

*Smith v. Bubak*,
    643 F.3d 1137 (8th Cir. 2011) ............................................................................19

*Tandon v. United Airlines*,
    926 F.Supp. 366 (S.D.N.Y. 1996) .....................................................................7, 8

*Walker v. Eastern Air Lines, Inc.*,
    775 F. Supp. 111 (S.D.N.Y. 1991) .........................................................................8

*White v. Emirates Airlines, Inc.*,
    493 F. App'x 526 (5th Cir. 2012) .....................................................................9, 10

*Williams v. Wraxall*,
    33 Cal. App. 4th 120 (1995) ............................................................................15, 16

*Young. Salazar v. United States*,
    No. 20-CV-941-SWS/MLC, 2021 WL 6808324 (D.N.M. Dec. 30, 2021) ............19

*Young v. Mem'l Hermann Hosp. Sys.*,
    No. CIV A. H-03-1859, 2006 WL 1984613 (S.D. Tex. July 14, 2006), *aff'd*, 573 F.3d 233
    (5th Cir. 2009) ("[Plaintiffs] have not and cannot show, as a matter of law, that Randall
    Young had a 51 percent or greater chance of avoiding his severely disabled condition had he
    received tPA treatment at Hermann Hospital on March 29, 2003.") ......................................19

**Statutes**

49 U.S.C.§40105 (1997) ............................................................................5

49 Stat. 3000 ............................................................................5

**Other Authorities**

CACI No. 3920 ............................................................................22

1 Shawcross & Beaumont, *Air Law* (Butterworths 1998) ............................................................15

1

2                                    **INTRODUCTION**

3          This is a personal injury lawsuit brought by Jesus Plasencia ("Plasencia") and his wife,

4    Ana Maria Marcela Tavantzis ("Tavantzis") (collectively "Plaintiffs"), for permanent disability

5    Plasencia sustained as the result of a massive ischemic stroke.  Plaintiffs allege that American

6    Airlines is responsible for Plasencia's injuries and damages suffered as the result of his stroke

7    because Plasencia was traveling as a passenger on board American Airlines Flight 68 from

8    Miami, Florida, to Madrid, Spain at the time his stroke occurred.

9          The evidence will show that, prior to takeoff, Tavantzis reported to American Airlines

10   crew members that Plasencia "blacked out" for several seconds and dropped his phone.  At the

11   time Plasencia's symptoms were reported to American Airlines, they had completely resolved.

12   Plaintiffs claim that American Airlines crew members failed to recognize Plasencia's symptoms

13   as potential precursors of a stroke and to facilitate appropriate medical care for Plasencia on the

14   ground, prior to takeoff in Miami.   However, the evidence will establish that Plaintiffs

15   affirmatively advised American Airlines personnel that Plasencia was doing fine and wished to

16   proceed with his flight and continued to do so for the remainder of the flight until his symptoms

17   became obvious.   The evidence will show that Plaintiffs chose not to disclose Plasencia's

18   medical history of hypertension, type II diabetes, obesity, and the fact that his four older siblings

19   had predeceased him due to a family history of stroke and congestive heart failure. The evidence

20   will further show that Tavantzis was fully aware that her husband was at risk for a stroke and

21   texted her siblings to say so prior to takeoff.

22          The parties do not dispute that Plaintiffs' claims are exclusively governed by the

23   Montreal Convention, a treaty of the United States.  The parties also do not dispute that in order

24   to recover pursuant to the Montreal Convention framework of liability, Plaintiffs must establish

25   that Plasencia's injuries or damages were caused by an "accident," meaning an "unusual or

26   unexpected event" that is external to the passenger.  Here, Plaintiffs allege two "accidents": (1) a

27   failure to summon medical assistance for Plasencia on the ground before the aircraft left Miami,

28   notwithstanding both Plaintiffs' insistence that Plasencia was fit to fly; and (2) a failure to

C ONDON & F ORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

summon medical assistance for Plasencia one and a half hours into the flight, when an American Airlines cabin crew member observed Plasencia to stumble while making his way to the aircraft lavatory, again notwithstanding Plasencia's repeated assurances that he was not in any distress.

Even assuming the American Airlines crew members, none of which are healthcare providers, could have recognized Plasencia's symptoms as precursors of a stroke, the record demonstrates that the American Airlines crew did all that they could to assist Plasencia, at take-off, one hour and a half into the flight, and for the duration of the flight.  All precedent interpreting Article 17 of the Montreal Convention under similar facts holds that neither of the purported "accidents" alleged by Plaintiffs are "accidents" as a matter of law.  American Airlines intends to move for a directed verdict, and for judgment notwithstanding the verdict, on this basis.

Plasencia was ultimately diagnosed with an acute ischemic stroke upon arrival in Madrid. The primary treatment for this type of stroke is the administration of tissue-type plasminogen activator ("TPA," also known as thrombolysis), which must be performed within 4.5 hours of the first onset of symptoms.  At trial, the evidence will show that the timely administration of TPA only results in improvement for approximately 35% of stroke patients.  In addition, TPA is rarely administered, and is never given to patients such as Plasencia with prohibitively high blood pressure due to the risk of hemorrhage.  Accordingly, Plaintiffs will not be able to meet their burden of showing, by a preponderance of the evidence, that timely administration of TPA would have resulted in any improvement of Plasencia's condition.  In addition, because Plaintiffs refused to deplane to obtain medical treatment in the first instance, layer upon layer of speculation is necessary to support this theory.  Plaintiffs simply cannot meet their burden of proof with respect to causation.  American Airlines will also move for a directed verdict and judgment notwithstanding the verdict on this issue.

## FACTS

On November 8, 2021, Plaintiffs were passengers on a connecting itinerary from San Francisco, California, to Madrid, Spain with a connection in Miami, Florida.  After boarding, but before takeoff, Tavantzis told cabin crew member David Eccles ("Eccles") that she observed

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    Plasencia "black out" and drop his phone.  Ex. A, Eccles Deposition Excerpts, 35:23-36:4.

2    Tavantzis sent text messages to her relatives stating that she thought Mr. Plasencia had a stroke,

3    but she never communicated that she thought he had a stroke to the American Airlines cabin

4    crew.  Ex. B, Tavantzis Deposition Excerpts, 53:15-57:10.  When Eccles responded to

5    Tavantzis's request for assistance, Plasencia's symptoms had subsided; he was fully coherent,

6    and Eccles did not personally witness any stroke-like symptoms.  Eccles offered to request

7    medical assistance for Plasencia at the gate and the opportunity for Plaintiffs to disembark, but

8    they declined.  Ex. A, Eccles Deposition Excerpts, 10:20-12:20.  In addition, Eccles informed

9    Plaintiffs that, based on his personal experience, it would be much more challenging for

10   Plasencia to receive medical attention once they departed, if the aircraft was forced to divert.  *Id*.

11   Eccles communicated that he was concerned about Plasencia to the purser (head flight attendant),

12   Ms. Kelly Gambello, who alerted the captain for the flight (Captain Anthony Occhino).  When

13   Captain Occhino arrived to speak to Plasencia, both Plaintiffs assured Captain Occhino that they

14   were fine.  Ex. C, Occhino Deposition Excerpts, 106:23-107:9.  Captain Occhino had no basis to

15   remove them from the flight.

16           During the flight, approximately an hour and a half after takeoff, Eccles saw Plasencia

17   stumble while heading to the aircraft lavatory.  Plasencia assured Eccles that he was fine, but,

18   after Plasencia returned to his seat, Eccles asked the passengers sitting around Plasencia to use

19   the flight attendant call button if they observed Plasencia in distress.  Eccles walked through the

20   cabin every five minutes during the flight, and Plasencia gave him a "thumbs up" signal to assure

21   Eccles that he was okay.  Ex. A, Eccles Dep., 66:23-67:15.

22           Approximately one hour prior to landing, Plasencia exhibited signs of distress, including

23   drooling while attempting to consume yogurt.  Ex. B, Tavantzis Dep., 76:3-10.  Although neither

24   Tavantzis nor Plasencia alerted the American Airlines crew that Plasencia was in distress, the

25   crew observed Plasencia to be in distress, paged for an onboard doctor, and several doctors

26   responded.  Ex. A, Eccles Dep., 69:24-70:11.

27           The passenger physicians identified Plasencia's symptoms as indicative of a stroke, and

28   first responders were called to meet the aircraft in Madrid.  Tavantzis and Plaintiffs' experts have

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

no objection to how American Airlines responded to this incident from this point. Ex. B, Tavantzis Dep. 92:3-17; Exhibit H, Deposition Transcript of Kathleen Lord-Jones, Jan. 7, 2025, at 92:14–94:2 (confirming that she has "no criticisms of the flight attendants'" handling of the incident "on descent into Madrid," and that she could not identify any additional symptoms— from an hour and a half into the flight until descent—that the flight attendants should have recognized as indicative of a stroke); Exhibit I, Deposition Transcript of Captain Levy, Dec. 6, 2024, at 51:20–52:13 (confirming that he had no "criticisms of Captain Occhino's response to the medical emergency that occurred prior to descent/approach into Madrid").

Upon landing, Plasencia was transported by ambulance to Ramon y Cajal Hospital. Plasencia's systolic blood pressure was over 200 at the time he was taken by ambulance to Ramon y Cajal hospital in Madrid, and he did not respond to 15 mg of labetalol given in the ambulance to attempt to lower his blood pressure. *See* Ex. D, Ramon y Cajal Hospital Records, p. 2. Plasencia's systolic blood pressure was 210 when he arrived at Ramon y Cajal, at which point he was provided a second, 50 mg dose of labetalol to lower his blood pressure. *See* Ex. E, La Paz Hospital Records, p. 12. Tavantzis arrived afterward, and affirmatively advised the attending physician at Ramon y Cajal that Plasencia's stroke occurred at least eight hours prior. Ex. B, Tavantzis Dep., 100:22-101:11; Ex. D, Ramon y Cajal Hospital Records, p.2. The doctors at Ramon y Cajal did not administer TPA to Plasencia. *Id.*

The parties' experts agree that TPA cannot be administered to patients with a systolic blood pressure of over 185. *See* Ex. F, Excerpts of Deposition of Plaintiffs' Expert Dr. Jack Schim; Ex. G, Expert Report of Dr. Suite, ECF No. 145-9, pp. 2-3.

## I

## THE MONTREAL CONVENTION EXCLUSIVELY GOVERNS THE RIGHTS AND LIABILITIES OF THE PARTIES

The parties do not dispute that the Montreal Convention applies to Plaintiffs' claims and provides their exclusive remedy in connection with their claims against American Airlines. The Montreal Convention is the successor treaty to the Warsaw Convention,[1] (*Hosaka v. United*

---

[1] Convention for the Unification of Certain Rules Relating to International Transportation by Air,

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    *Airlines, Inc.*, 305 F.3d 989, 996 (9th Cir. 2002)), and unifies and replaces the system of liability

2    that derived from the Warsaw Convention.  *Ehrlich v. Am. Airlines,* 360 F.3d 366, 371 (2d Cir.

3    2004).  While the Montreal Convention replaced the Warsaw Convention system of liability, it

4    retained many of the same provisions and terms from the original Warsaw Convention.  *See*

5    Montreal Convention, Art. 55.  Because many of the provisions of the Warsaw Convention were

6    retained in the Montreal Convention, courts continue to rely on Warsaw Convention cases where

7    the corresponding provision in the Montreal Convention is substantively the same.  *See e.g.,*

8    *Serrano v. American Airlines, Inc.,* 2008 WL 2117239, 3 (C.D. Cal. 2008); *Kruger v. United Air*

9    *Lines, Inc.*, 481 F. Supp. 2d 1005, 1008 (N.D. Cal. 2007).

10        The Montreal Convention, like the Warsaw Convention, completely preempts a

11    passenger's state law claims whether "in contract or tort" and exclusively governs the rights and

12    liabilities of the parties.  *See Paradis v. Ghana Airways Ltd*., 348 F. Supp. 2d 106, 114 (S.D.N.Y.

13    2004), *aff'd*, 194 Fed. Appx. 5 (2d Cir. 2006) (holding that the Montreal Convention has

14    "substantially the same preemptive effect" as the Warsaw Convention); *Kruger v. United*

15    *Airlines, Inc.*, 481 F. Supp. 2d 1005, 1008 (N.D. Cal. 2007); *see also El Al Israel Airlines, Ltd. v.*

16    *Tsui Yuan Tseng,* 525 U.S. 155, 161 (1999)) (Warsaw Convention) and *Carey v. United Airlines*,

17    255 F.3d 1044 (9th Cir. 2001) (same).  Accordingly, the rights and liabilities of the parties are

18    governed exclusively by the Convention.

19                                                    **II**

20    **PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING THAT PLASENCIA**

21    **SUSTAINED BODILY INJURIES CAUSED BY AN "ACCIDENT" UNDER ARTICLE 17**

22                **OF THE MONTREAL CONVENTION AS A MATTER OF LAW**

23        The circumstances under which an air carrier may be liable under the Montreal

24    Convention for bodily injury sustained by a passenger in the course of international carriage are

25    set forth in Article 17 of the Convention.  Article 17 provides that:

26            The carrier shall be liable for damage sustained in the event of the

27    ─────────────────────────────────────────────────────

28    October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note*
     *following* 49 U.S.C.§40105 (1997), commonly and hereinafter referred to as the "Warsaw
     Convention."

death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Montreal Convention, Art. 17.[2]

Thus, passengers seeking to hold an air carrier liable for bodily injury under the Montreal Convention have the burden of establishing that: (1) there has been an "accident;" (2) the "accident" caused the passenger's death, wounding or bodily injury; and (3) the "accident" took place on board the aircraft or in the course of the operations of embarking or disembarking. *See Eastern Airlines v. Floyd*, 499 U.S. 530, 535–36 (1991) (Warsaw).

The Convention does not define what type of occurrence may be considered an Article 17 "accident." The definition of the term "accident" was addressed by the Supreme Court in *Air France v. Saks*, 470 U.S. 392 (1985), which involved an action against the carrier by a passenger who suffered an ear injury during normal cabin pressurization changes. The flight itself was uneventful; plaintiff, however, felt "severe pressure and pain" in her left ear as the aircraft descended to land in Los Angeles. *Id.* at 394. Approximately five days after the flight, plaintiff consulted a doctor who concluded that she had become permanently deaf in her left ear. *Id.* After reviewing the language, drafting history and structure of the Convention, the Supreme Court defined an "accident" as "an unexpected or unusual event or happening that is external to the passenger." *Saks*, 470 U.S. at 405. The Court made clear that "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply." *Id.* at 406. The Court specifically noted that issues of negligence are not implicated or relevant. *Id.* at 405–06. In this regard, the "accident" inquiry focuses solely on the "nature of the event which *caused* the injury rather than the care taken by the airline to avert the injury." *Id.* at 407 (*emphasis in original*).

Following *Saks*, U.S. courts have held that a passenger's internal illness, including stroke,

---

[2] Paragraph 1 of Article 17 repeats verbatim the substance of Article 17 of the original Warsaw Convention. *Compare*, Warsaw Convention, Art. 17.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    myocardial infarction and cardiac arrest, does not constitute an "accident" under Article 17.  *See*

2    *Singh v. Caribbean Airlines Ltd.*, 49 F. Supp. 3d 1108, 1116 (S.D. Fla. 2014), *aff'd sub nom.*

3    *Singh ex rel. Singh v. Caribbean Airlines Ltd.*, 798 F.3d 1355 (11th Cir. 2015) (no "accident"

4    where airline did not disregard any "health-based request" for diversion of the aircraft from the

5    passenger and followed all applicable policies and procedures once it was determined that

6    passenger was experiencing a stroke, but mistakenly administered a nitroglycerin tablet to the

7    passenger); *Fischer v. Northwest Airlines, Inc.*, 623 F. Supp. 1064 (N.D. Ill. 1985) (passenger's

8    heart attack not an "accident" under Warsaw Convention); *Rajcoar v. Air India Limited*, 89 F.

9    Supp. 2d 324, 328 (E.D.N.Y. 2000) (same); *Tandon v. United Airlines*, 926 F.Supp. 366, 369-

10   370 (S.D.N.Y. 1996) (same); *Scarboro v. Swissair*, 28 Avi. Cas. (CCH) 16,147 (N.D. Ga. 2002)

11   (summary judgment in favor of airline finding no accident when passenger died of a seizure

12   during in-flight snack service); *Hipolito v. Northwest Airlines, Inc.*, 15 Fed. Appx. 109 (4th Cir.

13   2001) (summary judgment in favor of airline upheld on grounds that passenger's in-flight asthma

14   attack and failure to have full bottle of oxygen on-board not Article 17 accidents); *Abramson v.*

15   *Japan Airlines, Co.*, 739 F. 2d 130, 131 (3d Cir. 1984) (aggravation of existing injury during

16   routine flight not an accident); *Campbell v. Air Jamaica Ltd.*, 891 F. Supp. 2d 1338, 1342 (S.D.

17   Fla. 2012) (passenger's heart attack after being "bumped" from a flight not an accident).

18        In this case, Plaintiffs' experts have failed to specify when Plasencia's stroke occurred.

19   Accordingly, Plaintiffs may be unable to satisfy their burden of proving that Plasencia sustained

20   a "bodily injury" onboard the American Airlines flight.  Even if Plaintiffs can meet this burden,

21   said stroke would be an event entirely internal to Plasencia and completely unrelated to any of

22   the operations of the aircraft.  Accordingly, under the Supreme Court's definition of "accident"

23   in *Saks*, even if Plaintiff can prove that he suffered a stroke during the flight, Plasencia's stroke,

24   alone, is *per se* not an "accident" under Article 17 of the Montreal Convention.

25        Recognizing this, Plaintiffs allege that American Airlines failed to facilitate medical care

26   for Plasencia both on the ground at Miami, prior to departure, and approximately one and a half

27   hours into the flight.  However, the case law is clear that where an airline follows its own internal

28   policies and procedures in connection with providing care to a sick passenger, there can be no

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    "accident" under Article 17 of the Convention.

2         All cases to address whether an airline's response to a passenger's injury suffered on

3    board an aircraft have held that a failure to provide adequate medical assistance to a passenger,

4    without more, such as a substantial deviation from the airline's policies and procedures or

5    industry standard, is not an "accident" under Article 17 of the Montreal Convention.  *See e.g.*,

6    *Rajcooar v. Air India Ltd.*, 89 F.Supp.2d 324, 328 (E.D.N.Y. 2000) (finding inadequate medical

7    care does not constitute an "accident" without some showing of unexpected circumstances);

8    *Tandon v. United Air Lines*, 926 F. Supp. 366, 369–70 (S.D.N.Y.1996) (finding that airline

9    crew's failure to respond with adequate medical assistance to passenger suffering a heart attack

10   did not constitute an "accident"); *Walker v. Eastern Air Lines, Inc.*, 775 F. Supp. 111, 114

11   (S.D.N.Y. 1991) (stating that parties agreed that no "accident" occurred when airline crew

12   aggravated pre-existing condition of passenger); *Krys v. Lufthansa German Airlines*, 119 F.3d

13   1515, 1520 (11th Cir.1997) ("[I]n the absence of proof of abnormal external factors, aggravation

14   of a pre-existing injury during the course of a routine and normal flight should not be considered

15   an 'accident' within the meaning of Article 17."); *Abramson v. Japan Airlines Co.*, 739 F.2d 130,

16   132 (3d Cir.1984) (finding that flight attendant's worsening of hernia condition was not an

17   unusual or unexpected occurrence).

18        Decisions from the Supreme Court and the Ninth Circuit stand for the proposition that a

19   deviation from an airline's policies and procedures and/or industry standards in response to a

20   passenger's internal medical emergency may constitute an "accident" under Article 17.  *Olympic*

21   *Airways v. Husain*, 540 U.S. 644, 646 (2004) (finding airline's failure to move an asthmatic

22   passenger away from smoke during flight resulting in passenger's death was an accident under

23   the Montreal Convention); *Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914, 919 (9th Cir.2004)

24   (affirming summary judgment where plaintiff submitted no evidence that Air New Zealand failed

25   to comply with any industry standard in connection with passenger who developed deep vein

26   thrombosis).

27        Both before and after the Supreme Court's ruling in *Husain* in 2004, U.S. courts have

28   routinely held that there is no Article 17 "accident" where an airline fails to provide adequate

TRIAL BRIEF OF AMERICAN AIRLINES, INC.                        - 8 -
CASE NO.: 5:23-cv-05607-NW-SVK

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1   medical care to a passenger, particularly when the crew attempted to do so and substantially

2   complied with its policies and procedures and industry standards.   *See White v. Emirates*

3   *Airlines, Inc.*, 493 F. App'x 526 (5th Cir. 2012) (no accident when flight crew deviated from

4   policies and procedures in providing medical care to passenger prior to landing during descent of

5   aircraft); *Singh v. Caribbean Airlines Ltd.*, 49 F. Supp. 3d 1108, 1116 (S.D. Fla. 2014), *aff'd sub*

6   *nom. Singh ex rel. Singh v. Caribbean Airlines Ltd.*, 798 F.3d 1355 (11th Cir. 2015); *Arzu v. Am.*

7   *Airlines, Inc.*, No. 4:24-CV-00433-P, 2025 WL 1347329 (N.D. Tex. May 8, 2025); *Sook Jung*

8   *Lee v. Korean Air Lines Co.*, LTD, SACV 10-01709-JVS, 2012 WL 1076269 (C.D. Cal. Mar.

9   21, 2012) (no accident in absence of specific health based request from passenger or deviation

10  from airline policies and procedures); *Aziz v. Air India Limited*, 658 F.Supp.2d 1144 (C.D.Cal.

11  2009) (no accident where airline did not have an automated external defibrillator onboard the

12  aircraft to treat passenger following a heart attack); *Fulop v. Malev Hungarian Airlines*, 244 F.

13  Supp. 2d 217 (S.D.N.Y 2003) (no accident when flight crew relied on the opinion of on-board

14  doctor and continued flight to its scheduled destination); *Krys v. Lufthansa German Airlines*, 119

15  F.3d 1515 (11th Cir. 1997) (same).

16       In *White v. Emirates Airlines, Inc.*, 493 F. App'x 526, 531 (5th Cir. 2012), the son of an

17  airline passenger who suffered a heart attack shortly before her flight from Dubai landed in

18  Houston, and died two days thereafter, brought suit against the airline.  *Id.* at 527-528.   The

19  passenger's son argued that the airline had failed to follow its own policies and procedures while

20  assisting his mother on descent into Houston.   The Fifth Circuit upheld the district court's

21  dismissal of the case on the airline's motion for summary judgment, holding that even if the son's

22  contentions were true, "when evaluated in context, the crew's failure to [comply with its policies

23  and procedures] was not unusual or unexpected" because the aircraft was in its final descent

24  when the medical emergency was discovered.  *Id.* at 534.   The Court held that in light of the

25  potential dangers to the crew and other passengers, it was inadvisable to page for a physician

26  during the descent of the aircraft, and that because the aircraft was landing, it would have made

27  "little sense" to contact MedLink.  *Id.*   Thus, in *White*, the Fifth Circuit held that even a departure

28  from the airline's policies and procedures may not even be an "unusual or unexpected" event.

1    *Id.*

2        On May 8, 2025, the United States District Court for the Northern District of Texas

3    granted summary judgment to American Airlines in *Arzu v. Am. Airlines, Inc.*, No. 4:24-CV-

4    00433-P, 2025 WL 1347329 (N.D. Tex. May 8, 2025). Although American Airlines submits that

5    the evidence in this case will show compliance with all policies and procedures and industry

6    standards, *Arzu* establishes that even where, as here, Plaintiffs' experts allege minor deviations

7    from industry standards and American Airlines' policies and procedures, this is insufficient to

8    establish an "accident" under Article 17 of the Montreal Convention.

9        In *Arzu*, the decedent, a fourteen-year-old minor, lost consciousness on a flight from

10   Honduras to Miami. At the time of the incident, he weighed 319 pounds and suffered from a

11   host of diagnosed health complications including asthma, obesity, sleep apnea, and type II

12   diabetes. *Id.* at *1. After a several-hour delay and takeoff, the decedent asked his traveling

13   companion for his inhaler, but it did nothing to alleviate his symptoms and he became

14   unconscious shortly after the aircraft reached altitude. *Id.* When the cabin crew attendants

15   responded to calls for assistance, the decedent was unconscious and they called for medical

16   assistance from other passengers. *Id.*

17       The first passenger to respond was a nurse. The second passenger to respond was a

18   general surgeon. The decedent was removed from his seat and placed on the ground. Once he

19   was on the ground, the healthcare professionals, with the help of one flight attendant, began

20   administering CPR. *Id.* Another flight attendant brought a medical kit and an automated

21   external defibrillator ("AED"). *Id.* The nurse and general surgeon set up the AED and placed

22   the pads on the passenger. *Id.* The flight deck was then alerted of the medical emergency, and

23   just over an hour into the flight, the pilots began an emergency descent into Cancún International

24   Airport at 7:33 p.m. *Id.* The plane arrived at the gate at 7:50 p.m. *Id.* During the descent, the

25   healthcare professionals continued administering CPR and applying the AED machine.

26   Emergency medical services were waiting at the gate to transport the decedent to Amerimed

27   Hospital via ambulance, where he was pronounced dead shortly thereafter. *Id.*

28       In *Arzu*, the plaintiff alleged that the American Airlines crew's response to the emergency

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    included four different "accidents": (1) failure to immediately notify the flight deck; (2) failure to

2    immediately administer CPR; (3) failure to contact the physician on call; and (4) failure to

3    establish and adhere to emergency team roles.  All four relate to policies found in the American

4    Airlines Inflight Manual.  *Id.* at *3.

5         The district court held that "[e]ven under Arzu's version of the facts, the American

6    Airlines crew's response to [decedent's] emergency does not amount to an 'accident' under the

7    Montreal Convention.  This case is unlike other cases in which courts have found an 'accident.'. .

8    .  To the contrary, the four instances highlighted by Arzu reflect concerted efforts by the crew to

9    provide emergency assistance to [decedent]." *Id.* at *3.  The court further stated that it "accepts

10   Arzu's contentions that there may have been reactionary delays, confusion of roles, and

11   departures from policy, such as the failure to contact the physician on call. Notwithstanding all

12   of that, the flight crew 'took action to assist' [decedent] in multiple ways.  [] The flight

13   attendants sought medical assistance from other passengers, provided a medical kit and AED

14   machine, and alerted the flight deck to facilitate a diversion to Cancún for quicker medical

15   attention. The Court has little doubt that the American Airlines crew could have done more to aid

16   [decedent].  In fact, there is rarely, if ever, a perfect response to a medical emergency. But

17   ultimately, even accepting Arzu's recitation of the facts, the failure of American Airlines to

18   follow all relevant procedures, 'when evaluated in context ... was not unusual or unexpected.'"

19   *Id.* (*internal citations omitted*).

20        The Court also found that the decedent's pre-existing conditions including asthma,

21   obesity, sleep apnea, and diabetes complicated the flight crew's emergency response efforts.  *Id.*

22   at *4.

23        The Court concluded that American Airlines' response to the medical emergency did not

24   constitute an "accident" under the Montreal Convention and granted summary judgment in favor

25   of American Airlines on this claim.  *Id.* at *3-4.

26        District courts have also held that it is not an "accident" for an airline's crew to rely upon

27   the medical advice and treatment of a medical practitioner to treat a sick passenger on board even

28   if the care does not provide the passenger with a favorable outcome.  *Fulop v. Malev Hungarian*

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

*Airlines*, 244 F. Supp. 2d 217 (S.D.N.Y 2003).  The passenger in *Fulop* suffered chest pains after takeoff, while the aircraft was allegedly in the airspace of the United Kingdom.  *Id.* at 219.  The flight attendants paged for a doctor, and a doctor responded and provided the ill passenger with a pain killer.  *Id.*  The passenger claimed that he asked a crew member to divert the flight to England for an emergency landing.  *Id.* at 220.  The doctor told the captain of the flight that he was "unable to provide an opinion on whether or not the flight should be diverted" because he could not predict the passenger's future condition during the flight.  *Id.* at 221.  The court held that there was insufficient evidence to demonstrate that an "accident" had occurred on the flight. *Id.* at 220.

In *Rajcooar v. Air India Limited*, 89 F. Supp. 2d 324 (E.D.N.Y. 2000), the wife of a passenger who died after suffering a heart attack in the airport's transit lounge brought an action against Air India alleging that Air India employees failed to provide necessary medical help in time to prevent her husband's death.  Air India moved for summary judgment on the grounds that plaintiff could not recover because her damages were not the result of an Article 17 accident. The court granted Air India's motion, holding that neither the heart attack, nor the allegedly inadequate medical care, without some showing of unexpected circumstances, constitute an Article 17 "accident."  *Id.* at 328.

The court reached a similar conclusion in *Sook Jung Lee v. Korean Air Lines Co.*, LTD, SACV 10-01709-JVS, 2012 WL 1076269 (C.D. Cal. Mar. 21, 2012).  The plaintiff in *Sook Jung Lee* was traveling onboard a Korean Air flight from Seoul to Washington, D.C., and suffered a stroke at some point over the Pacific Ocean.  *Id.* at *2.  Following the Korean Air cabin crew's discovery that the passenger was unconscious,  the crew immediately began to follow Korean Air's policies and procedures for responding to in-flight medical emergencies, including notifying the flight crew of the situation, checking the plaintiff's condition, paging for the assistance of any doctor on board the flight, facilitating communication between the physician on board the aircraft and the flight crew, and checking the plaintiff's carry-on baggage for any medication he may be taking or other information that could assist the doctor in treating him.  *Id.* In addition, the flight crew contacted and consulted with Korean Air's Aeromedical Service

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1   Center and contacted Korean Air's Operations Control Center to advise it of the situation and

2   begin the process of diverting the aircraft.  *Id.*  The Korean Air Aeromedical Service Center

3   recommended that the aircraft be diverted, and the pilot diverted the aircraft to Seattle.  *Id.*  The

4   court ultimately held that the plaintiff had failed to provide evidence of any industry standard or

5   practice or internal policy or procedure not followed by Korean Air, and dismissed the lawsuit.

6   *Id.* at *6.

7          Likewise, in *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp. 3d 436, 443

8   (E.D.N.Y. 2014), aff'd, 621 F. App'x 82 (2d Cir. 2015), the district court found that Plaintiff

9   could not satisfy his burden of proving that an "accident" had caused his injuries from an in-

10  flight heart attack because the Plaintiff "has not pointed to any 'significant departure' from a

11  Lufthansa policy and procedure that was unexpected and could be deemed an "accident" under

12  the Montreal Convention."  The Court noted that rather, "the record makes clear that the crew of

13  Flight LH427 followed Lufthansa policy and procedure in all material respects."  *Id.*

14         The facts of *Safa* are strikingly similar to the present case, the only distinction being that

15  in *Safa*, the passenger was severely incapacitated, unlike Plaintiff in this case, whose only

16  symptoms were several seconds of disorientation, dropping his mobile phone, and stumbling on

17  the way to the aircraft lavatory.  In *Safa*, the flight purser was informed of and responded to the

18  medical situation involving the plaintiff.  Medical equipment was gathered and the purser

19  requested medical assistance, to which two or three physicians responded. With the physicians

20  administering care to the Plaintiff, the purser informed the cockpit crew of the situation. The

21  purser completed an emergency medical report and obtained the opinions of the physicians

22  regarding the severity of the incident. The physicians expressed their opinion that they were

23  uncertain if the Plaintiff had suffered a heart attack but essentially advised that no life-

24  threatening situation presented itself.  The purser conveyed this opinion to the cockpit crew.  *Id.*

25  at 442-43.  The Court held that minor deviations from Lufthansa's policies and procedures, such

26  as the purser mistakenly informing the captain of the flight that a cardiologist was attending to

27  the passenger, were insufficient to constitute an "accident" under Article 17 of the Convention.

28  *Id.*

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    Following these cases, passengers such as Plaintiffs seeking to hold an air carrier liable

2    for bodily injury sustained in flight has the burden of proving that the carrier substantially

3    deviated from its policies and procedures in a way that was "unexpected or unusual" such as to

4    constitute an "accident" under Article 17 of the Montreal Convention.  In this case, Plaintiffs

5    cannot meet that burden.  Plaintiffs urge that Plasencia's symptoms should have been

6    immediately recognized as stroke symptoms, but the fact remains that Plaintiffs were the only

7    parties in full possession of information indicating that Plasencia was likely undergoing a stroke,

8    and intentionally hid this information from the American Airlines crew members in order to

9    attempt to continue on their vacation to Madrid.   The American Airlines crew followed  policies

10   and procedures as well as industry practice to the letter, and did their utmost to provide excellent

11   care to Plasencia.  The fact that the American Airlines crew members were unable to recognize

12   Plasencia's symptoms as a stroke, particularly where Plaintiffs were doing their utmost to

13   minimize those symptoms, is not an "accident" under the Convention under all of the foregoing

14   authority.

15       In addition, to discharge their burden of proof under the Montreal Convention, and defeat

16   this motion for summary judgment, Plaintiffs must establish that an "accident" <u>proximately</u>

17   <u>caused</u> Plasencia's injuries.  *See Floyd*, 499 U.S. at 535-36; *Saks*, 470 U.S. at 396; *Rodriguez v.*

18   *Ansett Australia Airlines Ltd.,* 383 F.3d 914, 916 (9th Cir. 2004), *cert. denied*, 544 U.S. 922

19   (2005) (Warsaw); *Dogbe v. Delta Air Lines, Inc.*, 11-CV-6289 KAM LB, 2013 WL 4522572

20   (E.D.N.Y. Aug. 27, 2013).  Again, Plaintiffs cannot satisfy this burden.

### III

### PLAINTIFFS CANNOT PROVE THAT ANY ALLEGED "ACCIDENT" ONBOARD THE FLIGHT WAS THE PROXIMATE CAUSE OF PLAINTIFFS' INJURIES

24       Plaintiffs will be unable to meet their burden of proof at trial for the separate and

25   independent reason that Plaintiffs cannot prove that any occurrence onboard the American

26   Airlines flight caused Plasencia's injuries.  Even if Plaintiffs could prove that an "accident"

27   occurred onboard the flight, the Convention requires that Plaintiffs prove, by a preponderance of

28   the evidence, that the acts constituting the accident *caused* Plaintiff's damages.  *See Shah v. Pan*

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

*American World Services, Inc.*, 148 F.3d 84, 93–97 (2d Cir. 1998) (Warsaw).  It is not enough that Plaintiffs establish facts constituting an Article 17 "accident."  This was made clear in by the United States Supreme Court in *Air France v. Saks*.  In *Air France*, the Supreme Court clearly stated that injury or death must be caused by an accident to satisfy Article 17.  Specifically, the Court stated:

> [T]he text of Article 17 refers to an accident **which caused** the passenger's injury, and not to an accident which is the passenger's injury… In Article 17, the drafters of the Warsaw Convention apparently did make an attempt to discriminate between "the cause and effect"; the specified that air carriers would be liable if an accident caused the passenger's injury.  The text of the Convention thus implies that, however we define "accident,' it is the **cause** of the injury that must satisfy the definition rather than the occurrence of the injury alone.  American jurisprudence has long recognized this distinction between an accident that is the cause of an injury and an injury that is itself an accident. *See Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491m 78 L. Ed. 934, 54 S. Ct. 461, 90 ALR 1382 (1934).

*Air France v. Saks*, 470 U.S. at 398-399 (*emphasis in original*). Traditional proximate cause and cause-in-fact analysis must be considered.  *In re Air Crash Near Cali, Colombia on December 20, 1995*, 985 F. Supp. 1106, 1146 (S.D.Fl. 1996), *vacated in part on other grounds in Cortes v. American Airlines, Inc.*, 177 F.3d 1272 (111th Cir. 1999); *Margrave v. British Airways,* 643 F. Supp. 510, 514 (S.D.N.Y. 1986); *Jamil v. Kuwait Airways Corp.,* 773 F. Supp. 482, 484 (D.D.C. 1991); *Shah v. Pan American World Services, Inc.,* 148 F.3d 84, 93-97 (2d Cir. 1998); *In re Air Crash at Little Rock Arkansas, on June 1, 1999,* 291 F.3d 503, 512 (8th Cir. 2002).  "[T]he conduct of the carrier, his servants and agents, however blameworthy it may have been, is irrelevant if it did not cause the damage in question."  1 Shawcross & Beaumont, *Air Law* (Butterworths 1998), citing *Goepp v. American Overseas Airlines, Inc.,* 3 Av. Cas. 18,057 (N.Y.A.D., 1952).

A plaintiff cannot recover damages based upon the mere possibility that a defendant's conduct caused the harm.  *See Williams v. Wraxall*, 33 Cal. App. 4th 120, 133 (1995).  In *Williams*, the Court stated:

> Evidence of causation must rise to the level of a reasonable

probability based upon competent testimony…. 'A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.' **The defendant's conduct is not the cause in fact of harm 'where the evidence indicates that there is less than a probability, i.e., a 50-50 possibility or a mere chance,' that the harm would have ensued.**

*Id.* (*emphasis added*) (In professional malpractice action, there was no credible evidence to show that had expert witness made his test results available to the defendant in the underlying criminal action, an acquittal would have been more probable than not.); *see also Jennings v. Palomar Pomerado Health Systems*, 114 Cal. App. 4th 1108, 1117 (2004) ("A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, *it becomes more likely than not that the injury was a result of its action.*") (*emphasis in original*).

Here, Plaintiffs allege that the act that constitutes an Article 17 "accident" is American Airlines' failure to insist on a medical evaluation for Plasencia, either prior to departure or an hour and a half into the flight. However, Plaintiffs cannot meet their burden of proving that it is more probable than not that Plasencia's damage would have been avoided if they had been evaluated by healthcare professionals in Miami, or if the aircraft had diverted one and a half hours into the flight. In fact, it is distinctly improbable that any change in Plasencia's condition would have resulted from earlier medical treatment.

Plaintiffs' expert neurologist, Dr. Jack Schim, plans to testify at trial that Plasencia was more likely than not to experience improvement in his condition based upon the administration of TPA at Miami. American Airlines does not dispute that TPA is the "gold standard" for the treatment of an acute ischemic stroke such as the type experienced by Plasencia, and that this treatment, timely administered, was the only possibility of an improved outcome for Plasencia following the massive stroke he experienced. Rather, American Airlines argues that testimony from Dr. Schim that Plasencia would have had a better outcome had he received TPA should be excluded at trial because (A) the chain of causation is too remote; (B) Plasencia was not a candidate for TPA because of his high blood pressure; and (C) when it is (rarely) administered, TPA does not result in any improvement for more than 50% of patients. Under all Circuit Court

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

TRIAL BRIEF OF AMERICAN AIRLINES, INC.    - 16 -
CASE NO.: 5:23-cv-05607-NW-SVK

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

authority on this issue, this evidence should not be admitted and Plaintiffs cannot meet their burden of proof.

**A.    The Chain of Causation Presented by Dr. Schim Is Too Remote:**  Dr. Schim testifies that if Plasencia had been examined by any healthcare provider at Miami, prior to departure, this unidentified healthcare provider would have recognized Plasencia's symptoms as a transient ischemic stroke ("TIA") <u>and</u> advised him to go to the hospital, notwithstanding that Plasencia stated that he felt fine and wanted to proceed with his flight.  *See* Ex. F, Excerpts of Schim Deposition, pp. 42-44; 53.  Dr. Schim further posits that Plasencia would have taken this hypothetical advice and disembarked the flight and presented to a hospital, notwithstanding the fact that all evidence shows Plaintiffs were determined to take their flight to Spain.  *Id*.  Dr. Schim next claims that Plasencia would have gone to a stroke-admitting hospital with personnel who could have detected Plasencia's unique symptoms.  *Id*.  Dr. Schim asserts that had Plasencia presented himself for treatment at the emergency department of a stroke-admitting hospital, he would have received timely and appropriate diagnostic care, including brain imaging, which according to Dr. Schim, <u>would have been normal</u> after his TIA but prior to his stroke.  *Id.* at 45-46.  Dr. Schim testifies that Plasencia would have been admitted as an in-patient for observation, notwithstanding normal brain imaging.  *Id.* at 43.  The final link in the chain of causation, as it is formulated by Plaintiffs, is that had Plasencia disembarked the aircraft at Miami, presented at a stroke-receiving hospital, received appropriate diagnostic care and been admitted as in-patient based upon that diagnostic care, he would have been under the care of appropriate medical professionals at the time he experienced a massive ischemic stroke several hours later, and that these healthcare professionals would have administered TPA within the 4.5 hour window for doing so.  *Id.* at 42-6.

Alternatively, Dr. Schim testifies that American Airlines should have paged for a medical professional and sought advice from a remote healthcare services provider approximately 1.5 hours into the flight when a flight attendant observed Plasencia to stumble.  *Id.* at 43; 169.  Even assuming that Plasencia's stumble could have possibly alerted a flight attendant that he was having a stroke, what Dr. Schim's testimony does not consider is that it would have taken at least forty-five minutes to an hour in total for the American Airlines crew to page for a doctor on the flight, for that doctor to evaluate Plasencia's condition, for the Captain to call for advice on

treatment and a possible diversion, and if diversion was recommended, to formulate a plan for diversion. This assumes that the healthcare providers would have recommended diversion at this point, while Plasencia was still behaving normally, based only upon Plasencia's prior symptoms and stumble. At this point, it would then have taken another 2.5 hours to pilot the aircraft back to Miami. Even assuming the American Airlines crew had returned to Miami approximately 2.5 hours into the flight, as of the moment the aircraft hit the tarmac, Plasencia would have had less than an hour (with the 4.5 hour clock beginning at his stumble) to be transported off of the aircraft, clear customs, be transported to a stroke-receiving hospital, receive diagnostic imaging of his brain, to have his prohibitively high blood pressure lowered if possible, and actually receive TPA. Under either scenario, Dr. Schim's testimony is pure speculation and does not meet the threshold for establishing causation.

**B.    Dr. Schim's Testimony Regarding TPA Should Be Excluded because Plasencia Was Not a Candidate for TPA Due to His High Blood Pressure:** The parties' experts agree that TPA cannot be administered to patients with a systolic blood pressure of over 185. *See* Ex. F (Excerpts of Deposition of Dr. Schim); Ex. G, Expert Report of Dr. Suite, ECF No. 145-9, pp. 2-3. Although there are medications that can lower a patient's blood pressure, not all patients respond to these medications. Here, the undisputed evidence shows that Plasencia's systolic blood pressure was over 200 at the time he was taken by ambulance to Ramon y Cajal hospital in Madrid, and that he did not respond to 15 mg of labetalol given in the ambulance to attempt to lower his blood pressure. *See* Ex. D, p. 2 (Records from Ramon y Cajal Hospital in Madrid). Plasencia's systolic blood pressure was 210 when he arrived at Ramon y Cajal, at which point he was provided a second, 50 mg dose of labetalol to lower his blood pressure. *See* Ex. E, p. 12 (Medical Records from La Paz Hospital in Madrid). Plasencia was simply never a candidate for TPA in light of his blood pressure.

**C.    TPA Does Not Result in Improvement in Greater than 50% of Ischemic Stroke Patients:** Plaintiffs concede that causation must be proved by a preponderance of the evidence (greater than 50% likelihood). Omnibus Motion in Limine, ECF No. 145, 11:7-9. American Airlines does not dispute that TPA provided the best chance of any improvement for Plasencia, but the evidence simply shows that only a small number of patients who present promptly for stroke treatment receive TPA, and among those who do receive TPA, TPA only

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

results in improvement in a small percentage of cases. *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 34 (1st Cir. 2012) (upholding exclusion of expert testimony regarding administration of TPA on the grounds that "[t]he unavoidable conclusion from the studies deemed authoritative by [expert] is that only a small number of patients overall (and only a small fraction of those who would otherwise have experienced stroke-related injuries) experience improvement when t-PA is administered.") *Smith v. Bubak*, 643 F.3d 1137, 1138 (8th Cir. 2011) (affirming district court's grant of motion to exclude expert evidence that plaintiff had a 58% change of at least a partial recovery had she timely received TPA); *Young v. Mem'l Hermann Hosp. Sys.*, No. CIV A. H-03-1859, 2006 WL 1984613, at *6 (S.D. Tex. July 14, 2006), *aff'd*, 573 F.3d 233 (5th Cir. 2009) ("[Plaintiffs] have not and cannot show, as a matter of law, that Randall Young had a 51 percent or greater chance of avoiding his severely disabled condition had he received tPA treatment at Hermann Hospital on March 29, 2003."); *Dannenberg v. United States*, No. 04-CV-4897 NGG JMA, 2010 WL 4851341, at *1 (E.D.N.Y. Nov. 22, 2010) (at trial, plaintiff, who was taken to hospital after demonstrating stroke symptoms, asserted that, were it not for that malpractice, she could have been treated with TPA and avoided much of the stroke-related damages that she later suffered – plaintiff failed to prove by a preponderance of the evidence that—even assuming she was a TPA candidate—the lack of treatment with TPA was a substantial contributing factor to her injuries).

Moreover, the evidence relied upon by Dr. Schim establishes that, under the best circumstances, only 3% to 8.5% of potentially eligible patients receive TPA and less than 2% of community hospitals use it. *See* Exhibit H; *see also* ECF No. 145-7, Report of Dr. Schim, p. 15/15 (citing to Exhibit H).

Plaintiffs have offered two district court opinions to rebut this authority. One contains a cursory discussion of this issue and does not consider the opinions of the First, Fifth and Eighth Circuits in *Samaan*, *Smith*, or *Young*. *Salazar v. United States*, No. 20-CV-941-SWS/MLC, 2021 WL 6808324, at *1 (D.N.M. Dec. 30, 2021). *Salazar* is not persuasive for these reasons, alone.

The other case relied upon by Plaintiffs involves a "young" stroke victim, where the district court considered the above-cited Circuit Court opinions but permitted evidence of TPA to

establish causation due to the plaintiff's young age and the established efficacy of TPA on young stroke patients without comorbidities. *Banks v. Munir*, No. 120CV03729CNSMDB, 2023 WL 2914811, at *6 (D. Colo. Apr. 12, 2023). Here, Plasencia was 63 at the time of his stroke, with hypertension, obesity, and type II diabetes. This logic and reasoning does not apply in this case. Plaintiffs cannot meet their burden of establishing causation.

**IV**

**AMERICAN AIRLINES HAS A COMPLETE DEFENSE TO PLAINTIFFS' CLAIMS UNDER ARTICLE 20 OF THE MONTREAL CONVENTION**

At trial, American Airlines can be completely exonerated, or its liability reduced, based upon the negligence of both Plaintiffs under Article 20 of the Convention, which provides as follows:

> If the carrier proves that the damage was caused or contributed to by the negligence or other wrongful act or omission **of the person claiming compensation, or the person from whom he or she derives his or her rights**, the carrier shall be wholly or partly exonerated from its liability to the claimant to the extent that such negligence or wrongful act or omission caused or contributed to the damage. **When by reason of death or injury of a passenger compensation is claimed by a person other than the passenger, the carrier shall likewise be wholly or partly exonerated from its liability to the extent that it proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of that passenger.** This Article applies to all the liability provisions in this Convention, including paragraph 1 of Article 21.

Montreal Convention, Art. 20 (*emphasis added*).

Here, the negligence of both Plasencia and Tavantzis in failing to be forthright with the American Airlines crew members or elect to seek medical evaluation prior to departure in Miami, even when provided with the opportunity to deplane, will exonerate American Airlines from liability. Although Plaintiffs argue that only Plasencia's negligence is relevant under Article 20, the plain language of both clauses of Article 20 demonstrates otherwise. With respect to the first clause of Article 20, the negligence of both "the person claiming compensation" (Tavantzis) and "the person from whom he or she derives his or her rights" (Plasencia) may be

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

TRIAL BRIEF OF AMERICAN AIRLINES, INC.
CASE NO.: 5:23-cv-05607-NW-SVK

- 20 -

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1  used under Article 20 to reduce or extinguish American Airlines' liability.  With respect to the

2  second clause, here, "by reason of death or injury of a passenger, compensation is claimed by a

3  person other than the passenger," and American Airlines is entitled to be "wholly or partly

4  exonerated from its liability to the extent that it proves that the damage was caused or

5  contributed to by that passenger" (the person other than the dead or injured passenger –

6  Tavantzis) (emphasis added).  Tavantzis maintains her own loss of consortium claim in this

7  action, and, therefore, the plain meaning of Article 20 demonstrates that her negligence  that

8  contributes to both Plaintiffs' injuries would reduce American Airlines' liability or exonerate the

9  airline.

10          Here, American Airlines will be able to exonerate itself completely or partially from

11  liability in this action because the evidence will show that both Plaintiffs actively concealed

12  Plasencia's family history of stroke and congestive heart failure, history of hypertension and type

13  II diabetes, and the nature and severity of his symptoms on the date of the flight.

14                                              **V**

15  **EVEN IF PLAINTIFFS MEET THEIR BURDEN OF PROOF AND AMERICAN**

16      **AIRLINES IS UNABLE TO EXONERATE ITSELF UNDER ARTICLE 20,**

17      **PLAINTIFFS' DAMAGES WILL BE LIMITED UNDER ARTICLE 21 OF THE**

18                            **MONTREAL CONVENTION**

19          Article 21(2) of the Convention provides another potential defense to American Airlines

20  in this action and provides as follows:

21              2. The carrier shall not be liable for damages arising under
           paragraph 1 of Article 17 to the

22              extent that they exceed for each passenger 100 000 Special
           Drawing Rights if the carrier proves that:

23              (a) such damage was not due to the negligence or other wrongful
           act or omission of the

24              carrier or its servants or agents; or

25              (b) such damage was solely due to the negligence or other
           wrongful act or omission of a

26              third party.

27  Montreal Convention, Art. 21.

28          Accordingly, even if the Court were to determine that Tavantzis's negligence is not

relevant to the Article 20 determination, American Airlines can still cap its liability at the limit of liability under the Convention, if it is able to establish that this incident was not due to the negligence of American Airlines, but rather is due to the negligence of third parties, including Tavantzis and/or Plasencia's healthcare providers in Spain.

## VI

### TAVANTZIS HAS ONLY A DERIVATIVE CLAIM FOR LOSS OF CONSORTIUM, AND IS NOT ENTITLED TO DAMAGES FOR PURELY EMOTIONAL DISTRESS UNDER THE MONTREAL CONVENTION

The parties agree that the Montreal Convention contemplates a pass-through mechanism in Article 29, whereby domestic law controls the issue of whether loss of consortium is cognizable, and that Tavantzis has a derivative claim for loss of consortium under California law. *Kruger v. United Airlines, Inc.*, 481 F. Supp. 2d 1005, 1009 (N.D. Cal. 2007).

Under California law, with respect to a loss of consortium claim, a plaintiff may recover for the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, and loss of enjoyment of sexual relations.  CACI No. 3920.  Here, Tavantzis seeks to recover for her pre-existing depression as well as post-traumatic stress disorder allegedly caused by this incident.  Tavantzis seeks to recover damages for past and future medical care, including chiropractic treatment, for her alleged mental and emotional injuries. Not only are these types of injuries not permitted under California law, they are explicitly barred in cases governed by the Montreal Convention.  *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (mental or psychic injuries unaccompanied by physical injuries are not compensable under Article 17 of the Convention); *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 162, 119 S. Ct. 662, 668, 142 L. Ed. 2d 576 (1999) (same).

### CONCLUSION

For the reasons stated above, American Airlines, Inc. respectfully submits that judgment should be entered in its favor.  As a matter of law, Plaintiffs cannot meet their burden of proving that Plasencia sustained bodily injury as the result of an "accident" under Article 17 of the

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    Convention.   Plaintiffs also cannot meet their burden of proving that any act on the part of

2    American Airlines, Inc. caused Plasencia's injuries and damages.

3    Dated: September 2, 2025                    CONDON & FORSYTH LLP

4

5                                               By: _____

6                                                   IVY L. NOWINSKI

                                                    -and-

7
                                                    DAVID J. HARRINGTON
8                                                   CONDON & FORSYTH LLP
                                                    7 Times Square, 18th Floor
9                                                   New York, NY 10036
                                                    Telephone: (212) 490-9100
10                                                  Facsimile: (212) 370-4453

11                                                  Attorneys for Defendant
                                                    AMERICAN AIRLINES, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1

## CERTIFICATE OF SERVICE

2     I hereby certify that on September 2, 2025, I electronically filed the foregoing with the

3     Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel

4     or parties of record electronically by CM/ECF.

5

6     Sanjiv N. Singh
      SANJIV N. SINGH, APLC
7     1700 South El Camino Real, Suite 503
      San Mateo, California 94402
8     Telephone: (650) 389-2255
      E-mail: ssingh@sanjivnsingh.com
9

10    Darren P. Nicholson
      Hannah M. Crowe
11    BURNS CHAREST LP
      900 Jackson Street, Suite 500
12    Dallas, TX 75202
      Telephone: (469) 904-4550
13    Email: dnicholson@burnscharest.com;
      hcrowe@burnscharest.com
14

15

16    *Attorneys for Plaintiff*

17

18

19                                        Hannah Beck-Kilps

20

21

22

23

24

25

26

27

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030