1   Ivy L. Nowinski (State Bar No.: 268564)
    Email: inowinski@condonlaw.com
2   CONDON & FORSYTH LLP
    1901 Avenue of the Stars, Suite 1050
3   Los Angeles, California 90067-6036
    Telephone: (310) 557-2030
4   Facsimile:  (310) 557-1299

5      - and -

6   David J. Harrington (*Pro Hac Vice*)
    Email: dharrington@condonlaw.com
7   CONDON & FORSYTH LLP
    7 Times Square, 18th Floor
8   New York, New York 10036
    Telephone: (212) 490-9100
9   Facsimile:  (212) 370-4453

10  Attorneys for Defendant
    AMERICAN AIRLINES, INC.

11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14

15  ANA MARIA MARCELA TAVANTZIS, as an )   Case No. 5:23-cv-05607-NW-SVK
    individual, and as Legal Guardian of JESUS )
16  PLASENCIA, an incapacitated person, )      **NOTICE OF MOTION AND MOTION
                                        )       OF DEFENDANT AMERICAN
17                        Plaintiff,    )       AIRLINES, INC. FOR JUDGMENT AS
                                        )       A MATTER OF LAW (FED. R. CIV. P.
18          vs                          )       50(b))**
                                        )
19  AMERICAN AIRLINES, INC.,            )       Date:      April 22, 2026
                                        )       Time:      9:00 a.m.
20                        Defendant.    )       Place:     Courtroom 3 – 5th Floor
                                        )
21                                      )
                                        )
22  _____  )

23  TO PLAINTIFF AND HER ATTORNEYS OF RECORD:

24          PLEASE TAKE NOTICE that on April 22, 2026, at 9:00 a.m., in the above-captioned

25  court, located at 280 South 1st Street, Courtroom 3 – 5th Floor, San Jose, California 95113,

26  defendant American Airlines, Inc. ("American Airlines"), by and through its attorneys of record,

27  Condon & Forsyth LLP, will move this Court for judgment as a matter of law pursuant to Rule

28  50(b) of the Federal Rules of Civil Procedure on the grounds set forth herein.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    Judgment in this matter having been entered on December 22, 2025, Defendant American

2    Airlines, Inc. ("American Airlines") now renews its motion for judgment as a matter of law

3    pursuant to Rule 50(b) of the Federal Rules of Civil Procedure on the grounds set forth herein.

4    This motion will be based upon this Notice of Motion and Motion, the Memorandum of Points

5    and Authorities, the Declaration of Ivy L. Nowinski and exhibits thereto, and on all papers and

6    records on file in the above-entitled action, as well as such oral and documentary evidence as

7    may be presented at the hearing of this motion.

8

9    Dated: January 16, 2025                    CONDON & FORSYTH LLP

10

11                                              By: /s/ *Ivy L. Nowinski*

12                                                  IVY L. NOWINSKI

                                                    -and-

13                                                  DAVID J. HARRINGTON

14                                                  CONDON & FORSYTH LLP
                                                    7 Times Square, 18th Floor
15                                                  New York, NY 10036
                                                    Telephone: (212) 490-9100
16                                                  Facsimile: (212) 370-4453

17                                                  Attorneys for Defendant
                                                    AMERICAN AIRLINES, INC.

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

3   TABLE OF AUTHORITIES .................................................................................ii-iv

4   I.      INTRODUCTION .............................................................................1

5   II.     SUMMARY OF THE EVIDENCE .................................................3

6           A.      Pre-Flight in Miami.................................................................4

7           B.      The Incident Over Bermuda.....................................................6

8           C.      Medical Treatment for Ischemic Stroke .................................7

9   III.    LEGAL STANDARD .......................................................................9

10  IV.     PLAINTIFF HAS NOT ESTABLISHED A MONTREAL CONVENTION
            ARTICLE 17 "ACCIDENT" AS A MATTER OF LAW .................10

11          A.      Definition of "Accident" under Article 17 of the Montreal Convention ...11

12          B.      In Miami, American Airlines Personnel Did Not Ignore a Specific Health-
13                  Based Request from Plaintiff or Mr. Plasencia and Did Not Violate a
                    Policy, Procedure or Industry Standard ...................................21

14          C.      1.5 Hours after Takeoff, American Airlines did not Ignore a Health-Based
15                  Request and Did Not Violate a Policy, Procedure or Industry Standard ...22

16  V.      AMERICAN AIRLINES IS ENTITLED TO JUDGMENT AS A MATTER OF
            LAW BECAUSE PLAINTIFF CANNOT MEET HER BURDEN OF
17          PROVING PROXIMATE CAUSE ....................................................22

18  VI.     AMERICAN AIRLINES IS ENTITLED TO JUDGMENT AS A MATTER OF
19          LAW UNDER ARTICLE 20 OF THE MONTREAL CONVENTION BECAUSE
            PLAINTIFF AND MR. PLASENCIA FAILED TO SEEK OR REQUEST
20          MEDICAL ATTENTION OR ALERT THE CREW THAT MR. PLASENCIA'S
            CONDITION WAS DETERIORATING ...........................................24

21

22  VII.    CONCLUSION...................................................................................25

23

24

25

26

27

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Japan Airlines Co.*,
    739 F.2d 130 (3d Cir.1984)............................................................................20

*Air France v. Saks*,
    470 U.S. 392 (1985)........................................................................11, 12, 13

*Arzu v. American Airlines, Inc.*,
    782 F. Supp. 3d 361 (2025) ............................................................................19

*Blansett v. Continental Airlines, Inc.*,
    379 F.3d 177 (5th Cir. 2004) ...........................................................................14

*Caman v. Cont'l Airlines, Inc.*,
    455 F.3d 1087 (9th Cir. 2006) .............................................................*passim*

*Dannenberg v. United States*,
    No. 04-CV-4897 NGG JMA, 2010 WL 4851341 (E.D.N.Y. Nov. 22, 2010).......................24

*E.E.O.C. v. Go Daddy Software, Inc.*,
    581 F.3d 951 (9th Cir. 2009) .............................................................................9

*Fulop v. Malev Hungarian Airlines*,
    244 F. Supp. 2d 217 (S.D.N.Y.2003).................................................................18

*Janes v. Wal–Mart Stores, Inc.*,
    279 F.3d 883 (9th Cir. 2002) .............................................................................9

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) .............................................................................9

*Krys v. Lufthansa German Airlines*,
    119 F.3d 1515 (11th Cir.1997) .........................................................................20

*McCaskey v. Continental Airlines, Inc.*,
    159 F. Supp. 2d 562 (S.D. Tex. 2001) ..............................................................12

*Medina v. Am. Airlines, Inc.*,
    No. 02-22133 CIV, 2006 WL 3663692 (S.D. Fla. Nov. 14, 2006) .......................24

*Olympic Airways v. Husain*,
    540 U.S. 644 (2004)........................................................................11, 12, 13, 19

*Ostad v. Or. Health Scis. Univ.*,
    327 F.3d 876 (9th Cir. 2003) .............................................................................9

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

*Rajcooar v. Air India Limited*,
 89 F. Supp. 2d 324 (E.D.N.Y. 2000) ...........................................................19, 20

*Reeves v. Sanderson Plumbing Prods., Inc.*,
 530 U.S. 133 (2000)...................................................................................................10

*Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*,
 42 F. Supp. 3d 436 (E.D.N.Y. 2014) .....................................................................18, 19

*Samaan v. St. Joseph Hosp.*,
 670 F.3d 21 (1st Cir. 2012).......................................................................................23

*Singh v. Caribbean Airlines Ltd.*,
 49 F. Supp. 3d 1108 (S.D. Fla. 2014) .............................................14, 15, 16, 17

*Smith v. Bubak*,
 643 F.3d 1137 (8th Cir. 2011) .................................................................................23

*Sook Jung Lee v. Korean Air Lines Co.*, LTD, SACV 10-01709-JVS, 2012 WL 1076269
 (C.D. Cal. Mar. 21, 2012) .........................................................................................17

*Tandon v. United Air Lines*,
 926 F. Supp. 366 (S.D.N.Y.1996) ............................................................................20

*Twardowski v. Am. Airlines*,
 535 F.3d 952 (9th Cir. 2008) ..............................................................................13, 17

*Walker v. Eastern Air Lines, Inc.*,
 775 F. Supp. 111 (S.D.N.Y. 1991) ...........................................................................20

*Wallace v. City of San Diego*,
 479 F.3d 616 (9th Cir. 2007) ....................................................................................10

*White v. Emirates Airlines, Inc.*,
 493 Fed. Appx. 526 (5th Cir. 2012).........................................................................14

*Young v. Mem'l Hermann Hosp. Sys.*,
 No. CIV A. H-03-1859, 2006 WL 1984613 (S.D. Tex. July 14, 2006) ........................23, 24

**Statutes and Treaties**

The Convention for the Unification of Certain Rules for International Carriage by Air, done at
 Montreal on May 28, 1999, ICAO Doc. No. 9740 (entered into force on November 4, 2003),
 reprinted in Treaty Doc. 106-45, 1999 WL 33292734 (2000)
 ("Montreal Convention") ................................................................................. *passim*

The Convention for the Unification of Certain Rules Relating to International Transportation
 by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934),
 *reprinted in note following* 49 U.S.C. § 40105 (1997) ("Warsaw Convention") ..........1, 14, 20

Fed. R. Civ. P. 50 (West 2026).......................................................................................1, 9

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

# I.    INTRODUCTION

American Airlines renews its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on three bases:

1.    Plaintiff Marcela Tavantzis ("Plaintiff") did not meet her burden of establishing an "accident" withing the meaning of Article 17 of the Montreal Convention as a matter of law.

2.    Plaintiff did not meet her burden of establishing, by a preponderance of the evidence, that any act or omission of American Airlines proximately caused an exacerbation of Mr. Plasencia's stroke-related injuries and damages as a matter of law.

3.    American Airlines has met its burden of proving that it is entitled to complete exoneration under Article 20 of the Montreal Convention because Plaintiff and Mr. Plasencia bear 100% of the fault for this incident. Given the opportunity to deplane, they chose to stay on the flight and never advised American Airlines personnel of Mr. Plasencia's worsening condition. Instead, they repeatedly advised American Airlines personnel that Mr. Plasencia was "okay," including at 1.5 hours after takeoff. Their negligence exonerates American Airlines.

No reasonable juror could conclude that this incident constitutes an "accident" under Article 17 of the Montreal Convention. All caselaw interpreting the Montreal Convention and its predecessor, the Warsaw Convention, holds that a passenger's stroke, alone, is not an "accident." Binding Ninth Circuit case law explicitly holds that an air carrier's inaction, in the absence of a specific health-based request, is not an "accident" as a matter of law (*Caman*). All cases on this issue further hold that an airline's response to a passenger's internal medical condition will not constitute an "accident" unless (1) the crew ignores a passenger's health-based request for assistance or aid; or (2) the crew <u>substantially</u> deviates from its policies and procedures in responding to a passenger's <u>medical emergency</u> in a way that is so extreme as to be unusual or unexpected. All cases that have analyzed an air carrier's "imperfect" response to a medical emergency or minor deviations from policies, procedures, and industry standards, including communication errors and failing to correctly diagnose a passenger's symptoms, have held that such deviations will not constitute an "accident" as a matter of law. Here, no evidence was presented to the jury of any health-based request by Plaintiff or Mr. Plasencia. Plaintiff seeks to

hold American Airlines liable for its failure to insist that Mr. Plasencia undergo a medical evaluation, even where such evaluation had not been requested and American Airlines had been assured by both Plaintiff and Mr. Plasencia that he was "okay." Under *Caman*, this is impermissible. Likewise, no evidence was presented to the jury that any policy or procedure of American Airlines or other industry standard was not followed, much less that American Airlines deviated from its policies or procedures or industry standard in any substantial or material way. Accordingly, as a matter of law, Plaintiff cannot meet her burden of establishing an "accident" under the Montreal Convention framework of liability.

American Airlines also brings this motion on the grounds that no reasonable juror, properly understanding the applicable standard of proof, could find that Plaintiff met her burden of establishing causation as a matter of law. The Parties agree that Plaintiff was required to establish, by a greater than 50% probability, that an act or omission by American Airlines resulted in an exacerbation of Mr. Plasencia's stroke-related injuries. The medical experts agreed that the only treatment that could have improved Plaintiff's outcome was thrombolysis (also known as tissue plasminogen activator or "tPA"), which cannot be administered to patients with a systolic blood pressure over 185, and must be administered within 3 (FDA approved) or 4.5 hours (common practice in US and Europe) of the onset of a stroke. Accepting Plaintiff's expert's testimony as true, the stroke occurred approximately 3.3 three hours prior to landing in Madrid. No testimony was offered regarding any available diversion points over the Atlantic Ocean. The medical experts agreed that Mr. Plasencia's blood pressure was always too high for the administration of tPA after landing in Madrid. The medical experts further agreed that this treatment is only administered to less than 10% of stroke victims on land who promptly present for treatment of their stroke symptoms. Moreover, the defense medical expert provided uncontroverted testimony that the administration of tPA results in recovery or improvement in only 35% of cases, and that that the only comprehensive study on the efficacy of tPA found that it results in a worse outcome for Latino males over age 65 such as Mr. Plasencia. **No evidence was submitted to the jury that Mr. Plasencia had a stroke earlier than 3.3 hours prior to landing in Madrid, and no evidence was submitted to the jury that his blood pressure was**

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

**more likely than not to have been within the proper range for the administration of tPA had he received earlier medical treatment.** Accordingly, no reasonable juror could have found that, more likely than not, any act or omission exacerbated Mr. Plasencia's injuries or damages – the experts agree that tPA was the only intervention that could have improved Mr. Plasencia's outcome, Mr. Plasencia was not a candidate for tPA in Madrid, there was no evidence that Mr. Plasencia was ever a candidate for tPA, and the uncontroverted evidence was that tPA only results in improvement or recovery for 35% of the less than 10% of stroke victims who receive it.

Finally, American Airlines has a complete defense under Article 20 of the Montreal Convention because Plaintiff and Mr. Plasencia were solely negligent in their refusal to deplane in Miami or to ask for medical evaluation or assistance 1.5 hours into the flight. Prior to takeoff, Mr. Plasencia did not recognize his symptoms as a medical emergency or a precursor to a stroke. It is not disputed that Mr. Plasencia exhibited no signs of a stroke to American Airlines personnel pre-flight. Although Plaintiff testified that she believed Mr. Plasencia was having a stroke and wished for him to get medical treatment, she did not communicate this desire to American Airlines. Plaintiff testified that she asked Mr. Plasencia to deplane, and Mr. Plasencia then chose to ignore Plaintiff's concerns and instead told all American Airlines personnel that he was fine and wished to travel. Plaintiff admits that she did not communicate her fear that Mr. Plasencia was having a stroke to Captain Occhino when he directly asked if Mr. Plasencia was okay, and Plaintiff decided not to press the issue out of respect for her husband. The evidence demonstrates that, as a matter of law, the only persons who were negligent with respect to this incident were Plaintiff and Mr. Plasencia, who bear 100% of the total fault for this incident.

## II.    SUMMARY OF THE EVIDENCE

The Parties do not dispute that once American Airlines realized Plaintiff was experiencing a stroke, approximately 1.5 hours before landing in Madrid, American Airlines fully complied with all policies and procedures and arranged for all necessary medical care and transportation for Mr. Plasencia, both onboard the aircraft and upon arrival. In connection with pre-trial proceedings in this matter, Plaintiff narrowed her claims to allege two specific

"accidents" under Article 17 of the Montreal Convention: (1) the events that occurred in Miami, prior to takeoff; and (2) the events that occurred approximately 1.5 hours after takeoff from Miami. The evidence presented at trial regarding these incidents, as well as the evidence presented regarding the medical treatment available to Mr. Plasencia, is as follows.

### A. Pre-Flight in Miami

Plaintiff testified that she and Mr. Plasencia boarded Flight 68 to Madrid as normal. Nowinski Declaration, Ex. A, Trial Transcript, September 9, 2025, 232:10-13. Plaintiff testified that shortly after they sat down, Mr. Plasencia dropped his phone and was unable to grab it. *Id.* at 233:7-13. Plaintiff leaned over, grabbed the phone, handed it to Mr. Plasencia, and Mr. Plasencia spoke gibberish for "a few seconds." *Id.* at 233:7-13; 294:1-7. Plaintiff then stood up and said, in a volume that was neither whispering nor screaming, that Mr. Plasencia was having a stroke. *Id.* Flight Attendant David Eccles ("FA Eccles"), immediately came to assist Plaintiff. *Id.* at 234:10-13. Plaintiff told FA Eccles that she had observed Mr. Plasencia speaking gibberish and that she thought he was having a stroke. *Id.* at 234:25 – 235:1. Plaintiff testified that FA Eccles asked Mr. Plasencia if he was OK, and that Mr. Plasencia said yes. *Id.* at 235:2-5. Crediting Plaintiff's testimony, which differed from FA Eccles' testimony, Plaintiff then said "**<u>Maybe</u>** we shouldn't fly" (*emphasis added*) and FA Eccles responded that "I will get somebody that can make that decision." *Id.* Plaintiff never testified that she asked for medical personnel to assist or evaluate them and claimed that she didn't know that she could. *Id.* at 235:6-22. Plaintiff testified it was her internal expectation that medical personnel would return and evaluate Mr. Plasencia prior to takeoff, but she never verbally communicated her expectation to American Airlines. *Id.*

FA Eccles confirmed Plaintiff's testimony that he spoke with both Plaintiff and Mr. Plasencia. He asked Mr. Plasencia if he was okay, and Mr. Plasencia said yes, he was okay. Nowinski Decl., Ex. C, Trial Transcript, September 11, 2026, 528:2-9. FA Eccles further testified that he asked Plaintiff and Mr. Plasencia both several times if they would like to get off of the aircraft to get medical assistance and that they both said no. *Id.* at 528:20 - 529:11. FA Eccles then told Purser Kelly Gambello of his interaction with Plaintiff and Mr. Plasencia, who

reported the interaction to Captain Anthony Occhino. *Id.* at 574:19-24. FA Eccles, Purser Gambello, and Captain Occhino each had slightly different recollections regarding what they reported or what was reported to them. Purser Gambello testified that FA Eccles told her that Mr. Plasencia's wife was worried about him because he seemed "confused." *Id.* at 630:19 – 631:1. Captain Occhino testified that he was told Mr. Plasencia was "disoriented." *Id.* at 650:3-22. Neither Purser Gambello nor Captain Occhino considered it a medical situation at this point. *Id* at 631:8-14. Captain Occhino testified that he decided to leave the flight deck to investigate the situation himself, and to make sure there was not a safety concern, as he has ultimate responsibility for the safety of the flight. *Id.* at 651:17-653:9. Captain Occhino testified that he asked both Plaintiff and Mr. Plasencia "multiple times" if they were okay, and that they both stated that they were fine and wished to continue with their flight. *Id.* at 652:18-22; 654:17-21. He further testified that Mr. Plasencia exhibited no symptoms known to be associated with a stroke at this time. *Id.* at 653:3-654:7.

Plaintiff testified that she was surprised Captain Occhino came to speak to Plaintiff and Mr. Plasencia, because she had expected medical personnel to assist them, although they did not ask for such assistance. Nowinski Decl., Ex. A, Trial Transcript, September 9, 2025, 235:6-22. Plaintiff confirmed Captain Occhino's testimony that he asked Mr. Plasencia if he was okay, if he needed any help, and if he wanted to get off the aircraft. *Id.* at 235:23-25; 236:2-18. Plaintiff testified that Mr. Plasencia told Captain Occhino that he was okay, that he did not need help, and that he did not want to get off the aircraft. *Id.* Plaintiff testified that she told Captain Occhino that Mr. Plasencia spoke gibberish. She further testified that she wanted to get off the aircraft, but did not communicate this desire to Captain Occhino, FA Eccles, or anyone else other than Mr. Plasencia and her family members via text messages, out of respect for her husband's autonomy and wishes. *Id.* at 238:25 - 239:10. Plaintiff also testified that "if nothing else had happened, I still would have taken him to the doctor, but not as an emergency." *Id.* at 239:19-20.

Plaintiffs' cabin crew expert Kathleen Lord-Jones confirmed there was no violation of policy or industry standard at this point. *Id.* at 361:14-15. Plaintiff's piloting expert testified that Captain Occhino created a safety issue by leaving the cockpit prior to boarding, but there was no

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    testimony that Captain Occhino's decision to leave the cockpit was the cause of any injury

2    suffered by Mr. Plasencia.

3           Importantly, both medical experts agreed that this incident was not a stroke, but rather a

4    transient ischemic attack ("TIA").  Nowinski Decl., Ex. B, Trial Transcript, September 10, 2025,

5    295:3-14.  Plaintiff's medical expert, Dr. Jack Schim, testified that "the very short duration of

6    Mr. Plasencia's TIA would have made it more difficult for someone who is not trained in

7    neurology to recognize it as a TIA."  *Id.* at 320:5-9.  Dr. Schim testified that Mr. Plasencia's "last

8    known well" was after the initial TIA in Miami when he was speaking to Captain Occhino and

9    advised Captain Occhino that he wished to continue with his vacation.  *Id.* at 295:3-14.

10          **B.**      **The Incident Over Bermuda**

11          After having no further issues for the duration of boarding, takeoff, and for 1.5 hours of

12   the flight, Mr. Plasencia exhibited "difficulty walking" when he got up to go to the aircraft

13   lavatory 1.5 hours into the flight.  Plaintiff specifically testified that Mr. Plasencia "didn't really

14   need help" although "the flight attendant did offer some help."  Nowinski Decl., Ex. A, Trial

15   Transcript, September 9, 2025, 245:16-19.  FA Eccles confirmed that Mr. Plasencia stated that

16   he was fine and did not need help, but FA Eccles assisted him anyway.  Nowinski Decl., Ex. C,

17   Trial Transcript, September 11, 542:7-21.  Plaintiff and FA Eccles both testified that at this

18   point, they did not observe any visible signs of a stroke other than difficulty walking, which is

19   not explicitly listed as a symptom of a stroke in American Airlines training documents.

20   Nowinski Decl., Ex. A, 305:8-11; Ex. C, 548:7 -549:25.  Plaintiff further testified that other than

21   requesting a wheelchair to assist Mr. Plasencia upon landing, neither she nor Mr. Plasencia asked

22   for help or medical assistance either at this point, or at any point during their travels with

23   American Airlines.  Nowinski Decl., Ex. A, Trial Transcript, September 9, 2025, 305:12-16.

24          Plaintiff's cabin safety expert, Kathleen Lord-Jones testified that FA Eccles breached

25   American Airlines policies and procedures by failing to properly communicate with other crew

26   members.  She testified that FA Eccles "did not **adequately identify a <u>potential stroke-like</u>**

27   **symptom**" (*emphasis added*), and that this was a breach of American Airlines policy and

28   procedures and industry standard, although upon cross-examination, Ms. Lord-Jones admitted

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1   that a cabin crew member's decision to report symptoms was "discretionary" or a "judgment

2   call." *Id.* at 333:4-15; 344:5-10; 357:11-358:11.

3       Plaintiff's piloting expert Captain Richard Levy was not qualified as an expert on cabin

4   crew policies and procedures or the propriety of FA Eccles' actions and his compliance with

5   American Airlines cabin crew policies and procedures and industry standards.   Captain Levy

6   testified that had Mr. Plasencia's difficulty walking been reporting to Captain Occhino, he could

7   have called the physician on call ("POC") to obtain medical assistance and advice.

8       **C.**    **Medical Treatment for Ischemic Stroke**

9       Plaintiff's expert neurologist, Dr. Jack Schim, testified that tPA is the gold standard

10   treatment for ischemic strokes such as the one suffered by Mr. Plasencia, and that before tPA

11   was approved for the treatment of ischemic stroke, there were no effective treatments for stroke.

12   Nowinski Decl., Ex. B, Trial Transcript, September 10, 2025, 281:23-282:6.   Dr. Schim testified

13   that a patient who is timely administered tPA has a "far better" chance of recovery, and that the

14   administration of tPA would have "most probably" resulted in an improvement in Mr.

15   Plasencia's condition if timely administered, although he did not testify regarding the percentage

16   likelihood of any improvement or complete recovery or discuss any studies that would support

17   this opinion at trial.   *Id.* at 278:18-279:22; 287:24-288:2. The defense expert neurologist, Dr.

18   Nicholas Suite, testified regarding all studies that have been performed to date on the efficacy of

19   tPA, and testified that tPA results in an improved prognosis for 35% of stroke patients, and

20   actually results in a worse outcome for Latino males over 65 with hypertension, such as Mr.

21   Plasencia.   Nowinski Decl., Ex. D, Trial Testimony, September 15, 2025, 926:23-927:5; Ex. E,

22   Trial Testimony, September 16, 2025; 1033:20-1042:9; *see also* Trial Exhibit 112.   **This**

23   **testimony was uncontroverted at trial; Dr. Schim did not address these studies at all during**

24   **his trial testimony, nor did he address the percentage of likelihood of an improved**

25   **prognosis for a stroke patient administered tPA.**

26       Dr. Schim testified that in the United States, tPA is FDA approved for administration up

27   to 3 hours after the onset of stroke, but that in the United States and in Europe, as a practical

28   matter, tPA is administered up to 4.5 hours after the onset of a stroke.   Nowinski Decl., Ex. B,

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1  Trial Testimony September 10, 2025, 304:14-305:10. **Dr. Schim testified that he did not know**

2  **whether tPA is approved to be administered more than 3 hours after the onset of stroke in**

3  **Bermuda.** *Id.* at 305:11-13. Dr. Schim testified that tPA cannot be administered to patients that

4  have a systolic blood pressure over 185, but that medication is typically given to lower a

5  patient's blood pressure if it is over 185. *Id.* at 283:14 – 284:22. Dr. Schim testified that tPA is

6  only given to approximately 10% of stroke victims who present for medical treatment on the

7  ground, as opposed to on an aircraft flying over the Atlantic Ocean. *Id.* at 313:16-314:4.

8  　　　With respect to the timing of Mr. Plasencia's stroke, both experts testified that he could

9  not say, to a reasonable degree of medical certainty, exactly when Mr. Plasencia's stroke

10  occurred. Dr. Schim testified that he believed the stroke occurred the stroke occurred between

11  5:15 and 5:45 a.m. local time Madrid, but "not much" earlier than that.[1] *Id.* at 311:10-24.

12  American Airlines' expert, Dr. Suite, testified that Mr. Plasencia's stroke likely occurred at

13  around 7:00 a.m. local time Madrid, or approximately 1.5 hours prior to landing, based upon the

14  substantially different symptoms Mr. Plasencia exhibited at this time (facial deformity, couldn't

15  eat, drooling, couldn't move). Nowinski Decl., Ex. D, Trial Transcript, September 15, 2025,

16  912:21 – 914:15.

17  　　　Plaintiff did not argue at trial that any "accident" occurred after the incident

18  approximately 1.5 hours after takeoff, as the aircraft approached Bermuda. Plaintiff's argument

19  is that American Airlines should have recognized Mr. Plasencia's brief and transient TIA and/or

20  his difficulty walking as a precursor to a stroke, even though Mr. Plasencia appeared well at all

21  times when speaking to American Airlines and Dr. Schim testified that it would be difficult for

22  anyone other than a neurologist to recognize Mr. Plasencia's symptoms as a TIA. Plaintiff has

---

23

24  [1] Dr. Schim provided testimony that he himself described as "confusing" regarding the timing of
Mr. Plasencia's brain imaging and stroke. He first testified that the stroke likely occurred at least

25  four or five hours prior to brain imaging time-stamped at **8:00 p.m.** local time – nearly twelve
hours after the aircraft landed. Dr. Schim then changed his testimony, claiming that he may have

26  inadvertently altered the time-stamp, and stated that the imaging was likely taken at Ramon y
Cajal Hospital at approximately 10:15 a.m. local time, and that the stroke likely occurred five

27  hours before that – around 5:15-5:45 a.m. local time in Madrid, approximately three hours prior
to landing and long after Mr. Plasencia exhibited difficulty walking 1.5 hours after takeoff.

28  Given this glaring discrepancy, no reasonable jury could consider Dr. Schim's testimony
regarding when he believes that Mr. Plasencia's stroke occurred. Regardless, Dr. Schim's
<u>testimony supports American Airlines' positio</u>n.

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A
MATTER OF LAW (FED R. CIV. P. 50(b))　　　　　　- 8 -
CASE NO.: 5:23-cv-05607-NW-SVK

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    also presented no evidence that American Airlines personnel is trained to recognize TIA's.

2    With respect to the time it would take Mr. Plasencia to obtain medical treatment if the

3    aircraft had been diverted either back to Miami or to Bermuda, Dr. Schim conceded that it took

4    approximately 1.5 hours from landing in Madrid at 8:36 a.m. local time, until the time he was

5    admitted to Ramon y Cajal Hospital at 10:01 a.m. local time.  Nowinski Decl., Ex. B, Trial

6    Transcript, September 10, 2025, 308:1-309:1.  Dr. Schim conceded that it took another 15

7    minutes from that point for Mr. Plasencia's brain to be imaged at 10:16 a.m. local time.  *Id.*  Dr.

8    Schim testified that he had no reason to believe it would have taken more or less time to

9    transport Plaintiff to a hospital and image his brain if the aircraft had landed in Bermuda or

10   diverted back to Miami, and that Mr. Plasencia would have been very close to the threshold for

11   getting tPA from a timing perspective.  *Id.* at 309:2-16.  Dr. Schim testified that Mr. Plasencia's

12   blood pressure was too high for the administration of tPA every time it was taken, and that it did

13   not respond to efforts to lower it with medication.  *Id.* at 310:6-18. Dr. Schim testified that he did

14   not know that Mr. Plasencia's blood pressure would have been if he had presented for care

15   earlier.  *Id.* at 311:6-9.

16   ### III.    LEGAL STANDARD

17   A Rule 50(b) motion for judgment as a matter of law is a renewed Rule 50(a) motion.

18   *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Under Rule 50, a party

19   must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the

20   jury. *Id.*  If the judge denies or defers ruling on the motion, and if the jury then returns a verdict

21   against the moving party, the party may renew its motion under Rule 50(b).  *Id.*  The district

22   court must review a jury's verdict for substantial evidence in ruling on a motion under Rule

23   50(b).  *Id.*, *citing Janes v. Wal–Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002).  A court

24   may grant the motion if "there is no legally sufficient basis for a reasonable jury to find for that

25   party on that issue." *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (*citation and*

26   *internal quotation marks omitted*); accord *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881

27   (9th Cir. 2003) ("Judgment as a matter of law is proper when the evidence permits only one

28   reasonable conclusion and the conclusion is contrary to that reached by the jury.").

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    The court may not weigh the evidence or assess the credibility of witnesses; instead, the

2    Court must "draw all reasonable inferences in favor of the nonmoving party" and "disregard all

3    evidence favorable to the moving party that the jury is not required to believe." *Reeves v.*

4    *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-151 (2000). "Substantial evidence is

5    evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary

6    conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir.

7    2007).

8    **IV.    PLAINTIFF HAS NOT ESTABLISHED A MONTREAL CONVENTION**
     **ARTICLE 17 "ACCIDENT" AS A MATTER OF LAW**

9        Plaintiff has failed to establish an Article 17 "accident" as a matter of law under Supreme

10   Court, Ninth Circuit, and all lower court precedent.  All caselaw on this issue, some of it

11   analyzing remarkably similar facts, consistently holds that there can be no Article 17 "accident"

12   unless an airline either ignores a health-based request for assistance from a passenger or departs

13   so significantly from policy and procedure and/or industry standard that the departure is unusual

14   or unexpected.  There are no decisions that hold that an airline crew's failure to properly

15   diagnose a passenger's illness based upon their reported symptoms is an "accident."  There are

16   no decisions that hold that discrepancies in reporting of specific symptoms from flight attendant,

17   to purser, to captain is an "accident."  There are no decisions that hold that an airline's failure to

18   summon medical care, where a passenger has specifically rejected care and is conscious and

19   apparently well, is an "accident."  There are no decisions that hold that a captain's testimony that

20   he might have considered diversion had he been better informed of the situation in the aircraft

21   cabin is an "accident."  **In fact, there are decisions specifically holding that each of these**

22   **occurrences are not Article 17 "accidents" as a matter of law.**  The jury's decision in this

23   case is a clear departure from all cases analyzing Article 17 "accidents" and in direct conflict

24   from Ninth Circuit authority in *Caman* and similar decisions.  The jury was not instructed on this

25   caselaw, over American Airlines' strong objection.  Here, the evidence at trial showed that at

26   every juncture, medical assistance and advice was available to Plaintiff and Mr. Plasencia – but

27   that Plaintiff and Mr. Plasencia did not request that assistance or demonstrate any symptoms that

28

1  would have alerted American Airlines that there was a medical emergency.  No departure from

2  industry standard or policy and procedure was ever established by Plaintiff at trial – much less a

3  violation that was so serious as to be "unexpected or unusual."

### A.    Definition of "Accident" under Article 17 of the Montreal Convention.

Montreal Convention Article 17 provides:

> The carrier shall be liable for damage sustained in the event of the
> death or wounding of a passenger or any other bodily injury
> suffered by a passenger, if the accident which caused the damage
> so sustained took place on board the aircraft or in the course of any
> of the operations of embarking or disembarking. [2]

The definition of the term "accident" was addressed by the Supreme Court in *Air France v. Saks*, 470 U.S. 392 (1985), wherein the Supreme Court clarified that an "accident" is "an unexpected or unusual event or happening that is external to the passenger." 470 U.S. 392, 395, (1985). The Court determined that "accident" should "be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id*. at 405. In addition to identifying an unusual or unexpected event, liability only arises if "a passenger's injury is caused by [the] ... event." *Id*. at 392. The Court further recognized that "[a]ny injury is the product of a chain of causes." *Id*. at 406, 105 S. Ct. 1338. Thus, when evaluating causation, a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger." *Id*.

Following *Saks,* it is clear that a passenger's internal illness, including stroke, does not constitute an "accident" under Article 17—and Plaintiff concedes as much.  However, the Supreme Court again took up the definition of the term "accident" in *Olympic Airways v. Husain*, 540 U.S. 644 (2004).  In *Husain*, an asthmatic passenger perished in-flight after requesting on several occasions to be re-seated in a non-smoking area due to his asthma.  The Supreme Court held that a flight crew's unexpected and unusual response to a passenger's health-based request is external to the passenger, and can be a Montreal Convention "accident."  *Id*. at 646.  The Supreme Court's reasoning in *Husain* is instructive here, and was as follows:

> Suppose that a passenger on a flight inexplicably collapses and
> stops breathing and that a medical doctor informs the flight crew

---

[2] Paragraph 1 of Article 17 repeats verbatim the substance of Article 17 of the original Warsaw Convention. Compare, Warsaw Convention, Art. 17.

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A
MATTER OF LAW (FED. R. CIV. P. 50(b))        - 11 -
CASE NO.: 5:23-cv-05607-NW-SVK

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

that the passenger's life could be saved only if the plane lands within one hour. Suppose further that it is industry standards and airline policy to divert a flight to the nearest airport when a passenger otherwise faces imminent death. If the plane is within 30 minutes of a suitable airport but the crew chooses to continue its cross-county flight, "the notion that this is not an unusual event is staggering."

*Id.* at 656 (*quoting McCaskey v. Continental Airlines, Inc.*, 159 F. Supp. 2d 562, 574 (S.D. Tex. 2001)).

Although Plaintiff has argued to this Court that *Husain* supports Plaintiff's position that the facts of this case constitute an "accident," it fully supports American Airline's position. *Husain* holds that there can be an "accident" where (1) a passenger is plainly having a medical emergency – in the Supreme Court's hypothetical emergency, the passenger is found unconscious and not breathing; and (2) airline crew ignores medical advice that would have resulted in a better outcome for the passenger.  Here, Mr. Plasencia was never observed by American Airlines to be in any distress until approximately 1.5 hours before landing in Madrid, when his symptoms radically changed.  Although American Airlines offered help and assistance at every turn before this, Mr. Plasencia and Plaintiff repeatedly assured American Airlines personnel that he needed no help and that he was "okay."  Neither Plaintiff nor Mr. Plasencia ever made a health-based request to American Airlines.  Under the reasoning of *Husain*, this incident cannot be an Article 17 "accident" as a matter of law.

The Ninth Circuit has also ruled that absent a specific health-based request for assistance, an airline's act of omission – meaning "inaction that idly allows an unfolding series of events to reach their natural conclusion" cannot constitute an "unusual or unexpected event" under *Saks* and *Husain*.  *Caman v. Cont'l Airlines, Inc.*, 455 F.3d 1087, 1092 (9th Cir. 2006).  *Caman* involved allegations that Continental Airlines had failed to warn passengers of the risk of DVT on long haul flights.  The Ninth Circuit held that "[a]ttributing liability to an air carrier for failing to do all it can to prevent an injury that is inherent in air travel, as Caman is here requesting, **improperly shifts the focus of the inquiry from the nature of the event which caused the injury *to the alleged failure of the air carrier to avert the same*.**"  *Id. (emphasis added).*  The

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

Ninth Circuit went on to hold that:

> Applying the treaty's text and Supreme Court precedent to the facts of this case, we hold that Caman cannot establish his DVT was the result of an "accident" because he cannot show that it resulted from an "unexpected or unusual event." **Specifically, we hold that Continental's failure to warn Caman of DVT is not an "event" as that term is discussed in _Saks_ and _Husain_. Rather, Continental's failure to warn was an act of omission (inaction that idly allows an unfolding series of events to reach their natural conclusion) <u>as opposed to an act of commission (inaction that produces an effect, result or consequence) as in Husain's rejection of a direct plea for help.</u>**

_Id._, citing _Saks_, 470 U.S. at 404, 406 (_emphasis added_).

The Ninth Circuit has subsequently held that an airline's failure to heed requests from governmental or other regulatory bodies, as opposed to passengers, also does not constitute an "event" under _Saks_. _Twardowski v. Am. Airlines_, 535 F.3d 952, 960 (9th Cir. 2008).

_Saks_, _Husain_, _Caman_ and _Twardowski_ are controlling here and hold that, in the absence of the airline's "rejection of a direct plea for help," an airline's act of omission will not constitute an "accident" under Article 17 of the Montreal Convention. Here, it is undisputed that there was no specific health-based request by either Plaintiff or Mr. Plasencia, nor were there any visible symptoms indicating that Mr. Plasencia was plainly in distress, and Mr. Plasencia and Plaintiff assured cabin crew members at every turn that he was "okay." Under binding Ninth Circuit authority in _Caman_, American Airlines' acts of omission, or failure to insist that Mr. Plasencia undergo some type of medical evaluation before he suffered a stroke 1.5 hours prior to landing in Madrid, cannot be an Article 17 "accident."

A review of decisions from other circuits and lower courts also demonstrates that American Airlines' alleged failure to recognize Mr. Plasencia's symptoms as those of a stroke or to call for healthcare providers to evaluate Mr. Plasencia cannot be an "accident," and that American Airlines is entitled to judgment as a matter of law. These cases routinely grant summary judgment to the air carrier on this issue unless there has been (1) a specific, health-based request that was denied; or (2) a substantial and material deviation from policy and procedure or industry standards.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

In *Blansett v. Continental Airlines, Inc.*, 379 F.3d 177 (5th Cir. 2004), a passenger had a stroke as the result of a DVT during a flight from Houston to London.  The district court denied Continental's motion to dismiss for failure to state a claim.  Although it acknowledged that many other airlines did warn of DVT on long-haul flights and that this may be an "industry standard," the Fifth Circuit reversed on the grounds that a failure to warn passengers on an international flight about the risk that pressurized condition of aircraft's cabin might increase likelihood that passenger would experience episode of deep vein thrombosis (DVT) was not an "unusual or unexpected event" as a matter of law, and did not qualify as "accident" under Article 17 of the Warsaw Convention.  The Court noted that "no request was made of the airline; the flight staff was entirely passive" and explicitly rejected creating "a per se rule that any departure from an industry standard of care must be an 'accident,'" reasoning instead that "some departures from an 'industry standard' might be qualifying accidents under Article 17, and some may not." *Id.* at 180.

The Fifth Circuit again addressed this issue in *White v. Emirates Airlines, Inc.*, 493 Fed. Appx. 526 (5th Cir. 2012), holding that "the inquiry for purposes of Article 17 is not whether Emirates failed precisely to adhere to its procedures, but rather whether any such failure constituted an 'unexpected or unusual event or happening that is external to the passenger.'" The court emphasized that although the crew failed to follow all relevant procedures, "when evaluated in context, the crew's failure to do so was not unusual or unexpected."  In *White,* the crew members refused the passenger's son's explicit request to perform CPR and use a defibrillator on the passenger.  The Fifth Circuit held that these omissions were insufficient as a matter of law to constitute an "accident" because the crew took some action to assist the passenger, having moved the passenger, provided oxygen, and requested assistance upon landing.

In *Singh v. Caribbean Airlines Ltd.*, 49 F. Supp. 3d 1108, 1111 (S.D. Fla. 2014), *aff'd sub nom. Singh ex rel. Singh v. Caribbean Airlines Ltd.*, 798 F.3d 1355 (11th Cir. 2015), plaintiff Rovin Singh, a forty-year old father of four, suffered a stroke during a flight from Port-of-Spain, Trinidad and Tobago, to Miami, while traveling with his sister, Soorajnine Singh, a registered

nurse.  Approximately 1.5 hours into the flight, Ms. Singh observed Mr. Singh to have an episode of emesis after he went to the aircraft bathroom, to be losing consciousness, and to be slumped in his seat to the left side.  Ms. Singh reported these symptoms to a flight attendant, who believed the passenger was having a stroke, but testimony was unclear as to whether he notified the purser of his subjective belief.  The purser did not believe that Mr. Singh was having a stroke, as his symptoms were not typical of a stroke.  The purser then notified the captain that there was an "ill passenger."  The captain testified that if he had been advised at this point of the flight attendant's belief that Mr. Singh was having a stroke, he may have considered diverting the aircraft to Puerto Rico.  Still unaware that Mr. Singh was having a stroke, the cabin crew members gave a nitroglycerin tablet to Mr. Singh, which is contra-indicated for a passenger experiencing a stroke.  Mr. Singh then used the bathroom again, briefly seeming improved, but when he returned to his seat, he appeared paralyzed on one side of his face.  At this point, the crew members notified the pilot that the situation was serious and required medical attention.  A passenger who was a second-year medical student assisted in evaluating Mr. Singh and advised the cabin crew members that he believed Mr. Singh was having a stroke.  It was at this point, approximately 45 minutes after the first onset of symptoms, that the captain was notified that Mr. Singh might be having a stroke.  The captain and first officer then contacted the physician on call (MedLink). It took approximately half an hour to patch through to MedLink and to discuss Mr. Singh's symptoms with the physician on call.  At the conclusion of the call, MedLink advised the captain that Mr. Singh should get medical care "within a couple of hours" and recommended diversion to Nassau, the closest airport.  Nassau was thirty minutes closer than the destination point of Miami.  The Court heard testimony that Ms. Singh requested that the flight continue to Miami rather than divert to Nassau.  Ultimately, the captain, in conjunction with airline ground staff, utilizing principles of "crew resource management" and "threat resource management," made the decision not to divert the aircraft and to continue to Miami.  However, the captain did not notify MedLink of his decision, and medical personnel prepared to assist Mr. Singh in Nassau.  Ultimately, the aircraft landed in Miami and Mr. Singh received tPA, although this treatment was not successful and Mr. Singh was catastrophically disabled.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

After a bench trial, the Court entered judgment in favor of the defendant and the Eleventh Circuit affirmed, notwithstanding that an airline representative testified that if MedLink recommended diversion and the captain did not divert the aircraft, this would constitute a violation of the airline's policies and procedures.  The Court reasoned that although "there are certain deficiencies in how the flight and cockpit crew, including the Captain, responded to Mr. Singh's on-board medical emergency, those deficiencies, whether considered in isolation or collectively, do not support the basis of a claim under Article 17 of the Montreal Convention." The Court held that notwithstanding the crew's administration of nitroglycerin, which was a violation of the airline policies for responding to stroke symptoms in passengers, the flight attendants responded to Ms. Singh's request for help, reassured Mr. Singh and Ms. Singh, administered oxygen to Mr. Singh, checked on him throughout the flight monitoring his condition, and saw him safely to EMT upon his arrival at Miami International Airport.

The Court held that the cabin crew's error in administering nitroglycerin was not such an unusual or unexpected response so as to constitute an "accident." In addition, the purser's alleged error in not initially communicating to the cockpit crew just how serious Mr. Singh's condition appeared was not an unusual or unexpected event given that the purser was still gathering information and testified that most passengers who appear ill recover within 15 to 20 minutes of onset of symptoms.  Although the Captain did not divert the aircraft to Nassau as he was arguably instructed to do by MedLink, he acted within his discretion having regard for a number of complicating factors, including safety of flight and access to medical care for Mr. Singh, and proceeded to Miami.  The Court held that this was not an "accident" and that the Captain's error in not communicating to MedAire/Medlink his final decision to continue to Miami was also not such an unusual or unexpected event that it should give rise to finding an "accident" occurred. The District Court concluded its decision by reasoning that the airline did not disregard any explicit health-based request given by Mr. Singh or his sister to divert the aircraft.  *Id.* at 1120.

In reaching its decision, the *Singh* court relied heavily on Ninth Circuit and lower court precedent.   All lower court decisions to address similar fact patterns have held that in the absence of a specific health-based request, a failure to properly diagnose a passenger or to

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

provide adequate medical assistance to a passenger, without more, such as a <u>substantial or material</u> deviation from the airline's policies and procedures or industry standard, is not an "accident" under Article 17 of the Montreal Convention.

In *Sook Jung Lee v. Korean Air Lines Co.*, LTD, SACV 10-01709-JVS, 2012 WL 1076269 (C.D. Cal. Mar. 21, 2012), the plaintiff was traveling onboard a Korean Air flight from Seoul to Washington, D.C. and suffered a stroke at some point over the Pacific Ocean. *Id.* at *2. Following the Korean Air cabin crew's discovery that the passenger was unconscious and therefore plainly experiencing a medical emergency (a fact not present in this case), the crew immediately began to follow Korean Air's policies and procedures for responding to in-flight medical emergencies, including notifying the flight crew of the situation, checking the plaintiff's condition, paging for the assistance of any doctor on board the flight, facilitating communication between the physician on board the aircraft and the flight crew, and checking the plaintiff's carry-on baggage for any medication he may be taking or other information that could assist the doctor in treating him. *Id.* In addition, the flight crew contacted and consulted with Korean Air's Aeromedical Service Center and contacted Korean Air's Operations Control Center to advise it of the situation and begin the process of diverting the aircraft. *Id.* The Korean Air Aeromedical Service Center ultimately recommended that the aircraft be diverted, and the pilot diverted the aircraft to Seattle, but allegedly did not make adequate arrangements for the plaintiff to receive stroke treatment upon landing. *Id.* In analyzing whether this incident constituted an "accident," the district court focused on acts of commission and acts of omission under *Caman* and *Twardowski*, and considered whether there was a "specific health-based request" that was not followed. The district court held that there was no "event," as there was no specific health-based request that was not followed. The district court held that even if there was an "event," any deviation from policies and procedures was not so substantial as to be "unusual or unexpected," holding, for example, that the crew's failure to advise the ground crew that the plaintiff would need specialized stroke care was not a sufficient deviation from policy and procedure. *Id.* at *6.

The *Singh* court also relied heavily on *Fulop v. Malev Hungarian Airlines*, 244 F. Supp. 2d 217 (S.D.N.Y.2003). In *Fulop*, a passenger with a history of heart attack began experiencing

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1  chest pains sometime after take-off on a flight from Hungary to New York. He requested

2  assistance from flight attendants who paged for a doctor on board and the doctor and crew tended

3  to the passenger. *Id.* at 219. The possibility of diverting the flight to Great Britain or Ireland

4  existed during the first two to three-and-a-half hours of the flight.  *Id.*  The captain was

5  consulted, the passenger requested diversion, and an on-board doctor discussed the benefits of

6  diversion for the passenger's treatment, but the captain ultimately decided not to divert the flight.

7  *Id.*  The airline had arranged for an ambulance to meet the aircraft, and the passenger thereafter

8  underwent triple bypass surgery.  At the conclusion of a bench trial, the court entered judgment

9  for the defendant, finding the airline employees had not materially deviated from internal

10 procedures or industry standards in handling the medical emergency.  *Id.* at 221. The court found

11 the captain's decision not to divert the flight was made after taking into account considerations of

12 safety and convenience, and the overall thrust of the on-board doctor's advice, rather than an

13 outright rejection of the doctor's advice.  *Id.* at 222.

14      In  *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp. 3d 436, 443

15 (E.D.N.Y. 2014), *aff'd*, 621 F. App'x 82 (2d Cir. 2015), the district court found that Plaintiff

16 could not satisfy his burden of proving that an "accident" had caused his injuries from an in-

17 flight heart attack because the Plaintiff "has not pointed to any 'significant departure' from a

18 Lufthansa policy and procedure that was unexpected and could be deemed an "accident" under

19 the Montreal Convention."  The Court noted that rather, "the record makes clear that the crew of

20 Flight LH427 followed Lufthansa policy and procedure in all material respects." *Id.*  In *Safa*, the

21 flight purser was informed of and responded to reports that the plaintiff was lying unconscious in

22 the aircraft aisle.  Cabin crew members then moved plaintiff to the rear of the aircraft.  Medical

23 equipment was gathered and the purser requested medical assistance, to which two or three

24 physicians responded. With the physicians administering care to the Plaintiff, the purser

25 informed the cockpit crew of the situation. The purser completed an emergency medical report

26 and obtained the opinions of the physicians regarding the severity of the incident. The physicians

27 expressed their opinion that they were uncertain if the Plaintiff had suffered a heart attack but

28 advised that no life-threatening situation presented itself.  The purser conveyed this opinion to

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

the flight crew. *Id.* at 442-43. The Court held that minor deviations from Lufthansa's policies and procedures, such as the purser mistakenly informing the captain of the flight that a cardiologist was attending to the passenger when none of the onboard physicians were cardiologists, were insufficient to constitute an "accident" under Article 17 of the Convention, concluding that "the crew of Flight LH427 followed Lufthansa policy and procedure in all material respects." *Id.*

Most recently, in *Arzu v. American Airlines, Inc.*, 782 F. Supp. 3d 361 (2025), a minor passenger with substantial comorbidities (asthma, obesity, sleep apnea, and diabetes) experienced a medical emergency when he became unconscious shortly after takeoff. The plaintiff alleged that the American Airlines crew's response to the minor's emergency included four different "accidents": (1) failure to immediately notify the flight deck; (2) failure to immediately administer CPR; (3) failure to contact the physician on call; and (4) failure to establish and adhere to emergency team roles, all of which related to policies found in the American Airlines Inflight Manual. *Id.* at 366. The district court granted American Airlines' motion for summary judgment, holding that even accepting the plaintiff's version of the facts as true, American Airlines' response was not an "accident" under the Montreal Convention. The court distinguished *Husain*, where the flight crew's multiple refusals to move the plaintiff's decedent from the smoking section constituted an "accident," noting that all facts demonstrated that the cabin crew was taking action to assist the minor, even though the plaintiff alleged that the cabin crew violated policy and procedures while assisting the minor. Ultimately, this fact was determinative in the "accident" analysis, and the court held that although "there may have been reactionary delays, confusion of roles, and departures from policy, such as the failure to contact the physician on call . . . the flight crew 'took action to assist' the minor in multiple ways." *Id.* at 367. The district court also held that the minor's pre-existing conditions further rendered American Airlines' response not unexpected or unusual. *Id.* The same is true here.

Additional cases on this issue are as follows: *Rajcoar v. Air India Limited*, 89 F. Supp. 2d 324 (E.D.N.Y. 2000) (neither passenger's heart attack, nor alleged failure by Air India to provide necessary medical help in time to prevent passenger's death, without some showing of

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

1    unexpected circumstances, constitutes an "accident" under Article 17), *Tandon v. United Air*

2    *Lines*, 926 F. Supp. 366, 369–70 (S.D.N.Y.1996) ("the failure to provide adequate medical care

3    to a heart attack victim is not the type of external, unusual event for which liability is imposed

4    under the Warsaw Convention."); *Walker v. Eastern Air Lines, Inc*., 775 F. Supp. 111, 114

5    (S.D.N.Y. 1991) (stating that parties agreed that no "accident" occurred when airline crew

6    aggravated pre-existing condition of passenger); *Krys v. Lufthansa German Airlines,* 119 F.3d

7    1515, 1520 (11th Cir.1997) ("[I]n the absence of proof of abnormal external factors, aggravation

8    of a pre-existing injury during the course of a routine and normal flight should not be considered

9    an 'accident' within the meaning of Article 17."); *Abramson v. Japan Airlines Co*., 739 F.2d 130,

10   132 (3d Cir.1984) (finding that flight attendant's worsening of hernia condition was not an

11   unusual or unexpected occurrence).

12         In short, there are no cases that hold that a failure to provide medical care where a

13   passenger declines such care while conscious, alert, and seemingly able to make decisions of

14   their own accord is an "accident."  Under *Caman*, this act of omission is specifically not an

15   "accident."  In fact, the cases hold that there will be no "accident" unless the air carrier declines a

16   passenger's specific, health-based request or substantially deviates from its policies and

17   procedures in a way that is unusual or unexpected.  Miscommunications, including a failure to

18   report all relevant symptoms to the captain and a failure to properly diagnose a passenger is not

19   an "accident" because an airline crew is not medical personnel and cannot be expected to

20   recognize symptoms that both experts conceded might not be recognized by an EMT, a nurse, or

21   any healthcare provider not trained in neurology.  Plaintiff has affirmatively testified that she

22   never made a request for assistance that went unanswered, and all evidence shows that American

23   Airlines stood ready to assist Plaintiff and Mr. Plasencia at every turn, monitoring Mr. Plasencia

24   for the duration of the flight and taking all necessary measures to assist him once it because clear

25   that he was experiencing a medical emergency.

26

27

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

**B.    In Miami, American Airlines Personnel Did Not Ignore a Specific Health-Based Request from Plaintiff or Mr. Plasencia and Did Not Violate a Policy, Procedure or Industry Standard.**

Applying the above caselaw to Plaintiff's first alleged "accident" on the ground in Miami, no evidence was adduced at trial of a specific, health-based request from either Plaintiff or Mr. Plasencia on the ground in Miami.  Instead, Plaintiff testified that Captain Occhino offered them the opportunity to disembark the aircraft if they were not okay.  Plaintiff further testified that Mr. Plasencia declined and told both FA Eccles and Captain Occhino that he was "okay" and that at this time, Mr. Plasencia was experiencing no symptoms.  Plaintiff testified that although internally, she did not agree with this decision, she did not express her disagreement to anyone.  The American Airlines crew did not take further action at this time. Under *Caman*, this cannot be an "event," and certainly not an "accident" as a matter of law as the evidence establishes that this incident was purely an act of omission by American Airlines, and not one of commission.

Likewise, Plaintiff failed to identify any policy, procedure, or industry standard that would have required American Airlines to take any other course of action where Mr. Plasencia was indisputably in no distress and refusing medical treatment.  Moreover, all medical experts are in agreement that this incident was not, in fact, a stroke, but rather a TIA.  American Airlines does not train its cabin crew members to recognize TIA's and there is no guidance in the in-flight manual for treatment of a TIA.  Accordingly, the cabin and flight crew could not have violated a policy that did not exist.  Plaintiffs' expert Kathleen Lord-Jones conceded that no violation of policy had occurred. Nowinski Decl., Ex. A, Trial Transcript, September 9, 2025, 360:15-361:15.  Although Plaintiffs argued strenuously at trial that it was unexpected or unusual for Captain Occhino to leave the flight deck and check on Mr. Plasencia, Captain Occhino's decision, as the pilot in command of the aircraft, to take action to evaluate whether Plaintiff or Mr. Plasencia posed a safety risk cannot be an "accident" under Article 17 of the Convention and in fact demonstrates that American Airlines was taking action to assist Plaintiff and Mr. Plasencia.  Under all the caselaw discussed above, this fact demonstrates that American Airlines did respond to appropriately and offer care and assistance to Plaintiff.  Both Plaintiff and Captain

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

Occhino testified that Captain Occhino offered them the opportunity to deplane and that they declined.

### C.    1.5 Hours after Takeoff, American Airlines did not Ignore a Health-Based Request from Plaintiff or Mr. Plasencia and Did Not Violate a Policy, Procedure or Industry Standard.

Again, the testimony is uncontroverted that no health-based request (other than for a wheelchair on landing) was made approximately 1.5 hours into flight when Mr. Plasencia had difficulty walking to the bathroom.   Plaintiff testified that Mr. Plasencia had some trouble walking, but that she didn't help him because "he didn't really need help."  FA Eccles testified that Mr. Plasencia stumbled and appeared to lose his balance, but stated that he didn't need help. Plaintiff testified that she made no attempt to obtain further assistance for Mr. Plasencia at this time.  There is no American Airlines policy that requires any type of medical intervention when a passenger loses their balance while walking, but is able to ambulate and states that they are fine.  For all of these reasons, and under all applicable caselaw, discussed above, American Airlines is entitled to judgment as a matter of law because Plaintiff has not met her burden of establishing an Article 17 "accident."

## V.    AMERICAN AIRLINES IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF CANNOT MEET HER BURDEN OF PROVING PROXIMATE CAUSE

The parties do not dispute that Plaintiff is required to prove causation, and that Plaintiff must do so by a preponderance of the evidence.  Omnibus Motion in Limine, ECF No. 145, 11:7-9.  Plaintiff cannot meet this burden.  In analyzing this issue, the following undisputed facts are key:

- Both parties' medical experts testified that the only treatment that could have improved Mr. Plasencia's outcome was thrombolysis (or tPA), administered either 3 hours (FDA approved) or 4.5 hours (not FDA approved, but common practice in US and Europe) from the onset of stroke symptoms.   There was no testimony regarding the permitted time-frame for the administration of tPA in Bermuda.

- Both Parties' medical experts testified that Mr. Plasencia's stroke occurred between 5:15 and 7:00 a.m. local Madrid time (either 1.5 hours or 3.3 hours before landing at 8:36

1    a.m.), and not substantially earlier than that.

2    • Both Parties' medical experts testified that Mr. Plasencia's blood pressure was too high

3    for the administration of tPA at all times it was taken.  Both parties' medical experts

4    testified that Mr. Plasencia's blood pressure did not respond to attempts to bring it down

5    through medication.

6    • Plaintiff's expert Dr. Schim testified that he did not know what Mr. Plasencia's blood

7    pressure would have been had he disembarked the aircraft in Miami, or if the aircraft had

8    been diverted 1.5 hours into flight.

9    • Both parties' medical experts testified that less than 10% of stroke victims who timely

10   present to an emergency room receive tPA, due to the risk of death from administering

11   the drug to those with contraindications, including high blood pressure.

12   • Defense expert, Dr. Nicholas Suite, testified that tPA results in substantial improvement

13   in approximately 35% of cases where it is administered and that the only conclusive

14   study on the topic shows that tPA results in a worse outcome for patients similar to

15   Plaintiff, having regard for his age, ethnicity, and comorbidities.  This testimony was

16   uncontroverted.

17   Federal appellate courts, including the First, Fifth, and Eighth Circuits, have held that

18   expert testimony that tPA would have helped a stroke victim does not meet the preponderance of

19   the evidence standard because statistical evidence shows that only a small number of patients

20   who present promptly for stroke treatment receive TPA, and among those who do receive TPA,

21   tPA only results in improvement in a small percentage of cases.  *Samaan v. St. Joseph Hosp.*,

22   670 F.3d 21, 34 (1st Cir. 2012) (upholding exclusion of expert testimony regarding

23   administration of TPA on the grounds that "[t]he unavoidable conclusion from the studies

24   deemed authoritative by [expert] is that only a small number of patients overall (and only a small

25   fraction of those who would otherwise have experienced stroke-related injuries) experience

26   improvement when t-PA is administered.")  *Smith v. Bubak*, 643 F.3d 1137, 1138 (8th Cir. 2011)

27   (affirming district court's grant of motion to exclude expert evidence that plaintiff had a 58%

28   change of at least a partial recovery had she timely received TPA); *Young v. Mem'l Hermann*

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

*Hosp. Sys.*, No. CIV A. H-03-1859, 2006 WL 1984613, at *6 (S.D. Tex. July 14, 2006), *aff'd*, 573 F.3d 233 (5th Cir. 2009) ("[Plaintiffs] have not and cannot show, as a matter of law, that Randall Young had a 51 percent or greater chance of avoiding his severely disabled condition had he received tPA treatment at Hermann Hospital on March 29, 2003."); *Dannenberg v. United States*, No. 04-CV-4897 NGG JMA, 2010 WL 4851341, at *1 (E.D.N.Y. Nov. 22, 2010) (at trial, plaintiff, who was taken to hospital after demonstrating stroke symptoms, asserted that, were it not for that malpractice, she could have been treated with TPA and avoided much of the stroke-related damages that she later suffered – plaintiff failed to prove by a preponderance of the evidence that—even assuming she was a TPA candidate—the lack of treatment with TPA was a substantial contributing factor to her injuries).

Accordingly, Plaintiff cannot meet her burden of proving that an "accident" proximately caused Mr. Plasencia's injuries because she cannot establish that it is more likely than not that any delay in Mr. Plasencia's treatment attributable to any action of American Airlines caused or exacerbated his injuries.

## VI.    AMERICAN AIRLINES IS ENTITLED TO JUDGMENT AS A MATTER OF LAW UNDER ARTICLE 20 OF THE MONTREAL CONVENTION BECAUSE PLAINTIFF AND MR. PLASENCIA FAILED TO SEEK OR REQUEST MEDICAL ATTENTION OR ALERT THE CREW THAT MR. PLASENCIA'S CONDITION WAS DETERIORATING.

American Airlines asserted the defense that Plaintiffs' negligence wholly caused Mr. Plasencia's injuries. Article 20 provides that, if the carrier proves the claimed damage was caused or contributed to by the negligence or other wrongful act or omission of the plaintiff, the carrier is to be wholly or partly exonerated from its liability to the extent that that negligence or wrongful act or omission caused or contributed to the damage. *Medina v. Am. Airlines, Inc.*, No. 02-22133 CIV, 2006 WL 3663692, at *2 (S.D. Fla. Nov. 14, 2006). The evidence is clear that Plaintiff accurately predicted what was happening and still declined to deplane. Nowinski Decl., Ex. B, Trial Transcript September 9, 2025, 293:4-7. Although Plaintiff secretly harbored some desire to deplane, she did not tell anyone and did not act because her husband did not want to. *Id.* at 301:25-302:21.

For their part, American Airlines gave Plaintiffs multiple opportunities to receive

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A
MATTER OF LAW (FED. R. CIV. P. 50(b))
CASE NO.: 5:23-cv-05607-NW-SVK

assistance and/or deplane while on the ground. FA Eccles also repeatedly asked Mr. Plasencia if he needed assistance 1.5 hours into the flight, and neither Mr. Plasencia nor Plaintiff stated that they needed any help or that Mr. Plasencia's condition was deteriorating. Plaintiff was negligent because she declined to request medical care for her husband or insist that he stay in the country even though she suspected that he had a stroke. Mr. Plasencia was negligent for continuing to insist that he was fine even as his condition deteriorated. Plaintiff and Mr. Plasencia's refusal to deplane to get medical care and failure to advise the American Airlines cabin crew that they needed assistance exonerates American Airlines of liability as a matter of law.

## V.    CONCLUSION

For the reasons articulated herein, American Airlines requests judgment as a matter of law.

Dated: January 16, 2025                    CONDON & FORSYTH LLP


                                           By: /s/ Ivy L. Nowinski
                                               IVY L. NOWINSKI

                                               -and-

                                               DAVID J. HARRINGTON
                                               CONDON & FORSYTH LLP
                                               7 Times Square, 18th Floor
                                               New York, NY 10036
                                               Telephone: (212) 490-9100
                                               Facsimile: (212) 370-4453

                                               Attorneys for Defendant
                                               AMERICAN AIRLINES, INC.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
Telephone: (310) 557-2030

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record electronically by CM/ECF.

Sanjiv N. Singh
SANJIV N. SINGH, APLC
1700 South El Camino Real, Suite 503
San Mateo, California 94402
Telephone: (650) 389-2255
E-mail: ssingh@sanjivnsingh.com

Darren P. Nicholson
Hannah M. Crowe
BURNS CHARLES LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
Email: dnicholson@burnscharest.com;
hcrowe@burnscharest.com

*Attorneys for Plaintiff*

/s/ *Ivy L. Nowinski*