**SANJIV N. SINGH, APLC**
Sanjiv N. Singh (State Bar No. 193525)
ssingh@sanjivnsingh.com
1700 South El Camino Real, Suite 503
San Mateo, CA 94402
Telephone: (650) 389-2255

**BURNS CHAREST LLP**
Darren P. Nicholson (*pro hac vice*)
dnicholson@burnscharest.com
Hannah M. Crowe (*pro hac vice*)
hcrowe@burnscharest.com
Anna Katherine Benedict (*pro hac vice*)
abenedict@burnscharest.com
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA MARIA MARCELA TAVANTZIS, individually and as Trustee of the Plasencia Tavantzis Trust Dated November 19, 2019,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | Case No.: 5:23-cv-05607-NW-SVK<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Date: April 22, 2026<br>Time: 9 a.m. PT<br>Place: Courtroom 3 – 5th Floor |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ....................................................................................1

SUMMARY OF EVIDENCE .................................................................................3

LEGAL STANDARD ...........................................................................................10

ARGUMENT ........................................................................................................10

I.    American Belatedly Advances an Incorrect "Health-Based Request" Accident Standard That Must be Rejected.........................................................10

    A.  American Cannot Advance a New Argument it Did Not Raise in its Pre-Verdict Rule 50(a) Motion. ...................................................................11

    B.  The Definition of Montreal Convention Accident Under Controlling Supreme Court Precedent is "an Unexpected or Unusual Event or Occurrence That is External to the Passenger." ...........................................12

    C.  American's "Health-Based Request" or "Significant Departure" Standard Mischaracterizes Binding Supreme Court Law. .............................14

        1.   "Failure to Warn" Cases do not Require a Rejected Request for Assistance to Prove Accident. ...........................................................14

        2.   American Relies on Non-Binding Cases to Create a New Accident Standard Antithetical to Saks and Husain ..............................15

II.    There is Substantial Evidence to Support the Jury's Conclusion That At Least One Montreal Convention Accident Occurred on Flight 68. ........................................................................................................................17

    A.  There is Substantial Evidence of an Accident on the Ground in Miami. .........................................................................................................18

    B.  There is Also Substantial Evidence of an Accident Approximately 1.5 Hours into Flight 68. ...............................................................................20

    C.  There is Substantial Evidence That These Accidents Caused a Delay in Mr. Plasencia Receiving Treatment, Resulting in Severe Injury.................21

III.    There is No Evidence from Which a Reasonable Jury Could Find That American is Wholly Exonerated from Liability. ....................................22

CONCLUSION .....................................................................................................23

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

# TABLE OF AUTHORITIES

**Cases**

*Air France v. Saks*,
   470 U.S. 392 (1985) ...................................................................14, 16, 18

*Blansett v. Continental Airlines, Inc.*,
   379 F.3d 177 (5th Cir. 2004) ..............................................................15

*Boston Scientific Corp. v. Johnson & Johnson*,
   550 F. Supp. 2d 1102 (N.D. Cal. 2008)................................................11

*Caman v. Continental Airlines, Inc.*,
   455 F.3d 1087 (9th Cir. 2006) ............................................................15

*Cotton ex rel. McClure v. City of Eureka, Cal.*,
   860 F. Supp. 2d 999 (N.D. Cal. 2012)............................................11, 22

*E.E.O.C. v. Go Daddy Software, Inc.*,
   581 F.3d 951 (9th Cir. 2009) ..............................................................12

*Freund v. Nycomed Amersham*,
   347 F.3d 752 (9th Cir. 2003) .........................................................12, 13

*Husain v. Olympic Airways*,
   116 F. Supp. 2d 1121 (N.D. Cal. 2000)................................................24

*Janes v. Wal-Mart Stores, Inc.*,
   279 F.3d 883 (9th Cir. 2002) ..............................................................13

*Lifshitz v. Walter Drake & Sons*,
   806 F.2d 1426 (9th Cir. 1986) ............................................................12

*Loggervale v. Holland*,
   677 F. Supp. 3d 1026 (N.D. Cal. 2023)................................................11

*Lombino v. Bank of Am., N.A.*,
   797 F. Supp. 2d 1078 (D. Nev. 2011) ..................................................12

*Olympic Airways v. Husain*,
   540 U.S. 644 (2004) ...........................................................14, 15, 16, 18

*Pavao v. Pagay*,
   307 F.3d 915 (9th Cir. 2002)..........................................................11, 18

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000) .....................................................................11, 22, 23

1

Singh v. Caribbean Airlines Ltd.,
   49 F. Supp. 3d 1108 (S.D. Fla. 2014).................................................................1, 16, 17, 25

*Sook Jung Lee v. Korean Air Lines Co.*,
   2012 WL 1076269 (C.D. Cal. Mar. 21, 2012) .............................................................18

*Twardowski v. American Airlines*,
   535 F.3d 952 (9th Cir. 2008)..........................................................................................16

*Wallace v. Korean Air*,
   214 F.3d 292 (2d Cir. 2000) ...........................................................................................14

*White v. Emirates Airlines, Inc.*,
   493 F. App'x 526 (5th Cir. 2012)....................................................................................16

**Rules**

5TH CIR. R. 47.5.4. ................................................................................................................16

Fed. R. Civ. P. 50 ..................................................................................................................12

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Plaintiff Ana Maria Marcela Tavantzis, individually and as Trustee of the Plasencia Tavantzis Trust Dated November 19, 2019 ("Plaintiff"), opposes Defendant American Airlines, Inc.'s ("American") renewed Motion for Judgment as a Matter of Law and respectfully shows the Court as follows:

## SUMMARY OF EVIDENCE

### The Accident on the Ground in Miami.

The evidence presented at trial established that shortly after Ms. Tavantzis and Mr. Plasencia boarded Flight 68 in Miami and settled into their seats, Mr. Plasencia dropped his phone, could not pick it back up, and spoke in "gibberish." Ex. 2, Trial Tr. vol. 2, 233:9–13 (Sept. 9, 2025). Ms. Tavantzis pressed the call button, stood up, and called out "My husband is having a stroke, my husband is having a stroke." *Id.* at 233:14–17. Flight Attendant David Eccles responded to Ms. Tavantzis and approached Plaintiffs' row. *Id.* at 234:13. Ms. Tavantzis told FA Eccles that Mr. Plasencia had been speaking in gibberish and she was concerned he was having a stroke. *Id.* at 234:16–17, 234:25–235:1. In his American Airlines CERS report, FA Eccles reported that Ms. Tavantzis told him her husband had just "block [sic] out and couldn't remember where he was." Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000104. At this point, Mr. Plasencia had temporarily recovered from these symptoms and told FA Eccles that he felt okay. Ex. 2, Trial Tr. vol. 2, 235:3–4. But Mr. Plasencia could not remember what had just happened. *Id.* at 236:14–18. FA Eccles did not offer medical assistance to Ms. Tavantzis and Mr. Plasencia. *Id.* at 239:21–240:4. Still concerned, Ms. Tavantzis wondered if "maybe [they] shouldn't fly," and FA Eccles told her "I will get somebody who can make that decision." *Id.* at 235:3–5. Ms. Tavantzis understood this to mean that FA Eccles would get medical personnel to assess Mr. Plasencia. *Id.* at 235:6–9.

FA Eccles felt "uncomfortable" with the situation, so he left Ms. Tavantzis and Mr. Plasencia to speak to the purser (i.e., head flight attendant), Kelly Gambello. Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000104. FA Eccles told Purser Gambello that Ms. Tavantzis "was concerned" as Mr. Plasencia "seemed confused and didn't know his

3

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

name." Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000104; Ex. 11, Trial Ex. 11, Gambello CERS Report, AA_000110. Purser Gambello then asked the pilot, Captain Occhino, to speak to Ms. Tavantzis and Mr. Plasencia. Ex. 11, Trial Ex. 11, Gambello CERS Report, AA_000110. Captain Occhino testified that Purser Gambello told him a passenger appeared "disoriented" and she (Purser Gambello) wanted his opinion on the situation. Ex. 6, Occhino Dep. 27:25–28:1 (Sept. 18, 2024); *see also* Ex. 2, Trial Tr. vol. 2, 367:2–3 ("[T]he video deposition of Anthony Occhino was played in open court."). Captain Occhino testified at trial that FA Eccles failed to report the crucial details he had learned from Ms. Tavantzis:

> Q: Did David Eccles tell you that he had a passenger that had dropped his phone?
>
> A: No.
>
> Q: Did David Eccles tell you that he had a passenger that had blacked out?
>
> A: No.
>
> Q: Did David Eccles tell you that this particular passenger did not remember where he was?
>
> A: No.
>
> . . .
>
> Q: Would it be fair to say that it would be your expectation, as the pilot, that if you are going back to talk to these passengers who you were told were disoriented, that you would want to be told these things?
>
> A: It would have made a difference.
>
> Q: Okay. Why would it have made a difference?
>
> A: Well, I mean, if I had known all that, we might have – I still would have come back, but I might have gotten someone else involved and asked more questions, because I didn't really ask questions like, oh, I heard you blacked out, I heard you did this. I didn't ask any of that because I didn't know any of it.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Ex. 4, Trial Tr. vol. 4, 859:1–9; 860:4–15. Purser Gambello likewise confirmed that FA Eccles did <u>not</u> tell her about the circumstances surrounding Mr. Plasencia's condition. *Id.* at 843:11–13. Critically and most problematically for American, Captain Occhino and Purser Gambello's testimony was <u>directly contradicted</u> by FA Eccles, who testified that he did tell them <u>these critical details before takeoff</u>. *Id.* at 774:10–775:18; 779:1–14. With American's own witnesses directly contradicting each other, the jury was left with the task of determining which American witness was telling the truth.

According to Captain Occhino, because FA Eccles failed to brief him regarding the details of Mr. Plasencia's condition, Captain Occhino did <u>not</u> offer medical assistance to Ms. Tavantzis and Mr. Plasencia and merely asked if they "would like to deplane" on the ground in Miami. Ex. 2, Trial Tr. vol. 2, 236:9–11. Captain Occhino then returned to the flight deck and told Purser Gambello that Mr. Plasencia was fine to travel. Ex. 11, Trial Ex. 11, Gambello CERS Report, AA_000110. In contrast, FA Eccles' CERS report documented that "somebody" at American had conducted a "medical clearance" for Mr. Plasencia in order for Flight 68 to take off from Miami. Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000106; Ex. 4, Trial Tr. vol. 4, 820:16–19 (Q: ". . . Why did you check yes to the box [on the CERS report] that said, 'was a medical clearance done for this passenger'?" A: "It had to be done because we took off. So somebody gave medical [clearance] . . . so yes."). Again, the jury was left with the task of determining whether FA Eccles or Captain Occhino was telling the truth.

**The Accident 1.5 Hours into Flight 68.**

Ms. Tavantzis testified that "[a]fter the flight took off, [Mr. Plasencia] started getting worse and worse, and it was extremely concerning." Ex. 2, Trial Tr. vol. 2, 245:7–8. After takeoff, Mr. Plasencia could not talk; "he never talked again." *Id.* at 247:23. About one and a half hours into the flight, Mr. Plasencia "had a very difficult time walking to the bathroom and walking back." *Id.* at 245:14–15. Consistent with Ms. Tavantzis' testimony, FA Eccles reported observing that Mr. Plasencia "kept losing is balanced [sic] on the right side" approximately 1.5 hours into the flight. Ex. 8, Trial Ex.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

8, Eccles CERS Report, AA_000104. FA Eccles helped Mr. Plasencia walk to and from the bathroom. Ex. 2, Trial Tr. vol. 2, 245:18–19. Ms. Tavantzis, who was "extremely concerned," repeatedly asked FA Eccles to make a wheelchair available for Mr. Plasencia when they landed. *Id.* at 245:23–246:6.

Concerningly, FA Eccles did not inform Purser Gambello or Captain Occhino 1.5 hours into the flight that he saw Mr. Plasencia losing his balance on the right side of his body. Ex. 7, Eccles Dep. 64:05–11 (Sept. 9, 2024); *see also* Ex. 2, Trial Tr. vol. 2, 316:17–18 ("[T]he video deposition of David Eccles was played in open court."). Unsurprisingly, Purser Gambello testified that she would have expected to be told this information by FA Eccles:

> Q: Were you aware that Mr. Eccles observed Mr. Plasencia losing balance on his right side about an hour and a half into the flight?
>
> A: No.
>
> Q: Is that something you would have expected to be made aware of as the purser?
>
> A: I would say yes.

Ex. 10, Gambello Dep. 39:04–09 (Sept. 11, 2024); *see also* Ex. 2, Trial Tr. vol. 2, 317:2–3 ("[T]he video deposition of Kelly Gambello was played in open court."). Captain Occhino also testified that FA Eccles should have told him about Mr. Plasencia's deteriorating condition:

> Q: Were you informed of this incident approximately one and a half hours or thereafter into the flight?
>
> A: No.
>
> . . .
>
> Q: … [W]ere you aware at the time you were flying the plane, that the situation was so serious that they were checking on him every five minutes after that?
>
> A: No. He should have told me.

Ex. 6, Occhino Dep. 140:12–15; 141:07–12. Instead, FA Eccles reported that he instructed <u>the passengers</u> seated around Mr. Plasencia that "if something happened they

should press the flight attendant call light." Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000104. FA Eccles also reported that he checked on Mr. Plasencia every five minutes and that "he didn't look that good." *Id.* But FA Eccles did not inform Purser Gambello, Captain Occhino, or anyone else that he was monitoring a visibly worsening Mr. Plasencia. Ex. 6, Occhino Dep. 141:07–12.

The jury heard that American's Inflight Manual includes a variety of medical emergency signs and symptoms that flight attendants are trained to detect in passengers, including: "inability to move muscles in extremities, falling suddenly/ one-sided weakness or loss of movement;" "Slurred speech, difficulty talking or being understood, an inability to communicate, or confusion;" and "Unconsciousness." Ex. 9, Trial Ex. 9, Inflight Manual, AA_000484–85. The Inflight Manual further mandates how American crew members must respond to these symptoms:

- Rule out other causes
- Deliver Medical Assistance PA for physician or medical personnel on board
- Notify captain of the need to contact the Physician on Call
- Contact the Physician on Call (POC)

*Id.* at AA_000485. Consistent with the mandate contained in the Inflight Manual, Plaintiff's air cabin safety expert, former American Airlines flight attendant and purser Kathleen Lord-Jones, confirmed that crewmembers must communicate with one another regarding a passenger's symptoms:

> Q: Ms. Lord-Jones, are flight attendants expected to communicate with the rest of the cabin crew when one of these stroke symptoms is identified?
>
> A: Yes.
>
> Q: And if a flight attendant fails to communicate that, would that be an unexpected event?
>
> A: Yes.
>
> Q: Would it be an unusual event?
>
> A: Yes.

7

Ex. 2, Trial Tr. vol. 2, 332:12–20.

Plaintiff's aviation expert, Captain Richard Levy (also formerly of American Airlines, and currently of Southwest Airlines), explained that diversion would have been possible had FA Eccles informed Purser Gambello and Captain Occhino of Mr. Plasencia's worsening condition at the 1.5-hour mark. Captain Levy testified that it would have taken approximately five to ten minutes for a captain to communicate with a dispatcher about diversion due to a medical emergency. Ex. 2, Trial Tr. vol. 2, 376:7–9. Captain Levy further testified that at the 1.5-hour mark, the closest location for diversion was Bermuda. *Id.* at 383:2–5. Diversion to Bermuda would have taken 45 minutes total, including communicating with dispatch. *Id.* at 384:5. Captain Levy also testified that it would have taken approximately 1.5 hours to divert back to Miami. *Id.* at 385:8–19.

Ms. Tavantzis requested a wheelchair from FA Eccles multiple times during Flight 68. Ex. 2, Trial Tr. vol. 2, 246:18–247:2. Ms. Tavantzis also testified that she did not know that she could ask for medical assistance from the flight crew while inflight. *Id.* at 248:14–19. About an hour before landing in Madrid, Mr. Plasencia soiled himself and could not get out of the bathroom; "he was just hitting himself against the door opening." *Id.* at 247:4–8. At this point, FA Eccles finally alerted Purser Gambello that Mr. Plasencia was having a medical issue. Ex. 4, Trial Tr. vol. 4, 806:5–6. An overhead announcement for medical assistance was finally made, and several physicians responded. Ex. 2, Trial Tr. vol. 2, 249:7–17. Once Flight 68 landed in Madrid, paramedics boarded the plane and transported Mr. Plasencia to the hospital. *Id.* at 249:25–250:7. Mr. Plasencia stayed in Madrid in two hospitals over the course of 23 days before traveling home to California via air ambulance. *Id.* at 254:17; 255:21–22.

**The Causal Effect of the Accidents.**

As Plaintiff's physical medicine & rehabilitation (PM&R) expert Dr. Deborah Doherty explained to the jury, Mr. Plasencia suffered "a catastrophic stroke" that left him "with profound neurologic deficits." Ex. 2, Trial Tr. vol. 2, 438:2–3.

8

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Dr. Jack Schim, Plaintiff's neurology expert, testified that the ***delay in treatment*** caused by the Flight 68 crew resulted in such severe deficits. He explained that Mr. Plasencia likely experienced a TIA on the ground, or "temporary neurologic symptoms that were stroke related." Ex. 3, Trial Tr. vol. 3, 494:9–10. Dr. Schim testified that Mr. Plasencia's last known well was likely on the ground in Miami. *Id.* at 494:7. If a patient goes from "normal" to "not normal," the last known well is the last time the patient is reported acting normal. *Id.* at 494:7–14.

Dr. Schim further confirmed that Mr. Plasencia was experiencing "clear-cut neurologic symptoms" 1.5 hours into the flight when he was losing his balance on the right side of his body. *Id.* at 495:12–14. Considering the symptoms observed by FA Eccles "about an hour and a half into the flight[,]" Dr. Schim testified that Mr. Plasencia was "likely" "already having a stroke at that point[.]" *Id.* at 505:3–5.

By the time Mr. Plasencia arrived at the Ramón y Cajal hospital in Madrid, Mr. Plasencia already had a "bad stroke deficit." *Id.* at 487:11. The doctors gathered information to determine Mr. Plasencia's last known well, and "that indicated that it had been at least five hours." *Id.* at 487:19–21. Therefore, the doctors determined that too much time had passed for tPA to be administered. *Id.* at 488:1–4. Mr. Plasencia was instead transferred to a second hospital, La Paz, to undergo a mechanical thrombectomy. *Id.* at 488:5–6. Mr. Plasencia was "left with a very large area of stroke damage and a very large severe stroke deficit." *Id.* at 488:11–12.

Dr. Schim confirmed that if a patient in Mr. Plasencia's position had been transported to an appropriate medical facility in Miami after exhibiting stroke symptoms during a TIA, they would likely be administered tPA and experience a far better outcome. *Id.* at 495:1–16. Dr. Schim also confirmed that diversion either to Miami or Bermuda within Captain Levy's estimated timeframes would have allowed for the timely administration of tPA. *Id.* at 490:12–17. According to Dr. Schim, a patient in Mr. Plasencia's position would have, in all likelihood, experienced a better outcome with the timely administration of tPA. *Id.* at 490:18–20.

9

1

**LEGAL STANDARD**

"The party moving for judgment as a matter of law bears a heavy burden." *Boston Scientific Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1109 (N.D. Cal. 2008). "A jury's verdict <u>must</u> be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, <u>even if it is also possible to draw a contrary conclusion</u>." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) (emphasis added); *see also Loggervale v. Holland*, 677 F. Supp. 3d 1026, 1031 (N.D. Cal. 2023). The court "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000). The court "may not make credibility determinations or weigh the evidence." *Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1008 (N.D. Cal. 2012) (cleaned up) (quoting *Reeves*, 530 U.S. at 150). "Granting a renewed motion for judgment as a matter of law is proper when the evidence construed in the light most favorable to the non-moving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's verdict." *Boston Scientific Corp.*, 550 F. Supp. 2d at 1109.

**ARGUMENT**

**I.    American Belatedly Advances an Incorrect "Health-Based Request" Accident Standard That Must be Rejected.**

In its post-verdict Rule 50(b) motion, American advances a new, improper Montreal Convention "accident" standard that it did not raise in its Rule 50(a) motion. There, American argued that "a failure to provide adequate medical assistance to a passenger, without more, such as a substantial deviation from the airline's policies and procedures or industry standard, is not an 'accident' under Article 17 of the Montreal Convention." Dkt. 180 at 16; *see also* Order Denying Defendant's Motion for Judgment as a Matter of Law, Dkt. 183 at 2 (denying motion for judgment as a matter of law because "[e]ven assuming Americans Airlines is right" in this standard, the testimony presented "could lead a reasonable jury to find that American Airlines violated its policies and

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

procedures"). Now, American claims "there can be no Article 17 'accident' unless an airline either ignores a <u>health-based request for assistance</u> from a passenger or departs <u>so significantly</u> from policy and procedure and/or industry standard that the departure is unusual or unexpected." Dkt. 239 at 10 (emphasis added). The Court should not entertain this novel standard, which flouts the requirements of Federal Rule of Civil Procedure 50(b), mischaracterizes existing law, and defies controlling Supreme Court precedent.

## A. American Cannot Advance a New Argument it Did Not Raise in its Pre-Verdict Rule 50(a) Motion.

A "party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (citing Fed. R. Civ. P. 50 advisory committee's notes to the 1991 amendments)); *see also Lombino v. Bank of Am., N.A.*, 797 F. Supp. 2d 1078, 1082 (D. Nev. 2011) (finding "new legal arguments" brought for first time in Rule 50(b) motion were "not properly before this court"). The Ninth Circuit describes the purpose of this rule as "twofold": "First, it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of a judgment as a matter of law instead of forcing it 'to engage in an impermissible reexamination of facts found by the jury.'" *Freund*, 347 F.3d at 761 (quoting *Lifshitz v. Walter Drake & Sons*, 806 F.2d 1426, 1428–29 (9th Cir. 1986)). "Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them." *Id.* (citing *Lifshitz*, 806 F.2d at 1429).

American's new interpretation of the Montreal Convention accident standard necessarily requires the Court to "engage in an impermissible reexamination of facts found by the jury." *Id.* (internal quotation marks omitted). The Court denied American's Rule 50(a) motion "[e]ven assuming" that its previous "substantial deviation" standard applied, instead finding that a reasonable jury could determine that at least one accident

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

occurred on Flight 68. *See* Dkt. 183 at 2. A reasonable, unanimous jury of eight individuals then did so. Now, American seeks to have the Court usurp the role of the jury and apply its new, even more stringent standard that is equally unsupported by existing case law. This would require the Court to improperly reexamine the facts found by the jury for evidence that American ignored a specific "health-based request" or deviated "significantly" from its policies and procedures. American's introduction of this new standard also fails to allow for Plaintiff to correct "any alleged deficiencies" in the evidence when Plaintiff had an opportunity to correct them. Holding Plaintiff to this new, impossible standard now defeats the purpose of Rule 50(b). *See Freund*, 347 F.3d at 761.[1]

### B. The Definition of Montreal Convention Accident Under Controlling Supreme Court Precedent is "an Unexpected or Unusual Event or Occurrence That is External to the Passenger."

The definition of Montreal Convention "accident" is clearly established by binding Supreme Court case law. Article 17 of the Montreal Convention[2] provides that:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

---

[1] Even if the Court were to consider American's new legal argument belatedly raised in its post-verdict motion (it should not), a plain error standard would apply. "When ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, '[the court] is limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice.'" *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002)). "'This exception permits only extraordinarily deferential review that is limited to whether there was any evidence to support the jury's verdict.'" *Id.* at 961–62 (cleaned up) (quoting *Janes*, 279 F.3d at 888).

[2] American appears to have quoted the Warsaw Convention (which was superseded by the Montreal Convention), rather than the Montreal Convention, in its motion. Dkt. 239 at 11.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Montreal Convention art. 17(1). The Supreme Court defines "accident" under Article 17 as an "'unexpected or unusual event or happening that is external to the passenger.'" *Olympic Airways v. Husain*, 540 U.S. 644, 651 (2004) (quoting *Air France v. Saks*, 470 U.S. 392, 405 (1985)). Recognizing that "any injury is the product of a chain of causes," the Supreme Court emphasizes that "a plaintiff need only be able to prove that 'some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 652 (cleaned up) (quoting *Saks*, 470 U.S. at 406).

The Supreme Court has emphasized that the definition of accident "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Husain*, 540 U.S. at 651 (quoting *Saks*, 470 U.S. at 405). In doing so, the Supreme Court "did <u>not</u> [t]hereby authorize courts to add more hurdles for a plaintiff to overcome." *Wallace v. Korean Air*, 214 F.3d 292, 300 (2d Cir. 2000) (Pooler, J. concurring) (emphasis added). But that is precisely what American seeks to do here, post-verdict. There is no requirement in the Convention or the controlling law that an "accident" only happens when there is a denial of a "health-based request for assistance" or when there is a "significant" departure from policy. Such a standard warps the Supreme Court's clear definition of accident into an impossible evidentiary burden.

American likewise misconstrues the Supreme Court's holding in *Husain*. Applying the definition of accident first stated in *Saks*, the Supreme Court held that the *Husain* flight attendant's "inaction" in refusing to reseat an asthmatic passenger constituted an accident under the Warsaw Convention because it was unexpected or unusual. *Husain*, 540 U.S. at 647–48, 657. American summarily concludes that because the Supreme Court found that an accident occurred under *Husain*'s set of facts (articulated by American as the rejection of a "health-based request for assistance"), there cannot possibly be an accident under any other set of facts. *See* Dkt. 239 at 12. This is wrong, and it defies the Supreme Court's instruction to perform an "assessment of all the circumstances" in each particular case to determine whether something unexpected <u>or</u> unusual occurred. *See Husain*, 540 U.S. at 651 (quoting *Saks*, 470 U.S. at 405).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.    American's "Health-Based Request" or "Significant Departure" Standard Mischaracterizes Binding Supreme Court Law.

Even if American timely presented its new standard in its pre-verdict Rule 50(a) motion, it would still be a woefully inaccurate depiction of existing law.

#### 1.    "Failure to Warn" Cases do not Require a Rejected Request for Assistance to Prove Accident.

American first attempts to tether its new standard to cases involving claims of failure to warn of the risks of Deep Vein Thrombosis, or DVT. This line of cases holds that an airline is not required to explicitly warn passengers in advance of the risk of developing DVT while flying. These cases do <u>not</u>, contrary to American's claims, require a "direct plea for help" by passengers to establish accident under the Montreal Convention. In fact, these cases do not even involve allegations of failure on the part of the airline crews during the actual flights at issue.

For example, in *Blansett v. Continental Airlines, Inc.*, the plaintiffs alleged that the unexpected and unusual "nature of the alleged event arose not from the choices of the flight attendants, but from the [airline] policymakers who decided not to mandate DVT warnings[.]" 379 F.3d 177, 181 (5th Cir. 2004). In *Caman v. Continental Airlines, Inc.*, the plaintiff was diagnosed with DVT after arriving at his destination. 455 F.3d 1087, 1089 (9th Cir. 2006). Much like the plaintiff in *Blansett*, the plaintiff in *Caman* did not allege that the actions or inactions of crew members during the flight were unexpected or unusual. *Id.* at 1089. Rather, the plaintiff alleged that the unexpected or unusual event was the airline's failure to warn of the risk of developing DVT while flying. *Id.* The Ninth Circuit characterized the airline's failure to present a pre-flight warning of the risk of DVT as an act of omission, an inaction that idly allows an unfolding series of events to reach their natural conclusion," rather than an act of <u>commission</u>, an "<u>inaction that produces an effect, result or consequence</u>." *Id.* at 1092 (emphasis added). And in *Twardowski v. American Airlines*, the Ninth Circuit again confirmed that air carriers could not be held liable for failure to warn of the risk of DVT. 535 F.3d 952, 958 (9th Cir. 2008).

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Simply put, the Ninth Circuit does <u>not</u>, as American suggests, hold that the rejection of a request for help is the *only* type of "commission" that can constitute an unusual or unexpected event or happening.[3] It is difficult to envision a line of cases more inapposite to the present case than those premised on a lack of policy to warn of DVT. *See* Dkt. 239 at 12. Plaintiffs did not allege a failure to warn or a defect in existing policy. Rather, Plaintiffs alleged and proved at trial that there were multiple, repeated, and shocking failures by flight personnel <u>to follow existing policy</u>, which caused a delay in Mr. Plasencia's treatment and his resulting, profound, deficiencies.

### 2. American Relies on Non-Binding Cases to Create a New Accident Standard Antithetical to *Saks* and *Husain*.

The Supreme Court's binding definition of "accident" set forth in *Saks* and *Husain* controls, notwithstanding American's attempt to create a new "health-based request" standard by citing inapposite (and non-binding) case law.

American first turns to *White* and *Singh*, two cases with readily distinguishable rulings that do not require any "health-based request" from the passenger to establish accident. In *White v. Emirates Airlines, Inc.*, a passenger collapsed while the plane was in its final descent. 493 F. App'x 526, 527 (5th Cir. 2012) (per curiam).[4] The flight crew placed the passenger on the floor, administered oxygen, and alerted the captain, who notified medical personnel on the ground. *Id.* at 528. The Fifth Circuit determined that, "under the unique circumstances" of the case (i.e., final descent), the flight crew's failure to follow <u>all</u> airline procedures (such as calling the Physician on Call) was not unexpected

---

[3] In fact, under this omission/commission framework, American's repeated failures to address Mr. Plasencia's rapidly worsening condition during Flight 68 would constitute an act of commission, because it was inaction that produced a consequence of delay in necessary medical treatment.

[4] Not only is this case not binding on this Court, it is not even precedent in the Fifth Circuit. *See* 5TH CIR. R. 47.5.4. ("Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judicate, collateral estoppel or law of the case[.]").

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

or unusual. *Id.* at 534. In Mr. Plasencia's case, however, the American flight crew was not limited in its ability to address Mr. Plasencia's symptoms by the plane's final descent or any other constraint on time or resources. On the contrary, the evidence establishes that the cabin crew and flight deck had additional resources that they could have utilized if they had followed American's policies and procedures, especially while still on the ground in Miami. Ex. 12, Trial Tr. vol. 5, 974:12–15 (American's expert witness Jill Curry confirming presence of gate agent before takeoff and ability for gate agent to speak with passengers about medical concerns); *id.* at 1057:17–19 (American's expert witness Mr. Blalock testifying that if FA Eccles told Captain Occhino the crucial details of Mr. Plasencia's symptoms, "I'm sure [Captain Occhino] would have gotten the gate agent and maybe the CSM involved and maybe it would have escalated").

And in *Singh v. Caribbean Airlines Ltd.*, the district court concluded that "certain deficiencies" in the flight crew's response to a passenger's stroke symptoms did not rise to the level of being unexpected or unusual, in part because the flight crew was responsive to the ill passenger, administered oxygen, and monitored the passenger throughout the flight. 49 F. Supp. 3d 1108, 1118 (S.D. Fla. 2014). Notably, the *Singh* court found that the flight attendants' error in administering medication to the passenger "had negligible effect" on the passenger's condition. *Id.* at 1119. In Mr. Plasencia's case, on the other hand, the jury heard evidence that American's deficiencies <u>did</u> cause a detrimental effect to Mr. Plasencia by drastically delaying his access to medical treatment. Ex. 2, Trial Tr. vol. 2 490:18–20. And the *Singh* court's mention of testimony that "most passengers who appear ill recover within 15 to 20 minutes of onset of symptoms" only heightens American's failures here. *Id.* Unlike "most passengers," Mr. Plasencia <u>worsened</u> after his onset of symptoms on the ground in Miami. FA Eccles witnessed these worsening symptoms but failed to report them to Purser Gambello or Captain Occhino, who both testified that they would have expected to have been told. Ex. 10, Gambello Dep. 39:04–09; Ex. 6, Occhino Dep. 140:12–15; 141:07–12. This unexpected and unusual failure to communicate delayed Mr. Plasencia's treatment and deprived him of necessary and

timely medical care, which caused his severe stroke deficits. *See* Ex. 7, Eccles Dep. 64:05–11; Ex. 2, Trial Tr. vol. 2 490:18–20.

American also cites to *Sook Jung Lee v. Korean Air Lines Co.* to support its new standard. There, "upon being notified of [the passenger's] condition, the cabin crew began to follow [the airline's] policies and procedures for responding to in-flight medical emergencies." 2012 WL 1076269, at *2 (C.D. Cal. Mar. 21, 2012). Again, the facts of that case bear no resemblance to this one. When told of Mr. Plasencia's possible stroke symptoms on the ground, the Flight 68 cabin crew (and specifically, FA Eccles) <u>failed</u> to follow American's policies and procedures of ruling out other causes, delivering a PA for medical assistance, and contacting the Physician on Call. And when FA Eccles observed Mr. Plasencia exhibiting worsening stroke symptoms approximately 1.5 hours into the flight, he again failed to communicate this critical information to Purser Gambello or Captain Occhino, who both testified that <u>they should have been told</u>. Ex. 10, Gambello Dep. 39:04–09; Ex. 6, Occhino Dep. 140:12–15; 141:07–12.

Finally, American makes no showing why its blunderbuss citation of other (nonbinding) cases—*Safa*, *Fulop*, *Arzu*, and others—are factually analogous to <u>this case</u>, much less that they articulated a "health-based request" standard that would be properly aligned with *Saks* and *Husain*. *See* Dkt. 239 at 17–20. Such a standard impermissibly alters the Supreme Court's flexible definition of accident as an "'unexpected or unusual event or happening that is external to the passenger.'" *Husain*, 540 U.S. at 651 (quoting *Saks*, 470 U.S. at 405).

## II.    There is Substantial Evidence to Support the Jury's Conclusion That At Least One Montreal Convention Accident Occurred on Flight 68.

There is substantial evidence to support the jury's conclusion that at least one accident occurred on Flight 68. *See Pavao*, 307 F.3d at 918 ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, <u>even if it is also possible to draw a contrary conclusion</u>." (emphasis

17

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

added)). In fact, Plaintiff presented sufficient evidence of <u>two</u> accidents: one on the ground in Miami, and one approximately an hour and a half into the flight.

## A. There is Substantial Evidence of an Accident on the Ground in Miami.

Shortly after boarding Flight 68 in Miami, Mr. Plasencia dropped his phone, could not pick it back up, and spoke in "gibberish." Ex. 2, Trial Tr. vol. 2, 233:9–13. Ms. Tavantzis pressed the call button, stood up, and called out "My husband is having a stroke, my husband is having a stroke." *Id.* at 233:14–17. Ms. Tavantzis told FA Eccles that Mr. Plasencia had been speaking in gibberish and she was concerned that he was having a stroke. *Id.* at 234:16–17, 234:25–235:1. In his CERS report, FA Eccles reported that Ms. Tavantzis told him her husband had just "block [sic] out and couldn't remember where he was." Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000104.

The jury heard that American's Inflight Manual includes certain medical emergency signs and symptoms that flight attendants are trained to detect in passengers, including: "inability to move muscles in extremities, falling suddenly/ one-sided weakness or loss of movement;" "Slurred speech, difficulty talking or being understood, an inability to communicate, or confusion;" and "Unconsciousness." Ex. 9, Trial Ex. 9, Inflight Manual, AA_000484–85. The Inflight Manual further mandates how American crew members must respond to these symptoms:

- Rule out other causes
- Deliver Medical Assistance PA for physician or medical personnel on board
- Notify captain of the need to contact the Physician on Call
- Contact the Physician on Call (POC)

*Id.* at AA_000485. FA Eccles was told that Mr. Plasencia exhibited an "inability to move muscles in extremities," "one-sided weakness or loss of movement," "difficulty talking or being understood, an inability to communicate, or confusion" and "unconsciousness," all textbook stroke symptoms included in the Inflight Manual.

But FA Eccles only told Purser Gambello that Ms. Tavantzis "was concerned" as Mr. Plasencia "seemed confused and didn't know his name." Ex. 8, Trial Ex. 8, Eccles

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

CERS Report, AA_000104; Ex. 11, Trial Ex. 11, Gambello CERS Report, AA_000110. According to Captain Occhino, Purser Gambello only told him that a passenger was "disoriented." Ex. 6, Occhino Dep. 27:25–28:1. Captain Occhino acknowledged that FA Eccles' failure to inform him of Mr. Plasencia's symptoms "made a difference" because, had he <u>actually been told</u> he "might have gotten someone else involved" or "asked more questions" but he "didn't asked any of that because I don't know any of it." Ex. 4, Trial Tr. vol. 4, 859:1–9; 860:4–15.

American repeatedly claims that because Mr. Plasencia likely suffered a transient ischemic attack ("TIA"), and because American personnel are not trained "to recognize TIA[s]," the crew did not violate any American policy or procedure. But the fact that Mr. Plasencia was likely experiencing a TIA does not absolve American in any way: regardless of <u>what</u> Mr. Plasencia was experiencing, he was exhibiting the very symptoms that American trains its flight attendants to detect and respond to in a particular way, and to communicate those facts to others on the flight crew. Ex. 5, Trial Ex. 19, AA_000147 ("Flight attendants are trained to detect symptoms of sick passengers.").

It is unexpected and unusual that, when faced with a passenger reporting known symptoms of a medical emergency, FA Eccles failed to recognize these symptoms and failed to communicate the symptoms he was told about to Purser Gambello or Captain Occhino. Ex. 2, Trial Tr. vol. 2, 343:19–24.

FA Eccles notified Purser Gambello that Mr. Plasencia "seemed confused and didn't know his name." Ex. 8, Trial Ex. 8, Eccles CERS Report, AA_000104; Ex. 11, Trial Ex. 11, Gambello CERS Report, AA_000110. But FA Eccles failed to notify Purser Gambello of crucial information: that Mr. Plasencia was briefly unconscious, was confused, was having difficulty talking and being understood, and was experiencing an inability to move muscles in extremities. FA Eccles also failed to notify Purser Gambello that Ms. Tavantzis told him that she believed her husband was having a stroke. Ex. 2, Trial Tr. vol. 2, 234:16–17, 234:25–235:1. FA Eccles should have notified Purser

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Gambello and Captain Occhino of these symptoms and requested a medical evaluation for Mr. Plasencia. *See id.* at 336:3–7.

American claims Plaintiff's expert Kathleen Lord-Jones "conceded that no violation of policy had occurred" on the ground in Miami. Dkt. 239 at 21. This is flat wrong. First, Ms. Lord-Jones was asked to confirm whether the flight and cabin crew "notify[ing]" one another of a passenger issue was following American's policies and procedures. *See* Ex. 2, Trial Tr. vol. 2, 360:24–25 (Q: "So in this case on the ground, Flight Attendant Eccles did notify the purser, correct?"). Ms. Lord-Jones confirmed that crew members are required to accurately and truthfully notify one another about a passenger's symptoms. Ex. 2, Trial Tr. vol. 2, 332:12–20.

There is substantial evidence to support a finding that the conduct of the flight crew on the ground was unusual, unexpected, and a gross deviation from American's own policies and procedures.

## B.   There is Also Substantial Evidence of an Accident Approximately 1.5 Hours into Flight 68.

Approximately 1.5 hours into the flight, FA Eccles saw Mr. Plasencia losing balance on his right side as he walked to the bathroom. American's Inflight Manual lists "falling suddenly/one-sided weakness or loss of movement" as a stroke symptom. Ex. 9, Trial Ex. 9, Inflight Manual, AA_000484–85. It is unexpected and unusual that a flight attendant would see a passenger exhibiting stroke symptoms—the same passenger they had already been informed had been exhibiting stroke symptoms before departure—and not tell anyone else. The jury heard Ms. Lord-Jones' expert opinion that FA Eccles "failed to again identify someone exhibiting stroke-like symptoms" and "failed to communicate his observations and concerns with other flight attendants and the captain." Ex. 2, Trial Tr. vol. 2, 333:5–8. Ms. Lord-Jones confirmed that this, too, was a clear violation of the Inflight Manual, the crew resource management policy, and industry standards. *Id.* at 333:9–15. Fatal to American's arguments, Purser Gambello and Captain Occhino both testified that FA Eccles <u>should have told them</u> that he saw Mr. Plasencia exhibiting these

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

worsening stroke symptoms—in other words, his failure to do so was <u>unexpected</u>. Ex. 10, Gambello Dep. 39:4–9; Ex. 6, Occhino Dep. 140:12–15; 141:07–12.

### C. There is Substantial Evidence That These Accidents Caused a Delay in Mr. Plasencia Receiving Treatment, Resulting in Severe Injury.

There is substantial evidence to support the jury's conclusion that American caused Mr. Plasencia to suffer injury in the form of severe and profound stroke deficits that would not otherwise have occurred. The jury heard from Dr. Schim who explained that Mr. Plasencia's last known well was likely on the ground in Miami. Ex. 3, Trial Tr. vol. 3, 494:7. Dr. Schim confirmed that Mr. Plasencia's symptoms observed "about an hour and a half into the flight[,]" meant that he was "likely" "already having a stroke at that point[.]" *Id.* at 505:3–5. The jury also heard Dr. Schim's testimony that if a patient in Mr. Plasencia's position had gone to an appropriate medical facility in Miami after exhibiting stroke symptoms during a TIA, they would likely be administered tPA and experience a far better outcome than that of Mr. Plasencia. *Id.* at 495:1–16. Dr. Schim also confirmed that diversion either to Miami or Bermuda within Captain Levy's estimated timeframes would have allowed for the administration of tPA. *Id.* at 490:12–17. Dr Schim confirmed that "time is brain" when it comes to strokes and, "to a reasonable degree of medical probability," the delay in Mr. Plasencia's treatment was the direct and proximate cause of his profound deficiencies. Ex. 3, Trial Tr. vol. 3, 480:1; 486:20–487:2 ("The big picture is the delay of treatment.").

American's reliance on the testimony of its own expert, Dr. Suite, carries zero weight here. When considering a renewed motion for judgment as a matter of law, the Court must "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51. The court "may not make credibility determinations or weigh the evidence." *Cotton*, 860 F. at 999, 1008 (cleaned up) (quoting *Reeves*, 530 U.S. at 150).

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

Finally, it is simply incorrect for American to state that Dr. Schim "testified that Mr. Plasencia's stroke occurred between 5:15 and 7:00 a.m. Madrid time . . . and not substantially earlier than that." Dkt. 239 at 23. In reality, Dr. Schim testified that Mr. Plasencia's stroke occurred at "least four, maybe five hours, or longer, but not likely to be <u>shorter</u>" than the time of imaging. Ex. 3, Trial Tr. vol. 3, 505:24–506:1 (emphasis added). Regardless of the time stamp on the CT scan images, Dr. Schim also testified that, based on his review of the record, Mr. Plasencia was likely already experiencing a stroke at the <u>hour and a half mark of the flight</u>. *Id.* at 495:12–14; 505:3–5. There is substantial evidence necessary for a reasonable jury to determine that the delay in treatment—as well as American's failure to divert at the hour and a half mark—caused Mr. Plasencia to suffer a <u>far more</u> severe outcome than he would have experienced had he received timely medical treatment.

## III. There is No Evidence from Which a Reasonable Jury Could Find That American is Wholly Exonerated from Liability.

American failed to introduce sufficient evidence to support its affirmative defense of exoneration, and no reasonable jury could find that American is completely exonerated from liability.

As an initial matter, American's attempt to stand on the testimony of FA Eccles that he offered medical assistance to Plaintiffs as its basis for exoneration should be disregarded. *See* Dkt. 239 at 24–25. Plaintiff explicitly testified that FA Eccles did <u>not</u> offer medical assistance. Ex. 2, Trial. Tr. vol. 2, 240:4. And as the Court knows, it "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51.

American then argues, without any support, that Plaintiff had a duty to ask for help. The defendant airline in *Husain v. Olympic Airways* made a similar argument, claiming that the passenger and plaintiff should have requested to speak with the flight attendant's supervisor after the flight attendant refused to move the asthmatic passenger. 116 F. Supp.

22

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

2d 1121, 1141 (N.D. Cal. 2000). The district court rejected this argument, emphasizing that "[i]mposing such a duty would place an unreasonable burden on a passenger[.]" *Id.* Here, imposing a duty to ask for medical assistance would place an unreasonable burden on passengers, who would now be required to know that they are responsible for requesting medical attention. American's argument also fails to recognize that Plaintiff Tavantzis's testimony that <u>she did ask for help</u> and that she believed FA Eccles was going to return with medical assistance after she told him that she believed her husband was having a stroke. Ex. 2, Trial Tr. vol. 2, 235:6–9. Tellingly, American did <u>not</u> present any policy, procedure, law, or industry standard that requires a passenger to ask for help before being assisted in the event of a medical emergency, much less ask for help multiple times from multiple personnel. Indeed, creating such a rule would absolve American of all responsibility to respond to passenger medical emergencies.

Finally, American claims that it should be exonerated because "Mr. Plasencia did not recognize his symptoms as a medical emergency or a precursor to stroke." Dkt. 239 at 3. The only person with the training to recognize Mr. Plasencia's symptoms as a possible medical emergency was FA Eccles and other members of the flight crew who were "trained to detect" the very symptoms Mr. Plasencia was exhibiting on Flight 68. *See Husain*, 116 F. Supp. 2d at 1143 (recognizing that "the flight attendant was in a far better position to effectuate a change" to assist the asthmatic passenger in leaving the smoking section). Requiring a passenger who had <u>lost consciousness</u> to recognize the symptoms of his own medical emergency would create an unreasonable—if not impossible—burden for the passenger. *Id.* at 1141.

## CONCLUSION

The jury heard and saw substantial evidence to support its unanimous verdict. Substantial evidence exists to support the jury's conclusion that at least one accident occurred on Flight 68, causing Mr. Plasencia to suffer a massive stroke and profound disability. Substantial evidence also exists to demonstrate that had American followed its policies, procedures, and industry standards and properly responded to Mr. Plasencia's

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

stroke symptoms, he would have received quicker treatment and faced a far better outcome without being paralyzed, disabled, and dependent on 24-7 wakeful care. Despite American's immense effort to twist both the facts of this case and the law of the Montreal Convention in its favor, American cannot avoid this verdict. The Court should deny American's Renewed Motion for Judgment as a Matter of Law in full.

Dated: January 30, 2026                    Respectfully submitted,


                                           */s/ Hannah M. Crowe*
                                           Darren P. Nicholson (*pro hac vice*)
                                           dnicholson@burnscharest.com
                                           Hannah M. Crowe (*pro hac vice*)
                                           hcrowe@burnscharest.com
                                           Anna Katherine Benedict (*pro hac vice*)
                                           abenedict@burnscharest.com
                                           **BURNS CHAREST LLP**
                                           900 Jackson Street, Suite 500
                                           Dallas, TX 75202
                                           Telephone: (469) 904-4550


                                           Sanjiv N. Singh (State Bar No. 193525)
                                           ssingh@sanjivnsingh.com
                                           **SANJIV N. SINGH, APLC**
                                           1700 South El Camino Real, Suite 503
                                           San Mateo, CA 94402
                                           Telephone: (650) 389-2255


                                           *Attorneys for Plaintiff*

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK

## CERFICATE OF SERVICE

I hereby certify that on January 30, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record electronically by CM/ECF.

Ivy L. Nowinski (State Bar No.: 268564)
Email: inowinski@condonlaw.com
CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067-6036
Telephone: (310) 557-2030
Facsimile: (310) 557-1299

David J. Harrington (*pro hac vice*)
Email: dharrington@condonlaw.com
William deWolff (*pro hac vice*)
Email: wdewolff@condonlaw.com
CONDON & FORSYTH LLP
7 Times Square, 18th Floor
New York, New York 10036
Telephone: (212) 490-9100
Facsimile: (212) 370-4453

Attorneys for Defendant
AMERICAN AIRLINES, INC.

*/s/ Hannah M. Crowe*
Hannah M. Crowe

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO.: 5:23-cv-05607-NW-SVK