UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA MARIA MARCELA TAVANTZIS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | Case No. 23-cv-05607-NW<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING DEFENDANT'S MOTION FOR NEW TRIAL, AND GRANTING IN PART PLAINTIFFS' MOTION TO AMEND THE JUDGMENT**<br><br>Re: ECF Nos. 239, 241, 243 |

Before the Court are three post-trial motions: (1) Defendant American Airlines, Inc.'s ("American") motion for judgment as a matter of law, ECF No. 239; (2) Defendant's motion for a new trial, ECF No. 243; and (3) Plaintiffs'[1] motion to amend the judgment, ECF No. 241. For the reasons set forth below, the Court DENIES Defendant's motion for judgment as a matter of law, DENIES Defendant's motion for a new trial, and GRANTS IN PART AND DENIES IN PART Plaintiffs' motion to amend.

## I.    BACKGROUND

This case has a complicated history. Before addressing the specific factual and procedural issues presently before the Court, a broad overview of the case is warranted. As the Court summarized in its December 18, 2026 Order:

---

[1] Ana Maria Marcela Tavantzis, as an individual, and as Legal Guardian of Jesus Plasencia, filed this action on October 31, 2023. The matter went to trial, and on September 17, 2025, the jury rendered a verdict in Plaintiffs' favor. On October 11, 2025, Mr. Plascencia died. The following month Ms. Tavantzis moved the Court to substitute herself, "individually and as Trustee of the Plascencia Tavantzis Trust Dated November 19, 2019, as the proper Plaintiff in this case in accordance with the terms of the Last Will of Jesus Plasencia . . . and the Plascencia Tavantzis Trust." ECF Nos. 221, 231. American timely opposed. ECF No. 233. The Court granted Ms. Tavantzis' motion on December 18, 2026. *See* ECF No. 236.

United States District Court<br>Northern District of California

> On November 8, 2021, Jesus Plasencia suffered a stroke while on an American Airline flight from Miami, Florida to Madrid, Spain. Though doctors in Madrid were able to save Mr. Pl[a]sencia's life, he was left with irreversible physical and cognitive injuries. Plascencia and his wife Ana Marcela Tavantzis (collectively "Plaintiffs")[] sued American Airlines for its alleged failure to follow industry standards and internal policies, a failure that they alleged caused Mr. Plasencia's injuries. On September 17, 2025, following a six-day jury trial, the jury returned a verdict primarily in favor of Plaintiffs. ECF No. 201. The jury assigned 72.5% of the responsibility for the injuries to American, with the remaining 27.5% assigned to Plaintiffs. When prorated according to responsibility, the verdict granted Plaintiffs $9,629,829.55 for damages, including future medical and caregiving expenses. Plaintiffs' experts testified, and Defendants' experts did not dispute, that Mr. Plasencia had a life expectancy of an additional fifteen years.

ECF No. 236. The Court now turns to the specific details animating the three instant motions.

### A.   Summary of Evidence Presented at Trial

#### 1.   The Meaning of "Accident"

Because Plaintiff was on an international flight when all of the relevant events occurred, Plaintiffs' suit arises under the *Convention for International Carriage by Air*, S. Treaty Doc. No. 106-45 (May 28, 1999) ("Montreal Convention"). At the outset of the trial, the Court instructed the jury on a number of items, including the applicability of the Montreal Convention to the suit, the meaning of the word "accident" under the Convention, and Plaintiffs' theory of the case. As the Court explained:

> Plaintiffs assert that, pursuant to the Montreal Convention, there were two "accidents" during their flight that caused Jesus Plasencia's injuries:
>
> > (1) American Airlines' failure to follow industry standards or American Airlines' written policies and procedures in its flight operations manual and inflight manual with respect to Plaintiffs prior to the departure of Flight 68 from Miami, Florida, to Madrid, Spain, on November 8, 2021; and,
> >
> > (2) American Airlines' failure to follow industry standards or American Airlines' written policies and procedures in its flight operations manual and inflight manual with respect to Plaintiffs approximately an hour and a half into Flight 68 that departed from Miami, Florida, on November 8, 2021.

ECF No. 261 at 35.

### 2.    Accident #1: Pre-Flight in Miami

On November 8, 2021, Mr. Plasencia and Ms. Tavantzis boarded Flight 68 and sat in seats 28J and 28L in the main cabin.  Trial Tr. 291:15-22.[2]  According to Ms. Tavantzis:

> [v]ery shortly after we sat down, I saw [Mr. Plasencia] drop his phone -- he dropped his phone on the floor.  And I looked and I saw him trying to grab it, but he was not successful.  So I leaned over and I grabbed it and I handed it to him, and he looked at me and spoke gibberish.
>
> So I said, what's your name? and he spoke gibberish.  I pressed the call button, I got up, I stood in front of my husband and said, my husband is having a stroke, my husband is having a stroke.

*Id.* at 232:9-17.

Ms. Tavantzis explained that Flight Attendant David Eccles ("FA Eccles") "came right over." *Id.* at 233:16-18.  She stated that she told FA Eccles that she was concerned that Mr. Plasencia was having a stroke.  *Id.*  FA Eccles, who also appeared at trial, testified that Ms. Tavantzis never told him that she thought her husband was having a stroke.  *See id.* at 726:23-727:1.  Both Ms. Tavantzis and FA Eccles agree that at this point, Mr. Plasencia had seemingly recovered from his symptoms.  *See generally id.* at 233:19-22; 727:2-19.  FA Eccles asked Mr. Plasencia if he was okay, and Mr. Plasencia said "yes." *Id.* at 234:2-5; 727:4-19.  He told FA Eccles that he felt okay but could not remember what just occurred.  *Id.*; *see also id.* at 236:14-18. FA Eccles asked the pair if they wanted to deplane to get medical attention, but Mr. Plasencia declined the offer.  *Id.* at 726:1-25; 727:1-25, 728:1-25.

Feeling "uncomfortable" with the situation, FA Eccles promptly reported his interaction with Plaintiffs to his supervisor, Purser Kelly Gambello.  *See* Trial Ex. 8, Eccles CERS Report, ECF No. 193-8.  Purser Gambello, in turn, reported the interaction to the captain of the aircraft, Captain Anthony Occhino.  Trial Tr. at 830:15-20.  Both Purser Gambello and Captain Occhino testified that FA Eccles did not tell them that Mr. Plasencia had dropped his phone, blacked out, and could not remember where he was.  *Id.* at 859:1-9; 860:4-15; 843:11-13.  Captain Occhino

---

[2] There are seven volumes of trial transcripts, corresponding to the seven days of trial.  *See* ECF Nos. 186-192.  The complete transcript is numbered sequentially, from the first page of the first volume to the last page of the last volume, so the Court refers to the trial transcript (Tr.) as one document.

then left the flightdeck to speak to Mr. Plasencia and Ms. Tavantzis to assess the "safety" of the situation. *See generally id.* at 850:17-851-:22.  Captain Occhino testified that he asked both Plaintiff and Mr. Plasencia "multiple times" if they were okay, and that they both stated that they were fine and wished to continue with their flight. *Id.* at 851:11-22.

FA Eccles, Purser Gambello, and Captain Occhino each recounted what they reported and/or what was reported to them.  Captain Occhino testified at trial that FA Eccles failed to report crucial details he had learned from Ms. Tavantzis:

> Q: Did David Eccles tell you that he had a passenger that had dropped his phone?
>
> A: No.
>
> Q: Did David Eccles tell you that he had a passenger that had blacked out?
>
> A: No.
>
> Q: Did David Eccles tell you that this particular passenger did not remember where he was?
>
> A: No.
>
> . . .
>
> Q: Would it be fair to say that it would be your expectation, as the pilot, that if you are going back to talk to these passengers who you were told were disoriented, that you would want to be told these things?
>
> A: It would have made a difference.
>
> Q: Okay.  Why would it have made a difference?
>
> A: Well, I mean, if I had known all that, we might have - I still would have come back, but I might have gotten someone else involved and asked more questions, because I didn't really ask questions like, oh, I heard you blacked out, I heard you did this. I didn't ask any of that because I didn't know any of it.

*Id.* at 859:1-9; 860:4-15.  Purser Gambello testified similarly, agreeing with counsel that she was not made aware that Mr. Plasencia had "dropped his phone, blacked out, [and] did not remember where he was . . ." *Id.* at 842:15-23l; 843:11-13.  FA Eccles, however, testified that he either told Purser Gambello, or "must have told her," that Mr. Plasencia had "dropped [his] phone," "blacked out," and "did not remember where he was." *Id.* at 774:12-775:7.

4

Plaintiff's air cabin safety expert, former American Airlines flight attendant and purser Kathleen Lord-Jones testified that, in her opinion, the flight crew did not respond "appropriately to the symptoms that Mrs. Tavantzis was communicating to them" in a manner consistent with their training. *Id.* at 342:12-15. She further testified that, though flight attendants are "expected to communicate with the cabin crew when [a] stroke symptom[] is identified," FA Eccles did not properly communicate that information to the rest of the crew." *Id.* at 331:12-18; 342:16-18.

With the benefit of hindsight, both parties agree that Mr. Plasencia likely suffered a transient ischemic attack ("TIA"). *See id.* at 170:7-11 ("American does not dispute that Mr. Plasencia suffered a transient ischemic attack."). Plaintiffs' medical expert Dr. Jack Schim explained that a TIA is a kind of stroke where the patient "dodged the bullet, where there was a blockage and [the] body was able to dissolve the blockage quickly enough that the symptoms went away and there wasn't damage." *Id.* at 476:23-477:1.

### 3.      Accident #2: Incident Over Bermuda

An hour and a half into the flight, the status quo appeared to shift. FA Eccles observed Mr. Plasencia walking to and from the bathroom, noting that he had difficulty walking and appeared to be losing balance on his right side. Trial Ex. 8, Eccles CERS Report, ECF No. 193-8. Though neither Ms. Tavantzis nor Mr. Plasencia asked for medical assistance, and though Mr. Plasencia told FA Eccles he was fine, FA Eccles assisted Mr. Plasencia to his seat and continuously monitored him. *Id.* Ms. Tavantzis, who was "extremely concerned," repeatedly asked FA Eccles to make a wheelchair available for Mr. Plasencia when they landed. Trial Tr. at 245:23-246:6.

FA Eccles did not inform Purser Gambello or Captain Occhino of Mr. Plasencia's worsening condition. Purser Gambello testified that she would have expected to be told this information by FA Eccles:

> Q: Were you aware that Mr. Eccles observed Mr. Plasencia losing balance on his right side about an hour and a half into the flight?
>
> A: No.
>
> Q: Is that something you would have expected to be made aware of as the purser?
>
> A: I would say yes.

Gambello Dep. 39:04-09 (Sept. 11, 2024); *see also* Trial Tr. at 317:2-3 ("[T]he video deposition of Kelly Gambello was played in open court.").

Captain Occhino also testified that FA Eccles should have told him about Mr. Plasencia's deteriorating condition:

> Q: Were you informed of this incident approximately one and a half hours or thereafter into the flight?
>
> A: No.
>
> . . .
>
> Q: . . . [W]ere you aware at the time you were flying the plane, that the situation was so serious that they were checking on him every five minutes after that?
>
> A: No.  He should have told me.

Occhino Dep. 140:12-15; 141:07-12; Trial Tr. at 367:2–3 ("[T]he video deposition of Anthony Occhino was played in open court.").

Ms. Lord-Jones testified that FA Eccles, at that point, had repeatedly violated not only American Airlines policies and procedures, but industry standards, by failing to properly identify Mr. Plasencia's stroke-like symptoms (as contained in American's Inflight Manual), and by failing to communicate those symptoms with other crew members.  *See* Trial Tr. at 328:12-335:7. Plaintiff's aviation expert, Captain Richard Levy explained that at the 1.5 hour mark, the plane could have been diverted to Bermuda within 45 minutes or returned back to Miami within 1.5 hours. *Id.* at 384:5

### 4.    Mr. Plasencia Suffers a Stroke Near Madrid

Mr. Plasencia's symptoms dramatically worsened approximately an hour before the plane was set to land in Madrid.  Mr. Plasencia soiled himself and could not exit the bathroom. *Id.* at 247:4-8.  FA Eccles alerted Purser Gambello that Mr. Plasencia was having a medical issue. *Id.* at 806:5-6.  An overhead announcement for medical assistance was made, and several physicians responded. *Id.* at 249:7-17.  Once Flight 68 landed in Madrid, paramedics boarded the plane and transported Mr. Plasencia to the hospital. *Id.* at 249:25-250:7.  Plaintiffs' expert testified that Mr. Plasencia underwent a mechanical thrombectomy, though he was "left with a very large area of

6

United States District Court
Northern District of California

stroke damage and a very large severe stroke deficit." *Id.* at 487:22-488:12

Plaintiffs' and American's separate medical experts agreed that the only effective treatment available for a stroke is Tissue Plasminogen Activator ("tPA"). The effectiveness of tPA diminishes as time between stroke and treatment increases. *Id.* at 503:19-504:4. Plaintiffs' medical expert, Dr. Schim, testified that tPA is FDA approved for administration up to 3 hours after the onset of stroke, but in practice in the United States and in Europe, tPA is administered up to 4.5 hours after onset. *Id.* Neither Plaintiffs' nor American's medical experts, however, were able to say, to a reasonable degree of certainty, when the stroke occurred. Dr. Schim testified that Mr. Plasencia's symptoms "an hour and a half into the flight" demonstrated that he was "likely" "already having a stroke at that point[.]" *Id.* at 505:3-5. Dr. Schim opined that, "to a reasonable degree of medical certainty," had Flight 68 diverted to Miami or Bermuda, Mr. Plasencia likely would have received tPA and a better outcome. *Id.* at 496:2-12. In contrast, Dr. Suite testified that, based on his review of published studies analyzing the efficacy of tPA, tPA only improves prognosis for 35% of stroke patients, and that number is even lower for Latino males over 65 with hypertension, such as Mr. Plasencia. *Id.* at 1238:13-1239:19. Dr. Schim also testified that tPA cannot be administered to patients having a systolic blood pressure over 185, and at all times that it was checked, Mr. Plasencia's blood pressure exceeded that level. *Id.* at 1117:23-1118:15.

### 5. American's Inflight Manual

Throughout the trial, the Jury heard evidence about American's Inflight Manual. Expert and former American Airlines flight attendant Ms. Lord-Jones explained that the Inflight Manual "contains all the policies, procedures and rules, aircraft-specific information regarding American Airlines' aircraft." *Id.* at 325:18-20. According to Ms. Lord-Jones, "flight attendants have to know the Inflight Manual cover to cover before they can get certified to fly in the first place." *Id.* at 326:4-7. Ms. Lord-Jones also testified that it would be "a violation of the Inflight Manual and the policies and procedures of the company if the flight attendant didn't follow the inflight manual." *Id.* at 326:21-24.

Ms. Lord-Jones went on to explain that, when she was at American, the identification of stroke symptoms was something that flight attendants such as herself were trained to identify. *Id.*

at 328:12-16.  Among other things, the manual provides flight attendants with a list of symptoms for various illnesses including stroke, and the enumerated symptoms include "inability to move muscles in extremities, falling suddenly/one-sided weakness or loss of movement;" "Slurred speech, difficulty talking or being understood, an inability to communicate, or confusion;" and "Unconsciousness."  *See* Trial Ex. 9, Inflight Manual, ECF No. 193-9, AA_000484–85.  Ms. Lord-Jones testified that flight attendants are "expected to communicate with the rest of the cabin crew when one of these stroke symptoms is identified" and it would be "an unexpected event" if the flight attendant did not.  Trial Tr. at 331:12-23.

### B.    Procedural History

#### 1.    Jury Instructions

Before the trial, the Court worked with the parties to draft the jury instructions.  Of relevance here is American's objections to the final formulation of Jury Instruction 29 ("Instruction 29").

The very first versions of the instruction came to the Court on August 20, 2025, when the parties jointly filed their proposed jury instructions consistent with the Court's Civil Jury Trial Standing Order.  *See* ECF No. 152.  Though the parties agreed on many of the instructions, a major point of contention between them was how the Court should instruct the jury on the meaning of "accident" under the Montreal Convention.  Defendant proposed that the "accident" instruction include, in relevant part, the following language:

> An "accident" can include actions or failures to act by cabin crew or flight crew if those actions or failures to act were (1) unexpected or unusual and (2) caused the passenger's injury.

> However, not every failure to act is an "accident."  An imperfect response by the flight or cabin crew to a passenger's medical emergency does not necessarily constitute an accident.  An airline's departure from its own policies or procedures or relevant industry standards is not, on its own, "unusual or unexpected"; Plaintiffs must show, at minimum, that the airline's actions constitute a significant deviation from recognized practices and procedures to meet the threshold of "unusual or unexpected."  If the failure simply allowed events to occur naturally, it is not an "accident."  But if the failure itself caused Plaintiffs' harm, it may be considered an "accident."

ECF No. 152-2 at 12-13.

The Court reviewed the parties' separate proposed language for the instruction and ultimately crafted its own Instruction 29, which the Court provided to the parties on September 3, 2026, along with all other jury instructions it expected to give at trial. *See* Sept. 3, 2025 Tr. at 4:19-25, ECF No. 210. *Id.* at 25:13-16. The Court directed the parties to review the instructions and report back to the Court regarding their positions on the Court's draft. *See* ECF Nos. 173, 175. In response, American asked the Court to supplement language within Instruction 29 as emphasized below:

> Various events on a flight might be unexpected or unusual. The acts or omissions of airline personnel, including an employee's failure to follow airline policy or procedure, may be an unexpected or unusual event or happening. An event or happening is not "unexpected or unusual" when it is part of the usual, normal, and expected operation of the aircraft. **A departure by the airline crew from industry standards or airline policies and procedures can be an "accident" if you determine that the departure was "unexpected" or "unusual" when evaluated in context. Allegedly inadequate medical care by an airline does not constitute an "accident" without some showing of unexpected circumstances. Plaintiffs must show a material deviation from industry standards or airline policy or procedure to establish an "accident."**[3]

ECF 173.[4] American believed "that the jury would benefit from additional instruction regarding when an airline's violation of industry standards and internal airline policies [and] procedures may be considered an 'accident' under Article 17 of the Montreal Convention based upon applicable caselaw discussing this issue." *Id.*

On September 4, 2025, the Court held a hearing to discuss, among other things, the jury instructions. Counsel for American explained that Defendant had provided the supplement to Instruction 29 because it was:

> concerned that a jury could potentially think that any deviation from policy or procedure, industry standard can be an accident while the cases definitely say that that is not so. What the cases say is that there is no perfect response to a medical emergency. Policies and procedures are not going to be routinely followed to the letter . . . I

---

[3] The plain text is from the Court's Instruction 29; the bolded and underlined text constitutes American's proposed supplement.

[4] Plaintiffs also submitted proposed red lines. *See* ECF 175. The Court does not recite them here as they are not necessary to resolve American's motions.

United States District Court
Northern District of California

think it would be a mistake to provide these [instructions] to the jury without cautioning that not every violation of policy and procedure is an accident and allegedly an inadequate response.

Sept. 4, 2025 Tr. at 41:2-19, ECF No. 211.  The Court rejected American's supplemental language, explaining that "[t]he way that the instruction is currently written is that failure to follow airline policy or procedure *may be* an unexpected or unusual event or happening, not that it must be or it always is or that it is -- that it requires perfection." *See id.* at 42:15-23 (emphasis added).

The parties proceeded to trial with this final version of Instruction 29, largely unchanged from the Court's original draft, which the Court provided to the jury:

You must decide whether Jesus Plasencia suffered a bodily injury as a result of an "accident" as defined by the Montreal Convention.  Not every incident or occurrence during air travel qualifies as an "accident" under the Montreal Convention, even if a passenger is injured.

To establish American Airlines' liability under the Montreal Convention, Plaintiffs must prove by a preponderance of the evidence that

(1) there was an "accident," meaning an unexpected or unusual event or happening;

(2) that was external to Plaintiffs, and,

(3) that "accident" caused Jesus Plasencia's injuries.

The definition of "accident" should be flexibly applied after assessing the context and circumstances of a passenger's injuries.

Various events on a flight might be unexpected or unusual.  The acts or omissions of airline personnel, including an employee's failure to follow airline policy or procedure, may be an unexpected or unusual event or happening.  An event or happening is not "unexpected or unusual" when it is part of the usual, normal, and expected operation of the aircraft.

An event is not an "accident" if it results solely from the state of the passenger's own health and is unconnected with the flight.  A passenger's worsening condition caused by their own internal reaction to normal flight operations is not external to the Plaintiff and is therefore not an "accident' under the Montreal Convention.

Finally, for American Airlines to be liable to Plaintiffs, the "accident," (the unexpected or unusual event or happening, that was external to Plaintiffs) must have *caused* Jesus Plasencia's injuries.  Under the Montreal Convention, the words "accident" and "injury" do not mean the same thing.  Any injury is the product of a chain of causes.  Plaintiffs have the burden of proving by a preponderance of the evidence that the "accident" was a link in the chain that caused

United States District Court
Northern District of California

Jesus Plasencia's injuries.

Plaintiffs assert that, pursuant to the Montreal Convention, there were two "accidents" during their flight that caused Jesus Plasencia's injuries:

(1) American Airlines' failure to follow industry standards or American Airlines' written policies and procedures in its flight operations manual and inflight manual with respect to Plaintiffs prior to the departure of Flight 68 from Miami, Florida, to Madrid, Spain, on November 8, 2021; and,

(2) American Airlines' failure to follow industry standards or American Airlines' written policies and procedures in its flight operations manual and inflight manual with respect to Plaintiffs approximately an hour and a half into Flight 68 that departed from Miami, Florida, on November 8, 2021.

If Plaintiffs do not prove by a preponderance of the evidence that at least one of these two events was an "accident" that caused Jesus Plasencia's injuries, then you must find that American Airlines is not liable to Plaintiffs.

*See* ECF No. 261 at 35.  Now, in its motion for a new trial, American argues that Instruction 29 "did not fairly and adequately explain the law" because it lacked "key conditional language from the Fifth Circuit explaining that not every violation of policy is an 'accident or unexpected occurrence.'"  ECF No. 243 at 1.

### 2.    American's Initial JMOL and the Jury Verdict

On September 11, 2025, after Plaintiffs rested their case, American filed a motion for judgment as a matter of law ("JMOL motion").  ECF No. 180.  According to American, there were multiple reasons to grant the JMOL motion: (1) there was no "accident" within the meaning of Article 17, (2) neither of the supposed "accidents" served a "causal link in the chain leading to plaintiff's injuries," (3) Plaintiffs' failure to accept American's offers to deplane constituted negligence that exonerated American.

On September 15, the Court denied American's motion.  In its Order, the Court explained that:

the Court is not convinced that Plaintiffs failed to provide evidence that American Airlines acted outside the scope of its policies and procedures. As has been discussed frequently during the trial, American Airlines' in-flight manual included various stroke

11

> symptoms that flight attendants were expected to know.  Conflicting testimony was presented to the jury regarding whether Flight Attendant Eccles failed to properly act on that knowledge, either at the beginning of the flight or an hour and a half in.  That testimony could lead a reasonable jury to find that American Airlines violated its policies and procedures.  The Court will not take the decision out of the jury's hands on those grounds.

ECF No. 183.

On September 17, the jury returned a verdict in favor of Plaintiffs.  The jury assigned 72.5% of the responsibility for the injuries to American, with the remaining 27.5% assigned to Plaintiffs.  ECF No. 201.  Specifically, the jury awarded Mr. Plasencia $699,861.51 in past medical and caregiving expenses, $800,000 in past pain and suffering, $6,582,662 in future medical and caregiving expenses, and $3,200,000 for future pain and suffering.  For Ms. Tavantzis' loss of consortium claims, the jury awarded $2,000,000 in past and future damages.  At the close of trial, the parties met and conferred to determine the judgment award for Plaintiffs. The trial transcript reflects the following:

> The Court:  Have the parties met and conferred and come up with what the number is for the plaintiffs based on the verdict or is there some dispute about that?
>
> Mr. Harrington:  We have conferred and we have agreed.
>
> Mr. Nicholson:  I think we figured it out, it took us a while, but we got it.
>
> The Court:  Okay. Tell me where you ended up?
>
> Mr. Nicholson:  By our calculation doing the 27.5 discount, it comes out to $9,629,829.55.
>
> Mr. Harrington:  We agree.
>
> . . . .
>
> The Court:  Okay. How long will it take for the plaintiff to prepare the judgment?
>
> Mr. Nicholson:  We should be able to have you something by tomorrow, your honor.
>
> The Court:  Okay.  The court will look for that, and I assume it will be consistent, it's relatively straightforward, it will be consistent with the number that has been stipulated here in court.  I'm not attributing to the defense that the defense agrees with the decision of the jury with regards to that, but that both sides agree that the verdict, as it was rendered by the jury and the percentage that it attributed to the

> plaintiff, that that yields this figure of $9,629,829.55. And with that, there's really nothing else for the court to do unless and until there [are] post-trial motions that are filed.

Trial Tr. at 1476:7-1477:15.

### 3.   Post-Trial Motions

On September 19, 2025, two days after the verdict, Plaintiffs submitted a motion for entry of judgment. ECF No. 209. The Court was surprised to see that the judgment included both the $9,629,829.55 awarded by the jury and an additional $1,432,272.22 in prejudgment interest. *Id.* But believing the parties had stipulated to the judgment,[5] the Court entered final judgment on September 30, 2025, in the amount of $11,062,101.77. ECF No. 213. The Court vacated its Order later that same day when it learned that American opposed Plaintiffs' request for prejudgment interest. Defendant timely filed an opposition on October 3, 2025, arguing that Plaintiffs were "not entitled [to] prejudgment interest" and asked the Court to "enter judgment in the amount of the verdict returned by the jury, only." ECF No. 215. American noted that the case "ha[d] already been tried to a jury to verdict," and therefore the Court could "not alter that verdict to impose prejudgment interest in response to a post-verdict motion." *Id.* at 13. On October 9, 2025, the Court set the motion for hearing on November 19, 2025. The next day, Plaintiffs timely filed a reply. ECF No. 218.

On November 14, 2025, the Court took the matter under submission finding that the legal issue regarding prejudgment interest was fully briefed and the Court was prepared to issue an Order without oral argument; accordingly, the Court vacated the November 19, 2025 hearing. *See* ECF Nos. 217, 220. Later on November 14, 2025, Plaintiffs informed American that Mr. Plasencia had passed away on October 11, 2025. The same evening Defendant similarly apprised the Court of Mr. Plasencia's death.

---

[5] The Court believed (incorrectly) that the motion, which was filed without a hearing date, was an administrative motion under Local Rule 7-11. Motions under that rule are deemed submitted for immediate determination after five days have passed. L.R. 7-11(c). The Court, having waited eleven days after Plaintiffs' motion without seeing any opposition, entered judgment accordingly on September 30, 2025. The Court acknowledges, however, that the docket text associated with Plaintiffs' motion erroneously set October 3, 2025 as the deadline for Defendant to file an opposition. *See* ECF No. 209.

<div style="margin-left:0">United States District Court<br>Northern District of California</div>

On November 17, 2025, Plaintiffs filed a suggestion of death and a motion to substitute Ms. Tavantzis for Mr. Plasencia in her capacity as trustee of the Plasencia Tavantzis Trust Dated November 19, 2019. ECF No. 222. That same day, American filed a notice of intent to oppose Plaintiffs' motion for substitution and requested the Court set a briefing schedule. ECF No. 223. The Court reinstated the November 19 hearing date for discussion on if and how Mr. Plasencia's death may affect the posture of the case. ECF No. 224.

At the hearing, the Court asked Plaintiffs to withdraw the motion for judgment while the parties litigated the substitution issue. The Court also directed the parties to confer to determine whether they could settle this matter without further motions practice. *See* ECF Nos. 228, 229. Once it became clear the parties were unable to reach a settlement, the Court directed Plaintiffs to file a renewed motion for substitution on December 1, 2025, and set an expedited briefing schedule. The Court granted the motion to substitute on December 18, 2025, and on December 22, 2025,[6] the Court entered final judgment in the amount of $9,629,829.55.

Within the time period allotted by the federal rules, American renewed its motion for judgment as a matter of law and filed a motion for a new trial. Plaintiffs filed a motion to correct and amend the judgment, in which they renewed their request for prejudgment interest, and also asked the Court to correct the judgment *nunc pro tunc* to October 10, 2025, the date that all briefing on Plaintiffs' original motion for judgment (that included the prejudgment interest) was due to the Court. These motions were fully briefed as of February 9, 2026, and the Court heard argument on April 22, 2026.

## II.    LEGAL STANDARDS

### A.    Rule 50(b) Renewed Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) empowers a district court to grant judgment as a matter of law, sometimes called a judgment notwithstanding the verdict or JNOV, if the movant can show that the jury did not have a legally sufficient evidentiary basis to find for the non-

---

[6] The Court continued to be prepared, as it had been since the jury's September 17, 2025 verdict, to enter judgment the same day it granted the motion to substitute, but delayed entry by several more days to allow the parties additional time to confer regarding a potential settlement.

moving party. Such a ruling is warranted "when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). If there is substantial evidence to support the jury's verdict, the Court must deny the motion. *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994), *as amended* (Nov. 22, 1994).

The party moving for judgment as a matter of law bears a heavy burden. In analyzing a Rule 50(b) motion, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). The Court cannot weigh the evidence; it may only ask whether the nonmoving party has presented enough evidence to support the verdict. *Wallace*, 479 F.3d at 624.

### B.     Rule 59 Motion for New Trial

Federal Rule of Civil Procedure 59(a)(1) states, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1). As the Ninth Circuit has noted, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted . . . ." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Instead, the court is "bound by those grounds that have been historically recognized." *Id.* "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to

United States District Court
Northern District of California

15

prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

### C.  Motion to Amend and Correct Judgment

Rule 59(e) grants district courts the discretion to alter or amend a judgment.  "The history of Rule 59(e) shows that "alter or amend" means a *substantive* change of mind by the court." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 527 (9th Cir. 1983) (emphasis added).  "There are four grounds upon which a Rule 59(e) motion may be granted: (1) the motion is necessary to correct manifest errors of law or fact upon which the judgment is based; (2) the moving party presents newly discovered or previously unavailable evidence; (3) the motion is necessary to prevent manifest injustice; or (4) there is an intervening change in controlling law." *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (internal quotation marks and emphasis omitted) (quoting *McDowell v. Calderon*, 197 F.3d 1253, 1254 n.1 (9th Cir. 1999)).

Rule 60(a) allows a district court to correct clerical mistakes in the judgment.  The Ninth Circuit has on occasion "equated a request for an entry *nunc pro tunc* with a Rule 60(a) motion." *Miller*, 709 F.2d at 527.

## III.  ANALYSIS

### A.  Rule 50(b) Renewed Motion for Judgment as a Matter of Law

American's Rule 50(b) motion offers three grounds as to why the Court should reverse the jury verdict.  The Court takes each in turn.

#### 1.  There was substantial evidence supporting the jury's finding of an "accident" under Article 17 of the Montreal Convention.

As its first and primary argument, American claims, given the evidence elicited at trial, that no reasonable jury could have found that American's action (or inaction) constituted an "accident" under Article 17 of the Montreal Convention.  American insists that "an air carrier's inaction, in the absence of a specific health-based request, is not an 'accident' as a matter of law." ECF No. 239 at 1.  Because Plaintiffs did not make a specific health-based request, the argument goes, American is not liable to Plaintiffs as a matter of law.  But American is wrong: no case in

16

the Supreme Court or the Ninth Circuit has ever endorsed such a brightline rule. The cases American cites do not stand for that proposition and are distinguishable from the case at hand.

The Supreme Court first articulated the meaning of the term "accident" in Article 17 of the Warsaw Convention (the predecessor to the Montreal Convention) in *Air France v. Saks*, 470 U.S. 392 (1985). There, the Supreme Court held that a plaintiff must demonstrate three elements in order to transform an event into an "accident" under the Convention: plaintiff must show that the event was (1) "unexpected or unusual," (2) "external to the passenger," and (3) a "link" in a potentially larger chain of events that caused plaintiff's injury. *Id.* at 405.

Two decades later, the Supreme Court affirmed its holding in *Saks* and further outlined the contours of the term "accident." *Olympic Airways v. Husain*, 540 U.S. 644 (2004). According to American, "*Husain* holds that there can be an 'accident' where (1) a passenger is plainly having a medical emergency . . . ; and (2) [the] airline crew ignores medical advice that would have resulted in a better outcome for the passenger." ECF No. 239 at 12. Thus, if one assumes, as American does, that Mr. Plasencia did not have an obvious medical emergency, the only way for Plaintiffs to establish an "accident" occurred on Flight 68 was to show that American affirmatively ignored medical advice. Because Plaintiffs did not make such a showing, American argues there cannot have been an "accident" under the law.

American misunderstands the holding in *Husain*. In that case, a passenger with a history of anaphylactic reactions asked to be reseated away from the aircraft's smoking section. The crew refused the request, and the passenger died in an apparent reaction to the smoke in flight. Even though the conduct amounted to inaction, the Court concluded that it could nevertheless be an "event" because "[t]he rejection of an explicit request for assistance would be an 'event' or 'happening' under the ordinary and usual definitions of these terms." *Id*. at 655. In other words, *Husain* teaches that an airline crew's failure to heed medical advice **can** constitute an accident, but it never says that it is the **only** way (beyond an obvious medical emergency) that an airline's inaction can be an "accident." To insist otherwise creates a brightline rule untethered to *Saks* or *Husain*. In fact, *Saks* and *Husain* explicitly require courts to adopt a definition of "accident" that can "be flexibly applied after assessment of all the circumstances surrounding a passenger's

17

injuries." *Husain*, 540 U.S. at 651 (quoting *Saks*, 470 U.S. at 405). This is the very language the Court used in its jury instructions, and it is the proper standard.

But even assuming American accurately described the rule set forth in *Husain*, there was substantial evidence that Mr. Plasencia was "plainly having a medical emergency." For example, Ms. Tavantzis testified that 1.5 hours into Flight 68, Mr. Plasencia began to deteriorate; he began listing to one side and was unable to return to his seat from the lavatory without assistance. These symptoms may not be as obvious as the hypothetical emergency presented in *Husain*—a passenger who suddenly collapses and stops breathing—but FA Eccles witnessed these symptoms with the knowledge that pre-flight Mr. Plasencia had also dropped his phone, "blacked out," and "did not remember where he was." Tr. at 774:12-775:7. Further, the Supreme Court never held that the only circumstances that constitute a medical emergency tantamount to an "accident" are ones in which a passenger collapses and stops breathing. And regardless, it is the purview of the factfinder to weigh the evidence and decide whether Mr. Plasencia was "plainly having a medical emergency" at some point during the flight.

After arguing its misreading of *Husain*, American moves to Ninth Circuit cases analyzing Montreal Convention Article 17. *See Caman v. Cont'l Airlines, Inc.*, 455 F.3d 1087, 1092 (9th Cir. 2006) and *Twardowski v. Am. Airlines*, 535 F.3d 952, 960 (9th Cir. 2008). In the two cases American highlights, the supposed unusual or unexpected event was the airline's failure to heed governmental guidance and warn passengers of the risks of developing deep vein thrombosis ("DVT") during flight. *Caman*, 455 F.3d at 1091; *Twardowski*, 535 F.3d at 960. The Ninth Circuit found in both cases that neither airline acted unusually or unexpectedly by staying silent on the dangers of DVT. *See Twardowski*, 535 F.3d at 960 *(*"[A]n airline's failure to warn a passenger about DVT . . . does not become [an event] simply because public agencies have recommended, or 'requested,' warnings." (citing *Caman*, 455 F.3d at 1092)). Crucially, neither airline had internal policies or procedures mandating such warnings, and neither plaintiff demonstrated that industry practice required them. *Id.* at 961. Here, in contrast, Plaintiffs established that American deviated from its own internal policies governing medical emergencies and communication channels. It was this deviation by American that the jury reasonably could have concluded was unexpected and

18

unusual and thus constituted an "accident." Given this fundamental factual difference, *Caman* and *Twardowski* are inapposite.

American's remaining seven pages of argument on this issue are dedicated to out-of-circuit cases with distinguishable facts patterns. *See Blansett v. Cont'l Airlines, Inc.*, 379 F.3d 177, 181 (5th Cir. 2004) (failure-to-warn DVT case); *White v. Emirates Airlines, Inc.*, 493 F. App'x 526, 527 (5th Cir. 2012) (passenger collapsed while plane was in final descent). Of these cases, *Singh v. Caribbean Airlines Ltd.*, 49 F. Supp. 3d 1108, 1118 (S.D. Fla. 2014), *aff'd sub nom. Singh ex rel. Singh v. Caribbean Airlines Ltd.*, 798 F.3d 1355 (11th Cir. 2015) most resembles the instant action, but even that case differs in fundamental ways from the case at bar. In *Singh*, the evidence showed that "flight attendants followed in ***all but one respect*** the procedures contained in the [airline] Safety Manual and [airline] Operations Manual for responding to stroke symptoms in passengers." *Id.* (emphasis added). The court acknowledged that the crew may have acted imperfectly, but it also noted that the crew promptly attempted to solicit advice from medical professionals on the ground and on the plane. Here, there was substantial evidence presented at trial of American's repeated deviations from protocol, including the failure to consult a medical professional for many hours following the incident on the ground in Miami, even though—as the jury learned—there were several physicians on board the overseas flight who were ready and willing to assist Mr. Plasencia. The Court is not persuaded by *Singh*, nor will it overturn the jury's verdict on the basis of a single out-of-circuit case in a different posture (summary judgment) with distinguishable facts.

In sum, American asks the Court to find that American's conduct, considered in the light most favorable to Plaintiffs, was not sufficiently unusual or unexpected as to constitute an "accident." As the Court in *Saks* noted, "[i]n cases where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' as here defined caused the passenger's injury." *Id.* at 405. Plaintiffs provided substantial evidence that American's conduct—namely the flight crew's failure to communicate and properly identify the signs of Mr. Plasencia's stroke—were so unusual and unexpected as to be "accidents" under the Montreal Convention.

United States District Court
Northern District of California

**2.      There was substantial evidence supporting the jury's finding of proximate cause.**

American next claims that the testimony on tPA, which it argues both experts agreed was the only treatment for stroke, was insufficient to demonstrate American's causation.  American is merely repeating arguments it raised and lost in its *motion in limine* asking the Court to limit expert testimony as to the efficacy of tPA treatment.  Irrespective of the testimony on tPA, Plaintiffs' expert, Dr. Schim, testified "time is brain" when it comes to strokes and, "to a reasonable degree of medical probability," the delay in Mr. Plasencia's treatment was the direct and proximate cause of his profound deficiencies.  Trial Tr. at 480:1; 486:20–487:2.  Plaintiffs also elicited testimony from Captain Occhino who stated he would have acted differently had he been provided more information about Mr. Plascencia's condition, both before take-off and 1.5 hours into the flight.  Given the evidence presented at trial, the jury could have reasonably concluded that had Captain Occhino diverted the plane to Bermuda or returned to Miami, for example, Mr. Plasencia's time without medical care would have been significantly reduced.  Alone, these facts constitute substantial evidence that support the jury's finding of proximate cause, and its verdict in Plaintiffs' favor.

**3.      There was substantial evidence that American Airlines staff contributed to Mr. Plasencia's injury.**

Finally, American argues that it is entitled to complete exoneration of fault because Plaintiffs failed to affirmatively seek or request medical attention.  This argument fails for several reasons.  American does not provide any support—and it did not argue at trial—that it could not be liable unless Plaintiffs affirmatively asked for help.  Nor does American acknowledge that Ms. Tavantzis testified that she *did* ask for help, even if American disbelieves her or contends her request was somehow insufficient.  And finally, the Court notes that American raised a complete exoneration defense with the jury, and the jury rejected it, apportioning 72.5% of fault to American.

**B.      Motion for New Trial**

American also presents three grounds for its Rule 59 motion requesting a new trial. American argues that (1) Jury Instruction 29 did not accurately state the law and caused the jury to find for Plaintiffs when it otherwise would not have; (2) the verdict was against the clear weight of the evidence and resulted in a miscarriage of justice; and (3) the verdict was excessive under Rule 59(e) in light of Mr. Plasencia's passing.

**1.      Jury Instruction 29 did not misstate the law.**

American claims that Jury Instruction 29 did not fairly and adequately explain the law, even if it "did not affirmatively misstate the law." In particular, American takes issue with the Court's refusal to adopt American's proposed language to the instruction. As a consequence, American claims that "the definition of 'accident' favored plaintiffs because it was described as 'flexibly applied' without stating the obvious limitations identified by courts *in other circuits*, namely addressing the 'imperfect response' language request by American Airlines." ECF No. 243 at 12 (emphasis added). This position echoes the language used in American's oral objection to the instruction during pretrial. As counsel explained, American worried that the jury could "potentially think that any deviation from policy or procedure, industry standard can be an accident." ECF No. 211. And even though Instruction 29 used "may" instead of "must" when discussing whether a breach of policy or procedure can constitute an "accident," "American maintains that a mere mention of 'may' without explanation was insufficient because of the inclusion of 'flexibly applied' in light of the overall length of the instruction." ECF No. 243 at 12.

A jury instruction "is adequate if it enables the jury to determine the issue intelligently." *Brooks v. Cook*, 938 F.2d 1048, 1053 (9th Cir. 1991). A party "is not entitled to have the jury instructed in the particular language of [its] choice." *Id.* Indeed, "a court is not required to use the exact words proposed by a party, incorporate every proposition of law suggested by counsel or amplify an instruction if the instructions as given allowed the jury to determine intelligently the issues presented." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984); *see also Mathew Enterprise, Inc. v. Chrysler Group LLC*, 250 F. Supp. 3d 409, 422 (N.D. Cal. 2017) (finding that jury instruction offered accurate statement of the

United States District Court
Northern District of California

law "even if it did not provide all of the detail [the moving party] desired"); *Madrigal v. Allstate Ins. Co.*, 215 F. Supp. 3d 870, 911 (C.D. Cal. 2016) (rejecting defendant's argument that instruction was not specific enough and finding no error where instruction "was consistent with the law and the evidence in the present case").

Here, Instruction 29 accurately stated the law and enabled the jury to intelligently determine the issues before it. American does not grant the jury enough credit. A reasonable juror knows that the term "may" differs from "will" or "must" or "does." *See also* ECF No. 211 at 42:15-23 (emphasis added). ("The way that the instruction is currently written is that failure to follow airline policy or procedure may be an unexpected or unusual event or happening, not that it must be or it always is or that it is -- that it requires perfection."). The Court was not required to provide more granular guidance on what types of policy deviations may constitute an "accident," nor how serious the deviation must be. The Court exercised its "broad discretion" and drafted Instruction 29 after considering the law, the respective positions of the parties, and the substantially similar jury use instructions that were given to a jury in another trial in the Ninth Circuit. That exercise of discretion did not constitute error and does not justify a new trial.

And as Plaintiffs point out, even if the Court erred in failing to include Defendant's additional language in Instruction 29 (which American claims would have clarified that not *any* deviation from policy, procedure, or industry standard constitutes an accident) that error was harmless. This is because the remainder of the Instruction clearly articulated that for American to be liable under the Montreal Convention, Plaintiffs must prove by a preponderance of the evidence that (1) there was an "accident," meaning an unexpected or unusual event or happening; (2) that was external to Plaintiffs, and, (3) that the "accident" *caused* Jesus Plasencia's injuries. As discussed above, the jury heard substantial evidence from both fact and expert witnesses that American's repeated deviations from its own policies, procedures, and industry standards were unusual and unexpected, were external to Mr. Plascencia, and caused his injuries. This is sufficient evidence to demonstrate American's deviation from its policies, procedures, and industry standards was not just *any* deviation, but one that was "material."

22

**2.      The award did not contravene the clear weight of the evidence.**

According to American, "[b]ecause no unusual or unexpected event external to Mr. Plasencia occurred either before takeoff or 1.5 hours into the flight (the only two potential 'accidents' identified by Plaintiffs), there was no 'accident' under Article 17."  ECF No. 255 at 2. The Court has thoroughly addressed this issue above.  For example, the Court noted that the jury heard testimony from Ms. Lord-Jones, herself a former American purser and expert in cabin safety.  She testified that American's conduct *was* unusual and unexpected during boarding and 1.5 hours into the flight.  A reasonable jury could find that this conduct substantially deviated from the policies and procedures set forth in American's Inflight Manual and served as a link in the chain that led to Mr. Plasencia's injury.

**3.      The Court will not strike the future damages award.**

American again argues, as it has done in all of its briefing since Mr. Plasencia's passing, that allowing the verdict to go forward would constitute a miscarriage of justice.  As the Court has already addressed these arguments in a prior Order, it provides that reasoning below:

> [American] does not provide a single case where a trial court vacated a final jury verdict solely on the basis of the prevailing party's death before judgment. In contrast, Plaintiff provides cases going the opposite way. *See Cadlo v. Metalclad Insulation Corp.*, 151 Cal. App. 4th 1311, 1323 (2007) (vacating judgment entered after plaintiff's death and entering identical judgment *nunc pro tunc* to a date preceding death); *Boyd v. Bulala*, 672 F. Supp. 915, 922 (W.D. Va. 1987). The Court sees no reason to disturb the rule set forth in the American Jurisprudence (Second) treatise:
>
> > Where a verdict has been rendered before the plaintiff's death but not a judgment, the action may still survive. **There is no abatement upon the prejudgment death of a party to a nonsurviving action if the litigation is ripe for judgment**; what is significant is not any metaphysical notion of merger of the cause of action into the verdict but rather the circumstance that all effectual questions have been resolved before the party died, and **a case may become ripe for judgment following the return of a verdict**.
>
> 1 Am. Jur. 2d Abatement, Survival, and Revival § 58 (emphasis added).

ECF No. 236.

Regardless, because the Court grants Plaintiffs' request to enter judgment *nunc pro tunc*, *see infra*, American's argument is even less compelling. Courts that have considered cases where judgment has already been entered (as the *nunc pro tunc* entry of judgment makes so) have uniformly rejected these arguments, calling the position that American now takes "nearly frivolous." *Davis by Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 134 (6th Cir. 1990). A plaintiff's death cannot be grounds to disturb judgment, because to so hold would be "to invite a morass of appeals from defendants in cases where the plaintiffs did not survive an 'acceptable' amount of time following the entry of final judgment." *Id.* at 135. The Court is not aware of any case that has vacated a jury verdict on this basis, and it does not do so now.

### C.    Motion to Amend and Correct the Judgment

Plaintiffs' motion makes two requests: first, that the Court enter judgment *nunc pro tunc* to the date the issue of prejudgment interest was fully briefed and submitted to the Court, *i.e.*, October 10, 2025; and second, that the Court grant Plaintiffs prejudgment interest from the date of the accident through the date of judgment.

### 1.    Issuing Judgment *Nunc Pro Tunc*

The term *nunc pro tunc* "describes [the] inherent power of court to make its records speak the truth . . . . *Nunc pro tunc* signifies now for then, or in other words, a thing is done now, which shall have same legal force and effect as if done at time when it ought to have been done." *United States v. Allen*, 153 F.3d 1037, 1044 (9th Cir. 1998), *quoting Nunc Pro Tunc*, Black's Law Dictionary (5th ed. 1979). The Supreme Court first set out the contours of a district court's *nunc pro tunc* powers in *Mitchell v. Overman*, 103 U.S. 62, 64-65 (1880). There, the Court explained:

> the rule established by the general concurrence of the American and English courts is, that where the delay in rendering a judgment or a decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment or the decree may be entered retrospectively, as of a time when it should or might have been entered up. In such cases, . . . it is the duty of the court to see that the parties shall not suffer by the delay. A *nunc pro tunc* order should be granted or refused, as justice may require in view of the circumstances of the particular case.

*Id.* To be sure, a court may not use the *nunc pro tunc* power to "creat[e] 'facts' that never occurred." *Roman Cath. Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 589 U.S. 57, 65 (2020). Instead, its use should be limited to "making the record reflect what the district court actually intended to do at an earlier date, but which it did not sufficiently express or did not accomplish due to some error or inadvertence." *United States v. Sumner*, 226 F.3d 1005, 1010 (9th Cir. 2000) (emphasis added).

The Court has been unable to identify any cases in the Ninth Circuit that address a court's *nunc pro tunc* powers in the period of time between jury verdict and judgment. The Federal Circuit, however, has spoken directly on this issue:

> The Supreme Court has consistently entered judgment *nunc pro tunc* "[w]here a party dies after his case is submitted, but before the opinion issues, and the case would otherwise be rendered moot." *Padgett v. Nicholson*, 473 F.3d 1364, 1367 (Fed. Cir. 2007) (collecting cases). Indeed, the death of a party following submission but prior to judgment is the "paradigm case" for retroactively entering judgment on a nunc pro tunc basis. *Id.* (quoting *Weil v. Markowitz*, 898 F.2d 198, 201 (D.C. Cir. 1990)).

*Reyes v. Wilkie*, 780 F. App'x 923, 924 (Fed. Cir. 2019). And a court in Mississippi has in fact considered a case much like this one where the plaintiff passed following a bench trial but before the court issued its opinion. *See West v. United States*, No. CIVA307CV581TSLJCS, 2009 WL 2169852, at *5 (S.D. Miss. July 20, 2009). There, the court exercised its power to issue the order it had always intended to issue *nunc pro tunc*.

Considering the authorities cited above and this Court's actual and clear intention to enter judgment immediately following the verdict, the Court grants Plaintiffs' request to issue judgment *nunc pro tunc* to October 10, 2025.

The record reflects that the Court *intended* to promptly enter judgment right after trial ended.[7] As set forth in detail above, the Court conferred with the parties, and American agreed, that the verdict entitled Plaintiffs to $9,629,829.55 in damages. This colloquy occurred on September 17, 2025, approximately 30 minutes after the jury rendered its verdict and the Court

---

[7] *See* F.R.C.P Rule 58(b)(2) ("the court must promptly approve the form of the judgment" for a special verdict).

25

thanked and released them.  Tr. 1475:11-1478:7.  The Court then directed Plaintiffs to file a motion reflecting that amount on the following day.  As the Court observed, "there [was] really nothing else for the court to do" but to promptly enter judgment.  Trial Tr. at 1477:13-15.  And where there is "nothing for the court to do but execute the judgment," there is no excuse for the court not to do so.  *Klestadt & Winters, LLP v. Cangelosi*, 672 F.3d 809, 813 (9th Cir. 2012) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)).  Federal Rule of Civil Procedure 58 requires as much, directing courts to "promptly approve the form of the judgment, which the clerk must promptly enter, when . . . the jury returns a special verdict."  Fed. R. Civ. P. 58(b)(2)(A).

Once Plaintiffs filed the judgment on Friday, September 19, the Court allowed for 6-Court days to pass to ensure there was no unexpected objection to what it viewed as an administrative motion, and then promptly, albeit erroneously, entered judgment on September 30.  The Court vacated the judgment after realizing the parties had a dispute regarding prejudgment interest.

Upon receipt of American's opposition a few days later, however, there was not—and indeed, there has *never* been—a dispute that the jury awarded Plaintiffs $9,629,829.55 in damages.  The *sole issue* the parties briefed and the Court set for argument was whether Plaintiffs were entitled to prejudgment interest *on top of* the verdict amount; there was no dispute that Plaintiffs were entitled to judgment on American's allocated share of the verdict, which the parties agreed was $9,629,829.55.  In fact, in the last line of its October 3, 2025 opposition brief on the issue of prejudgment interest, American's position was crystal clear.  It told the Court, "American Airlines, Inc. respectfully requests that the Court deny Plaintiffs' Motion insofar as it seeks prejudgment interest, and **enter judgment in the amount of the verdict returned by the jury, only**."  ECF No. 215 (emphasis added).

But the Court, focused on the many other matters before it, and the disputed issue of prejudgment interest in this case, failed to do what Rule 58 requires, which was promptly enter judgment for the Plaintiffs in the amount of $9,629,829.55.  Not doing so was a result of the

United States District Court
Northern District of California

26

Court's own delay and inadvertence. Accordingly, the Court will correct the judgment date to October 10, 2025.[8]

### 2. Prejudgment Interest Under the Montreal Convention

The Court turns next to the issue of prejudgment interest.

#### a. The Montreal Convention permits recovery of prejudgment interest.

Plaintiffs argue that the text of Article 22(6) of the Montreal Convention allows a district court to award, "in accordance with its own law . . . court costs and . . . other expenses of the litigation incurred by the plaintiff, including interest." Montreal Convention art. 22(6). American asks the Court to ignore the plain language of this provision because it contravenes several cases analyzing the Warsaw Convention, the predecessor treaty to the Montreal Convention. American rightly points out that courts routinely rely on Warsaw Convention precedent when analyzing Montreal Convention provisions, but that is only "where the equivalent provision in the Montreal Convention is substantively the same." *Narayanan v. Brit. Airways*, 747 F.3d 1125, 1127 n.2 (9th Cir. 2014) (citing *Phifer v. Icelandair*, 652 F.3d 1222, 1224 n.1 (9th Cir. 2011)). Critically, the Warsaw Convention is silent as to the issue of costs, expenses, and interest where the Montreal Convention is not. For that reason alone, the Court has discretion to grant prejudgment interest.

But even if the Court were to assume Article 22(6) was inapplicable, the Ninth Circuit has permitted prejudgment interest under the Warsaw Convention. *See Motorola, Inc. v. Fed. Exp. Corp.*, 308 F.3d 995 (9th Cir. 2002) (finding "the award of prejudgment interest [to be] consistent with the purposes of the Warsaw Convention."). It is therefore of no relevance that other circuits

---

[8] Much of the parties' briefing is devoted to argument addressing whether California Civil Procedure Code § 377.34 bars Plaintiffs from recovering the portion of their award granting future damages. Had the December 22, 2025 judgment stood, it is American's position that Plaintiffs' future damages are capped by California Civil Procedure Code § 377.34, which bars a plaintiff in a survivor action from collecting damages for future costs. *See* ECF No. 247; *see also Kellogg v. Asbestos Corp. Ltd*, 41 Cal. App. 4th 1397 (1996) (vacating judgment for future damages where plaintiff died after verdict but before judgment); *see also Cadlo v. Metalclad*, 151 Cal. App. 4th 1311 (2007) (agreeing with *Kellogg*). Because the Court issues judgment *nunc pro tunc*, the judgment operates as though it was entered on October 10, 2025; Mr. Plasencia was still alive on that date, so § 377.34 would not have triggered. Consequently, the Court does not make any determination as to whether § 377.34 would limit damages under the Montreal Convention.

have come out differently when considering the Warsaw Convention.  It is likewise immaterial that American finds the reasoning within *Motorola* unpersuasive; this Court is bound by the decision regardless.  *Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) ("District courts are, of course, bound by the law of their own circuit, and are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be." (internal quotation marks omitted)).

### b.      California law applies when calculating prejudgment interest under the Montreal Convention.

Though the Court has determined that the Montreal Convention itself does not bar the Court from granting prejudgment interest, the Court must also determine (1) whether federal or California law governs the measure of recovery and (2) whether that governing law permits the imposition of prejudgment interest.  According to Plaintiffs, federal law governs damages; American, contends that it is California law that applies.  Though there are no circuit cases that address the issue of prejudgment in the context of the Montreal Convention, there are circuit court cases that more generally consider whether state or federal law governs substantive damages issues in Montreal Convention actions.  *See, e.g.*, *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017).

*Doe v. Etihad Airways*, though not directly on point, is instructive.  There, as here, the plaintiff brought a personal injury under Article 17 of the Montreal Convention.  In deciding whether Michigan or federal law applied, the Sixth Circuit began by looking to the text of the treaty itself and explained:

> Article 29 of the Montreal Convention clarifies that actions under Article 17(1), such as Plaintiffs' action, are brought "without prejudice to the question[] as to who are the persons who have the right to bring suit and *what are their respective rights*."  Montreal Convention art. 29 (emphasis added).  As we discussed [above], the United States Supreme Court has held that the effect of the parallel provision in the Warsaw Convention (Article 24) is to leave to the domestic law of the contracting parties the determination of how a successful plaintiff's damages are measured.  *See Zicherman* [*v. Korean Air,* 516 U.S. 217, 224-26 (1996)].  Lower courts have consistently applied *Zicherman* to hold that the measure of damages is to be fixed according to whatever law (i.e., according to whatever choice-of-law rules) would apply in a domestic-law case, and

28

*Zicherman* is one of the Warsaw Convention "precedents" that guides our interpretation of the Montreal Convention.

*Id.*; *see also Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12-13 (2d Cir. 1996) ("[B]ecause the Warsaw Convention functions as a 'pass-through, authorizing us to apply the law that would govern in [the] absence of the Warsaw Convention,' [*Zicherman*, 516 U.S. at 229], we believe that application of the forum state's choice of law principles rather than the federal common law rule better effectuates the Convention's overall intent."); *In re Air Crash at Taipei, Taiwan, on October 31, 2000*, 219 F.Supp.2d 1069, 1069 (C.D. Cal. 2002) (finding in Warsaw Convention action that "local law provides the substantive rule regarding the recovery of compensatory damages.").

In the absence of binding precedent from the Ninth Circuit, the Court finds the analysis in the above referenced cases persuasive and opts to apply California law on issues of damages.

### c. California law forecloses any award of prejudgment interest in the instant action.

"Under California law, prejudgment interest is recoverable in any action in which damages are "certain, or capable of being made certain by calculation" and the "right to recover . . . is vested in the [plaintiff] upon a particular day." Cal. Civ. Code § 3287(a). The test for determining certainty under § 3287(a) is whether "defendant actually knows the amount owed or from reasonably available information could . . . have computed that amount." *Roodenburg v. Pavestone Co., L.P.*, 171 Cal. App. 4th 185, 190 (2009) (quoting *Cassinos v. Union Oil Co.*, 14 Cal. App. 4th 1770, 1789 (1993)). Crucially, "where the amount of damages cannot be resolved except by verdict or judgment, section 3287(a) prejudgment interest is not appropriate." *Id.* (citing *Wisper Corp. v. Cal. Commerce Bank,* 49 Cal. App. 4th 948, 960-61 (1996) (prejudgment interest not awardable on bank's liability for customer damages because portion of damages attributable to bank's negligence not subject to calculation until after trial and determination of relative fault)). 4th 948, 960-61 (1996) (prejudgment interest not awardable on bank's liability for customer damages because portion of damages attributable to bank's negligence not subject to calculation until after trial and determination of relative fault)).

Plaintiffs are not entitled to prejudgment interest on any portion of their damages. As in

29

*Wisper*, "[a]lthough the universe of [Plaintiffs'] damage was calculable . . . the question of whether and to what extent [Defendant] had any liability for [Plaintiffs'] loss was hotly disputed." 49 Cal. App .4th at 961.  Given the "disparity between that which was sought and that which was ultimately found appropriate," American could not have calculated the amount of damages until the jury both assessed those damages and determined the parties relative shares of responsibility. *Id.*  And while the *Wisper* court left open the possibility of prejudgment interest in circumstances where a plaintiff "recovers virtually all of the claimed damages, except for a minor percentage based on his or her comparative fault," Plaintiffs cannot avail themselves of this exception.  *Id.* at 962.  The jury found Plaintiffs 27.5% at fault for the total damages, diminishing Plaintiffs' return by more than a $2.5 million.

The Court DENIES Plaintiffs' request for prejudgment interest.

## IV.   CONCLUSION

The Court DENIES Defendant's motion for judgment as a matter of law, DENIES Defendant's motion for a new trial, and GRANTS IN PART AND DENIES IN PART Plaintiffs' motion to amend.  Specifically, the Court enters judgment in the amount of the verdict on October 10, 2025, but denies all other relief requested by Plaintiffs.

**IT IS SO ORDERED.**

Dated: May 28, 2026

_____
Noël Wise
United States District Judge